UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE 1732 Wisconsin Avenue, NW Washington, DC  20007 )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY Washington, D.C. 20528 )<br><br>IMMIGRATION AND CUSTOMS ENFORCEMENT 425 I Street, NW Washington, D.C. 20536 )<br><br>Defendants. ) | Civil Action No.: |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**Nature of Action**

1.     This action seeks to vindicate the public's fundamental right to know whether the government is telling them the truth about how it has been conducting law enforcement in the post-9/11 era.  In particular, this lawsuit under Freedom of Information Act ("FOIA"), 5 U.S.C. §§ 552 *et seq.*, seeks data that would either validate or dispel the widespread perception that Defendants Department of Homeland Security ("DHS") and Immigration and Customs Enforcement ("ICE") have been misusing information from the National Security Entry/Exit Registration System ("NSEERS") to impermissibly target, or "profile," Arab-Americans and Muslims for general law enforcement purposes, in direct contravention of NSEERS's stated purpose and despite Defendants' repeated public representations to the contrary.  To that end, this suit demands the immediate disclosure of government records concerning the national origin, ethnicity, race, religion, and gender of the more than 230 individuals detained by the government in connection with a law enforcement operation known as the "October Plan."

2.      FOIA requires all federal agencies, including Defendants, to make agency information available to the public upon request, unless such information is specifically exempted under one or more of the exceptions set forth in 5 U.S.C. § 552(b). Any person denied access to requested information, like Plaintiff American-Arab Anti-Discrimination Committee ("ADC"), may file a complaint in this Court, and this Court has jurisdiction both to enjoin the agency from withholding such information and to order its immediate production. This Court reviews the agency's denial of access to agency information *de novo*, and may examine the contents of requested agency records *in camera* to determine whether such records, or any part thereof, may be withheld under a § 552(b) exemption.

3.      To be clear: the present action does not attempt to subvert or in anyway undermine the October Plan and any related pending or potential future investigations. It merely seeks generalized data for which no exception to FOIA's broad disclosure requirements applies and whose public import is manifest.

**Jurisdiction and Venue**

4.      This Court has subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. § 552(a)(4)(B) and 552(a)(6)(E)(iii), respectively. Venue lies in this district under 5 U.S.C. § 552(a)(4)(B).

**Parties**

5.      Plaintiff American-Arab Anti-Discrimination Committee is a nonprofit, civil rights organization, committed to defending the rights of, and addressing discrimination and bias against, Americans of Arab descent. ADC is non-partisan and non-sectarian. ADC is the largest Arab-American grassroots civil rights organization in the United States, with members in all 50 states, chapters nationwide, staff offices in Boston, MA, Dearborn, MI, Los Angeles, CA, New York, NY, San Francisco, CA, and San Diego, CA, and national headquarters in Washington, DC. ADC was founded in 1980 by former United States Senator James Abourezk. Former United States Congresswoman Mary Rose Oakar is currently ADC President. ADC submitted the FOIA requests, denied by Defendants DHS and ICE that are the subject of this action.

6.      Defendant Department of Homeland Security is an agency of the United States. It has possession of, and control over, the information sought by Plaintiff ADC under FOIA, and it has withheld said information from Plaintiff ADC.

7.      Defendant Immigration and Customs Enforcement is an agency of the United States within the Department of Homeland Security. It has possession of, and control over, the information sought by Plaintiff ADC under FOIA, and has withheld said information from Plaintiff ADC.

## The National Security Entry/Exit Registration System ("NSEERS")

8.      On June 6, 2002, then-Attorney General John Ashcroft proposed the creation of a new federal program to be known as the National Security Entry-Exit Registration System ("NSEERS"). *See* Attorney General Prepared Remarks on the National Security Entry-Exit Registration System, June 6, 2002, at http://www.usdoj.gov/archive/ag/speeches/2002/060502agpreparedremarks.htm; *see also* Registration and Monitoring of Certain Nonimmigrants, 67 Fed. Reg. 40581 (proposed rule June 12, 2002). As finally constituted, NSEERS required nationals of certain countries, as designated by the Attorney General, to submit to fingerprinting and photography upon entry into the United States, to register periodically with the Immigration and Naturalization Service ("INS"), and to comply with certain exit controls when they departed the country. Registration and Monitoring of Certain Nonimmigrants, 67 Fed. Reg. 52,584, 52,591-93 (final rule Aug. 12, 2002) (amending 8 CFR § 264.1(f)). That aspect of NSEERS was called "Special Registration." *See id.*

9.      Despite widespread concerns that the government would use information obtained through the NSEERS Special Registration program to discriminatorily target "specific minority ethnic groups and members of a specific religion, *i.e.*, Arabs and Muslims," *id.* at 52585, the Department of Justice announced that it "remains firmly committed to protecting the civil rights of all individuals in the United States while seeking to prevent acts of terrorism. The Department unequivocally rejects the notion that the requirements of the final rule, or the criteria for application of the final rule, to nonimmigrant aliens subject to special registration are, or are intended to be, invidiously discriminatory." *Id.*

10.    Despite those pronouncements, Attorney General Ashcroft eventually required male nationals from just 25 countries—24 of which are predominantly Muslim (the other being North Korea)—to appear at INS offices for questioning, fingerprinting, and photographing. *See* Registration of Certain Nonimmigrant Aliens from Designated Countries, 67 Fed. Reg. 67,766, 67,766 (Nov. 6, 2002) (Iran, Iraq, Libya, Sudan, and Syria); Registration of Certain Nonimmigrant Aliens from Designated Countries, 67 Fed. Reg. 70,526, 70,526 (Nov. 22, 2002) (Afghanistan, Algeria, Bahrain, Eritrea, Lebanon, Morocco, North Korea, Oman, Qatar, Somalia, Tunisia, United Arab Emirates, and Yemen); Registration of Certain Nonimmigrant Aliens from Designated Countries, 67 Fed. Reg. 77,642, 77,643 (Dec. 18, 2002) (Pakistan and Saudi Arabia); Registration of Certain Nonimmigrant Aliens from Designated Countries, 68 Fed. Reg. 2363, 2364 (Jan. 16, 2003) (Bangladesh, Egypt, Indonesia, Jordan, and Kuwait).

11.    Within weeks, the government detained more than 1100 people as a result of NSEERS. *See* Kris Kobach, Counsel to the Attorney General, Department of Justice, Foreign Press Center Briefing (Jan. 17, 2003), at http://fpc.state.gov/fpc/16739.htm.

### The "October Plan" for Interrogations, Surveillance, and Detentions Prior to the 2004 Presidential Election

12.    On September 17, 2004, CBS News reported that the Federal Bureau of Investigation ("FBI") had sent an internal e-mail advisory to supervisory agents detailing "a massive counter-offensive of interrogations, surveillance and possible detentions" that was designed to "disrupt [any] terrorist plans" targeting the presidential election. *See* CBS News, "FBI's Anti-Terror 'October Plan,'" Sept. 17, 2004, at http://www.cbsnews.com/stories/2004/09/17/eveningnews/printable644096.shtml (attached as Ex. 1). CBS News reported that, according to the FBI's e-mail advisory, "'extraordinary measures' ... will go into place 'beginning the first week of October through the elections.'" *Id.*

> Specifically, the [October] plan calls for "aggressive—even obvious—surveillance" techniques to be used on a short list of people suspected of being terrorist sympathizers, *but who have not committed a crime.* Other "persons of interest," *including their family members,* may also be brought in for questioning....

*Id.* (emphasis added).  CBS News also reported that the FBI "expect[ed] to be criticized for the strategy if it goes too far," and noted that "some officials fear[ed] … a wave of protests from Arab-Americans and civil libertarians." *Id.*

13.    On September 30, 2004, DHS and ICE (the "largest investigative arm of the Department of Homeland Security"), referred to the October Plan in a press release titled "Terrorist Threat and Disruption Efforts by ICE." *See* Ex. 2.  The press release reported that "ICE has been working for the past several months at a heightened level in direct support of the government-wide Interagency Security Plan that will remain in effect through the 2005 Presidential Inauguration." *Id.*  The press release further asserted that "[t]his initiative builds upon ICE's continued efforts to target immigration status violators in America—*without regard to race, ethnicity or religion*," and claimed that ICE "is *not* conducting a 'round-up' or a 'sweep' in any community," "is *not* profiling based on race or religious affiliation," and, "is *not* instituting a blanket detention policy." *Id.* (emphasis added).  Despite those disclaimers, the press release acknowledged that "ICE's Compliance Enforcement Unit routinely researches and assigns immigration status violator leads to ICE field office nationwide based on data from … the National Security Entry/Exit Registration System (NSEERS)." *Id.*

14.    That same day, ADC issued a press release stating that "officials from the Department of Homeland Security (DHS) and ICE" had responded to ADC's concerns about the October Plan by "stress[ing] their commitment to continuing to build their working relationship with the Arab and Muslim American communities." *See* ADC, Press Release, "ICE Responds to ADC's Concerns," Sept. 30, 2004 (attached as Ex. 3).  ADC's press release further indicated that government officials had "*emphasized that their initiative is not based on racial profiling*." *Id.* (emphasis added).  Nonetheless, ADC's press release expressed its concern that the government might use NSEERS to select targets for October Plan surveillance, and that NSEERS-based "national origin profiling" might cause "the ICE initiative [to] be selectively carried out against Arabs and Muslims." *Id.*

15.    On November 4, 2004, DHS and ICE issued a press release titled "ICE Threat Disruption Effort Results in More Than 230 Arrests—More Than 900 Investigations Completed." *See* Ex. 4.  That

press release reported that "in a one-month period beginning October 1, 2004, ICE has arrested 237

immigration status violators nationwide as part of the government-wide Interagency Security Plan that

will remain in effect through the 2005 Presidential Inauguration." *Id*. The press release further asserted

that "leads ha[d] been sent to ICE field offices for immediate investigation and potential arrests—*without*

*regard to race, ethnicity, or religion*." *Id*. (emphasis added). In contrast to the September 30 press

release, ICE omitted any mention of its reliance on NSEERS. *Id*.

16.     Notably, the November 4, 2004 press release *disclosed the nationalities of eight of the*

*detainees*, four of whom were from Arab or Muslim countries, including a Saudi national, Jordanian

national, Lebanese national, and Pakistani national. *See id*.

**ADC's FOIA Request for Nationality Data on Persons Detained under the "October Plan"**

17.     By letter dated December 14, 2004, ADC requested that DHS release "data on nationality

of those 230 individuals detained" in connection with the enforcement efforts described in DHS's

November 4, 2004 press release ("the October Plan detainees"). *See* ADC FOIA Request, Dec. 14, 2004

(attached as Ex. 5). ADC's President, former Congresswoman Mary Rose Oakar, reiterated ADC's

concern that reliance on NSEERS data might result in selective enforcement of the October Plan against

Arab-Americans and Muslims. *Id*. ADC explained that "[i]n order to alleviate these concerns, which

have since been echoed by numerous members of the Arab-American and Muslim communities, it is our

sincere hope that ICE will release the nationality breakdown of those arrested in order to assure the Arab-

American and Muslim communities, along with the rest of our nation, that immigration enforcement is

not resulting in a disproportionate impact on individuals from Arab or Muslim countries." *Id*.

18.     On February 14, 2005, DHS denied ADC's request for data on the nationalities of the

October Plan detainees—notwithstanding the fact that DHS and ICE had voluntarily disclosed some of that

very information in its November 4, 2004 press release. In marked contrast to its prior conduct, DHS

purported to base its denial of ADC's FOIA request on the ground that the requested data is exempt from

disclosure under 5 U.S.C. § 522(b)(7)(A), which commonly is known as the "law enforcement exemption."

19.    By letter dated March 3, 2005, ADC appealed DHS's denial of ADC's FOIA Request. *See* ADC FOIA Appeal, Mar. 3, 2005 (attached as Ex. 6). ADC explained that mere information on the October Plan detainees' nationalities could not possibly interfere with potential law enforcement proceedings: "To be clear our request did not seek, and is not seeking, the names or individual private information of any kind on the detainees, nor did we attempt to gain information of a particularized nature with respect to the investigation." *Id*.

20.    On September 5, 2005, DHS denied ADC's appeal—again, notwithstanding the fact that DHA's November 4, 2004 press release had voluntarily disclosed some of the very information ADC sought in its FOIA request. *See* DHS Denial of ADC FOIA Appeal, Sept. 5, 2005 (attached as Ex. 7); *see also* Ex. 4. In addition to asserting that the requested nationality data were exempt from disclosure under the law enforcement exception, *see id*. (citing 5 U.S.C. § 522(b)(7)(A)), DHS further asserted that the data ADC sought were exempted from disclosure by 5 U.S.C. § 552(b)(7)(E), which covers information that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

21.    Given that ADC's FOIA request merely sought generalized data on the nationalities of the October Plan detainees, DHS's assertion that the release of such data "would disclose techniques and procedures for law enforcement" all but conceded that Defendants have been, and presumably still are, engaged in national origin profiling.

### ADC's FOIA Request for Race, Ethnicity, Religion, and Gender Data on Persons Detained under the October Plan

22.    On February 8, 2006, ADC filed a second FOIA request with ICE. That request sought generalized data on the race, ethnicity, religion, and gender of the October Plan detainees, and was intended to assure Arab-Americans and Muslims that their communities were not being selectively targeted and that Defendants were not engaged in racial, ethnic, or religious profiling. *See* Ex. 8.

23.    ADC reiterated that it was not seeking particularized information about any individual October Plan detainee, such as their name, other personal information, the particular allegations and/or

charges of wrongdoing levied against them, or the date and location of their arrest. As a result, there was no reasonable possibility that disclosure of the requested data could interfere with ongoing law enforcement proceedings, nor that such information would disclose any of the techniques, procedures, or guidelines used for law enforcement investigations and/or prosecutions—unless, of course, the government was using racial, ethnic, or religious profiling as an investigatory or prosecutorial tactic. Instead, the information sought was (and remains) crucial to determining whether the government is discharging its law enforcement duties uniformly and neutrally, without regard to race, ethnicity, gender, or religious affiliation.

24.    As of the date of the filing of this complaint, despite inquiries from ADC regarding the status of its request, and in gross disregard of the statutory twenty-day response time, 5 U.S.C. § 552(a)(6)(A)(i), ICE has neither responded to ADC or its counsel, nor identified any "unusual circumstances" that might warrant an extension, nor given any indication of the "date on which a determination is expected to be dispatched." 5 U.S.C. § 552(a)(6)(B)(i). ADC's February 8, 2006 FOIA request is thus ripe for judicial adjudication. 5 U.S.C. § 552(a)(6)(C).

### The Denial Of ADC's FOIA Request By DHS And ICE Is Unlawful

25.    FOIA "mandates a 'strong presumption in favor of disclosure.'" *Nat'l Ass'n of Homebuilders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2003) (quoting *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)). Indeed, "FOIA reflects a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *Id*. Thus, "[u]nlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'" *Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 754 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)).

### *Exemption 7(A) Is Inapplicable*

26.    Exemption 7(A) authorizes the withholding of "records or information compiled for law enforcement purposes, *but only to the extent that production of such law enforcement records or*

*information ... could reasonably be expected to interfere with enforcement proceedings.*"  5 U.S.C. § 552(b)(7)(A).  The exemption is not meant to "endlessly protect material simply because it was in an investigatory file." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224 (1978).

27.     FOIA obligates the government to demonstrate "with specificity a logical connection between the information held and identified investigations." *City of Chicago v. U.S. Dep't of the Treasury*, 287 F.3d 628, 633 (7th Cir. 2002); *see also Am. Friends Serv. Comm. v. Dept. of Defense*, 831 F.2d 441, 444 (3d Cir. 1987).  To establish that disclosure would interfere with open or prospective proceedings, the agency must show that disclosure of the requested materials would "hinder an agency's ability to control its investigation, enable suspects to elude detection and intimidate witnesses, or prematurely reveal evidence or strategy." *City of Chicago*, 287 F.3d at 634.

28.     The national origin information sought by ADC cannot possibly satisfy this rigorous test. ADC merely sought generalized data on the demographic characteristics of the October Plan detainees as a group.  It did not request the names of, or any other identifying information regarding, the October Plan detainees, and did not seek any information regarding the DHS employees that were involved in, or any law enforcement techniques, sources, or procedures used by DHS in connection with, the October Plan detentions.  Put simply, the information ADC requested—data on the nationalities of a specific population of detainees—is of such a generalized and innocuous nature that its release cannot reasonably be expected to interfere with ongoing or prospective enforcement proceedings.  Nor can the disclosure of the race, ethnicity, religion, and sex of those detainees.  To the contrary, and to reiterate, while such data would reveal whether or not the government is discharging its law enforcement duties uniformly and neutrally, as it must, or instead is engaged in racial, religious, ethnic, gender-based, or national origin profiling, it cannot possibly interfere with a past, present, or future law enforcement proceeding.

### *Exemption 7(E) Is Inapplicable*

29.     Exemption 7(E) authorizes the withholding of law enforcement information that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose

guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

30.     The agency withholding information pursuant to Exemption 7(E) must establish that releasing the information sought would "be expected to risk circumvention of the law." *See PHE, Inc. v. U.S. Dep't of Justice*, 983 F.2d 248 (D.C. Cir. 1993).

31.     By itself and without more, mere disclosure of the nationalities of the October Plan detainees cannot possibly interfere with an investigation or facilitate a target's circumvention of the law in any of the ways contemplated by Exemption (7) or recognized by any court.  So too with information regarding the race, ethnicity, religion, and sex of the October Plan detainees.

32.     Indeed, the only way that revealing the nationality, race, ethnicity, religion, or sex of the October Plan detainees could possibly disclose a law enforcement technique or procedure is if DHS and ICE are making law enforcement determinations *based on nationality, race, ethnicity, religion, or sex— that is, if DHS and ICE are engaged in the very sort of profiling they have repeatedly disclaimed.*

### The Court Should Grant ADC The Relief Sought

33.     ADC has a statutory right to the national origin data that it has requested under FOIA, and there is no legal basis for the Department of Homeland Security's refusal to disclose this information.

34.     ADC has a statutory right to the ethnicity, race, religion, and gender data it has requested under FOIA.  The Department of Homeland Security's failure to provide a response is in violation of Congressional mandate. 5 U.S.C. § 552 (a)(6)(A)(ii).

35.     The public's fear that our government has engaged in discriminatory profiling since 9/11—be it national origin-related, ethnic, racial, religious, or gender-based—has caused the Department of Homeland Security to repeatedly offer public assurances that it does not engage in such profiling. *See, e.g.*, Sept. 30, 2004 Press Release, Ex. 2 (stating that "ICE's continued efforts to target immigration status violators in America [are] *without regard to race, ethnicity or religion*," and that ICE "is *not* profiling based on race or religious affiliation") (emphasis added); Nov. 4, 2004 Press Release, Ex. 4 (stating that

"leads ha[d] been sent to ICE field offices for immediate investigation and potential arrests—*without regard to race, ethnicity, or religion*") (emphasis added).

36.    The government's own justifications for refusing to disclose the generalized data ADC requested cast serious doubt on the government's assertions that it is not, and has not been, engaged in profiling. Indeed, those justifications—including the remarkable claim that releasing such generalized data would reveal a law enforcement technique—all but confirm that that is precisely what the government has been doing.

37.    FOIA entitles ADC to the requested information precisely because the "relevant public interest in the FOIA balancing analysis is the extent to which disclosure of the information would shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to." *Lepelletier v. FDIC*, 164 F.3d 37, 46 (D.C. Cir. 1999) (citing *Dep't of Defense v. Fed. Labor Relations Auth.*, 510 U.S. 487, 497 (1994) (quotations and alterations omitted)). Here, the information sought is indispensable to determining whether DHS and ICE are engaged in profiling and, thus, to assessing whether or not the government has been honest with the American public.

WHEREFORE, Plaintiff ADC prays that this Court:

(1)    Declare that Defendants refusal to disclose the information requested by Plaintiff ADC is unlawful;

(2)    Enjoin Defendants from withholding the information requested by Plaintiff ADC, and order the immediate production of said information;

(3)    Assess against the United States reasonable attorney fees and other litigation costs incurred on behalf of Plaintiff ADC in this action; and

(4)    Grant such other and further relief as this Court may deem just and proper.

Dated:  October 17, 2006

Respectfully submitted,

Tefft W. Smith (D.C. Bar No. 458441)
Michael D. Shumsky (D.C. Bar No. 495078)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
Ph:     (202) 879-5000
Fax:    (202) 879-5200

*Counsel for Plaintiff*
*American-Arab Anti-Discrimination Committee*

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE | UNITED STATES DEPARTMENT OF HOMELAND SECURITY; IMMIGRATION AND CUSTOMS ENFORCEMENT |

| | | |
|---|---|---|
| **(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**    11001 (EXCEPT IN U.S. PLAINTIFF CASES) | **COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT**    11001 **(IN U.S. PLAINTIFF CASES ONLY)** NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED | |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Tefft W. Smith<br>Michael D. Shumsky<br>KIRKLAND & ELLIS LLP<br>655 Fifteenth Street, N.W.<br>Washington, D.C.  20005<br>(202) 879-5000 | |

## II. BASIS OF JURISDICTION
### (PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ○ 3 Federal Question (U.S. Government Not a Party)
- ● 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
### (Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ○ A. *Antitrust* | ○ B. *Personal Injury/ Malpractice* | ○ C. *Administrative Agency Review* | ○ D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ○ E. *General Civil (Other)*    OR    ○ F. *Pro Se General Civil* | | | |
|---|---|---|---|
| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br><br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or defendant<br>☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ⊙ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☒ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

This lawsuit seeks the release of improperly withheld agency records pursuant to the Freedom of Information Act, 5 U.S.C. § 552(a)(4)(B).

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ _ _ _ _ _ _ _ _ _ _  Check YES only if demanded in complaint<br>JURY DEMAND:    YES ☐    NO ☑ |
|---|---|---|

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE  October 16, 2006    SIGNATURE OF ATTORNEY OF RECORD  *[signature]*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**

Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.



## CBS NEWS
**SEE IT NOW.**
Anytime. Anywhere.

SEARCH ⦿ Stories ○ Videos ○ The

**Home | U.S. | World | Politics | SciTech | Health | Entertainment | Business | Opinion | Strange News | Sp**

**CBS Evening News [ Watch Now ] | The Early Show | 48 Hours | 60 Minutes | CBS Sunday Morning | Face The N**

## CBS EVENING NEWS

| Main Page | E-MAIL THIS STORY | PRINTABLE VERSION | TAG WITH ■ del.icio.us |

Couric & Co.

Couric's Notebook

First Look

CBS News FYI

freeSpeech

Assignment America

CBS News Investigates

Reporter's Notebook

Bios

Contact Info

Inside Scoop

CBS Evening News Video

WIRELESS ALERTS

E-MAIL ALERTS

POD PODCASTS

XML RSS - ALL FEEDS

**INTERACTIVE**



**America On Guard**
The Homeland
Security Department,
the terror alert
system,
preparedness quiz
and more.

**INTERACTIVE**



**Global Terror**
Major terrorist
organizations, the
FBI's most wanted
and facts and photos
from recent attacks.

**INTERACTIVE**

**Sept. 11 And Since**
Reflecting on the
events of Sept. 11,
2001, the day that

# FBI's Anti-Terror 'October Plan'
**Operation Intended To Prevent Terror Attack Timed To Election**

**WASHINGTON, Sept. 17, 2004**



(AP / CBS)

1 | 2

| PREVIOUS IMAGE | NEXT IMAGE |

**QUOTE**

**One element of the FBI plan calls for addressing what it fears could be a wave of protests from Arab-Americans and civil libertarians once the so-called "October Plan" kicks off.**

**(CBS)** Convinced that al Qaeda is still determined to disrupt the U.S. fall elections by an attack on the homeland, FBI officials here are preparing a massive counter-offensive of interrogations, surveillance and possible detentions they hope will disrupt the terrorist plans, reports **CBS News Correspondent Jim Stewart.**

FBI field offices and Homeland Security agencies will be advised of "extraordinary measures" that will go into place "beginning the first week of October through the elections."

An internal e-mail advisory to supervisory agents this week from the FBI's "'04 Threat Task Force" said the purpose of the counter-offensive is "to foster the impression that law enforcement is focused on individuals who may be a threat."

Specifically, the plan calls for "aggressive - even obvious - surveillance" techniques to be used on a short list of people suspected of being terrorist sympathizers, but who have not committed a crime. Other "persons of interest," including their family members, may also be brought in for questioning, one source said.

All recent truck thefts, chemical thefts and suspicious cargo truck rentals will also be reviewed as part of the plan. Mosques will be revisited and members asked whether they've observed any suspicious behavior.

Throwing hundreds of agents on the street and conducting invasive surveillance has become a standard post-9/11 tactic for the bureau, which hopes at a minimum to force terrorists go back into hiding and re-think their plan.

 changed America.

**RELATED STORIES & LINKS**

**U.S. To Free Hamdi This Week**
'Enemy Combatant' Yaser Hamdi Will Be Sent Back To Saudi Arabia

**FBI Erred Linking Lawyer To Terror**
Apologizes For Detaining Oregon Man In Madrid Blast Probe

**Cheney Backs Off Kerry Claim**
VP Now Says Electing Democrat Would Not Invite Terror Attack

**Poll: Americans Resigned To Terror**
**CBS**: Fewer Americans Think U.S., Allies Winning War On Terror

Some officials believe it was just such tactics that foiled the remainder of al Qaeda's New Year's bomb plot in January 2000 after agents arrested one operative, Ahmed Ressam, in Port Angeles, Wash., with a car trunk-full of explosive material.

The bureau also knows it can expect to be criticized for the strategy if it goes too far. One element of the plan calls for addressing what some officials fears could be a wave of protests from Arab-Americans and civil libertarians once the so-called "October Plan" kicks off.

©MMIV, CBS Broadcasting Inc. All Rights Reserved.

**INSIDE CBS EVENING NEWS**



**The Nuclear Genie's Bottle Can Be Resealed**
Taking Lessons Of South Africa To North Korea

• 2 Plans For Getting Out Of Iraq
• Irreverent ... Irrelevant ... Ig Nobel
• DMZ: Where North Meets South
• **More**

**TOP STORIES**



**Lawyer Gets 28 Months For Aiding Terrorist**
Lynne Stewart Sentenced For Aiding Sheik Convicted In Terror Plots

• Man Charged In Murder Of 5 Family Members
• U.S.: N. Korea Nuke Test The Real Deal
• Sectarian Killings Surge In Iraq
• **More**

 Back To Top

**Wireless Alerts:** CBS News To Go **E-Mail Sign-Up:** Breaking News | Today On CBS News | 60 Minutes | 48 Hours | The Early

**Recommended Sites:** CBS Corporation | The ShowBuzz | CBS.com | CBS SportsLine | CWTV.com | ETOnline.com | The INS

Site Map | Video Site Map | RSS Feeds | Help | Advertise With Us | Contact Us | Terms of Service | Privacy Policy | CBS Bios

## CBS NEWS

SEARCH  ● Stories  ○ Videos  ○ The Web

©MMVI, CBS Broadcasting Inc. All Rights Reserved.

*Office of Public Affairs*
**U.S. Department of Homeland Security**



**U.S. Immigration and Customs Enforcement**

September 30, 2004
Contact:
ICE Public Affairs
202-514-2648

# Statement

## TERRORIST THREAT AND DISRUPTION EFFORTS BY ICE

U.S. Immigration and Customs Enforcement (ICE) is the largest investigative arm of the Department of Homeland Security. As part of its homeland security mission, ICE seeks to maintain the integrity of the immigration system through effective enforcement of our immigration laws. ICE also seeks to protect the homeland by targeting immigration violators who may pose a threat to national security.

ICE has been working for the past several months at a heightened level in direct support of the government-wide Interagency Security Plan that will remain in effect through the 2005 Presidential Inauguration. ICE's stepped-up enforcement actions involve the re-prioritization of existing leads on suspected immigration status violators according to national security criteria. This initiative combines the resources of the ICE Office of Investigations, the Office of Detention and Removal and the Office of Intelligence to apply real-time threat information to detect, prevent, and disrupt potential terrorist activities.

**This initiative builds upon ICE's continued efforts to target immigration status violators in America – without regard to race, ethnicity or religion.**

Acting on the prioritized leads, ICE agents in the field will locate suspected immigration status violators. If ICE investigators determine that the individual is out of status, then the individual will be arrested. Determinations on detention will be decided on a case-by-case basis in keeping with standard ICE detention policy. Anyone subject to detention will be afforded access to counsel as permitted under national standards.

When appropriate, and as resources allow, ICE agents will be supported by other law enforcement agencies through the nation's Joint Terrorism Task Forces.

What ICE is not doing:
- ICE is not conducting a "round-up" or a "sweep" in any community.
- ICE is not profiling based on race or religious affiliation.
- ICE is not instituting a blanket detention policy.

As the recent 9/11 Commission Staff monograph on terrorist travel notes, at least three of the 9/11 hijackers violated the terms of their visas before carrying out their attacks.  The 9/11 Commission report further added that: "Had the immigration system set a higher bar for determining whether individuals are who or what they claim to be – and ensuring routine consequences for violations – it could have potentially excluded, removed, or come into further contact with several hijackers."

To detect and deter such abuses, ICE's Compliance Enforcement Unit routinely researches and assigns immigration status violator leads to ICE field offices nationwide based on data from the Student Exchange Visitor Information System (SEVIS), the National Security Entry/Exit Registration System (NSEERS), and the United States Visitor and Immigrant Status Indicator Technology program (USVISIT).

# ICE #

*U.S. Immigration and Customs Enforcement (ICE) is the largest investigative arm
of the Department of Homeland Security*

ABOUT US | CURRENT ISSUES | TAKE ACTION | PRESS DESK | LEGAL SERVICES | EDUCATION AND OUTREACH | JOIN ADC

- Home
- About ADC
- President's Corner

Media Desk

All Press Releases

Laila Al-Qatami

- Legal Section
- Education
- Events
- Feedback
- Government Affairs
- Community Profiles
- Search

**SUPPORT ADC**



**DONATE**

✉ Tell A Friend

**ADC FACTSHEET**

The illegal Israeli occupation of Palestinian land is the foremost obstacle to peace.

**Learn more >>**



History of Palestine

**WHAT'S NEW**

▸ ADC Events

▸ **October 11 is Alex Odeh Day** October 12

▸ **Johns Hopkins Study Cites 655,000 Iraqi Deaths Since US Invasion in 2003** October 11

▸ **ADC Presents Best Practices at G8 Conference in Portugal** October 6

▸ **Workplace Bias Against Muslims, Arabs on Rise: LA Times** October 3

▸ **ADC Presents Civil Rights Award to Sen. Russell Feingold** September 29

▸ **FBI Confirms Continued Investigation of Michigan Charity** September 26

▸ **Ads are yanked as offensive to Arabs, Muslims** September 26

▸ **The Uncounted Constituency of Arab Americans** September 25

▸ **ADC Calls Upon FBI To Explain Timing of Raids** September 21

▸ **ADC Outreach Program with FBI Highlighted in Washington Post Article** September 21

▸ **Over 40 Organizations Support ADC's Request for Temporary**

**30 September, 2004**

## ICE Responds to ADC's Concerns

For the statement from ICE, click here >>

On September 30, ADC raised concerns about the Bureau of Immigration and Customs Enforcement's (ICE) latest initiative.  ICE has responded by releasing the following statement (see full statement below.)

During several phone calls yesterday, officials from the Department of Homeland Security (DHS) and ICE stressed their commitment to continuing to build their working relationship with the Arab and Muslim American communities.  They also emphasized that their initiative is not based on racial profiling but rather based on data from the Student Visitor Information System (SEVIS), the National Security Entry/Exit Registration System (NSEERS), and the United States Visitor and Immigrant Status Indicator Technology Program (US VISIT).  Additionally, they highlighted importance of all citizens voting in the upcoming Presidential election.

ADC would like to thank ICE for their rapid response and reiterates its commitment to building bridges with the federal government.  However, it is worth noting that NSEERS, also known as the "Special Registration" program, required citizens from 24 Arab and Muslim countries in addition to North Korea to register with immigration authorities.  The program was based on national origin profiling and a majority of the program was suspended by DHS in December 2003.  ADC hopes that the information gleaned from that "Special Registration" program will not be used as one of the three resources for prioritizing ICE's enforcement activities because it was based solely on national origin.

STATEMENT, September 30, 2004

Office of Public Affairs, Department of Homeland Security, US Immigration and Customs Enforcement, Contact: 202-514-2648

TERRORIST THREAT AND DISRUPTION EFFORTS BY ICE

U.S. Immigration and Customs Enforcement (ICE) is the largest investigative arm of the Department of Homeland Security. As part of its homeland security mission, ICE seeks to maintain the integrity of the immigration system through effective enforcement of our immigration laws.

ICE also seeks to protect the homeland by targeting immigration violators who may pose a threat to national security.

ICE has been working for the past several months at a heightened level in direct support of the government-wide Interagency Security Plan that will remain in effect through the 2005 Presidential Inauguration. ICE's stepped-up enforcement actions involve the re-prioritization of existing leads on suspected immigration status violators according to national security criteria. This initiative combines the resources of the ICE Office of Investigations, the Office of Detention and Removal and the Office of Intelligence to apply real-time threat information to detect, prevent, and disrupt potential terrorist activities. This initiative builds upon ICE's continued efforts to target immigration status violators in America - without regard to race, ethnicity or religion.

Acting on the prioritized leads, ICE agents in the field will locate suspected immigration status violators. If ICE investigators determine that the individual is out of status, then the individual will be arrested. Determinations on detention will be decided on a case-by-case basis in keeping with standard ICE detention policy. Anyone subject to detention will be afforded access to counsel as permitted under national standards.

When appropriate, and as resources allow, ICE agents will be supported by other law enforcement agencies through the nation's Joint Terrorism Task Forces.

What ICE is not doing:

·        ICE is not conducting a "round-up" or a "sweep" in any community.

·        ICE is not profiling based on race or religious affiliation.

·        ICE is not instituting a blanket detention policy.

As the recent 9/11 Commission Staff monograph on terrorist travel notes, at least three of the 9/11 hijackers violated the terms of their visas before carrying out their attacks. The 9/11 Commission report further added that: "Had the immigration system set a higher bar for determining whether individuals are who or what they claim to be - and ensuring routine consequences for violations - it could have potentially excluded, removed, or come into further contact with several hijackers."

To detect and deter such abuses, ICE's Compliance Enforcement Unit routinely researches and assigns immigration status violator leads to ICE field offices

Protected Status for Lebanon and Gaza
**September 14**

▶ ADC to Participate in DHS Discussion on Enhancing America's Security
**September 14**

▶ ADC Takes Part in Rally to Support Immigrants' Rights
**September 7**

▶ ADC to Address International Commission of Jurists
**September 7**

▶ Sign-On Request for Lebanon and Gaza Protected Status
**September 6**

▶ ADC Mourns the Passing of Famed Author Naguib Mahfouz
**August 31**

▶ Passenger with Arabic T-Shirt Denied Boarding
**August 30**

▶ ADC Congratulates Tony Shalhoub on Third Emmy
**August 28**

▶ ADC Welcomes State Department Inquiry into Israeli Use of Cluster Bombs
**August 25**

▶ ADC Achieves Goal with Lawsuit
**August 22**

▶ NSA's Warrantless Spying Ruled Unconstitutional
**August 18**

nationwide based on data from the Student Exchange Visitor Information System (SEVIS), the National Security Entry/Exit Registration System (NSEERS), and the United States Visitor and Immigrant Status Indicator Technology program (USVISIT).

# ICE #

U.S. Immigration and Customs Enforcement (ICE) is the largest investigative arm of the Department of Homeland Security



Printer Friendly Format
**E-MAIL UPDATES**
Enter E-Mail

◉ Subscribe
◯ UnSubscribe
Submit

**DONATE**
Your donation will help ADC correct stereotypes. Go >

### Immigration and Customs Enforcement (ICE) Plans Immigration Sweeps

The American-Arab Anti-Discrimination Committee (ADC) has confirmed through federal government sources that Immigration and Customs Enforcement (ICE) has initiated, or soon will initiate, specific enforcement actions in major metropolitan areas prior to the November 2nd Presidential election. This new ICE initiative is supposedly separate from the recent ADC alert about the voluntary interviews being conducted by the Federal Bureau of Investigation (FBI.) However, ADC has confirmed that ICE's enforcement action is in fact, being carried out in conjunction with the FBI's latest initiative.

The ICE initiative consists of a stepped up effort to arrest a number of non-citizens whose immigration paperwork is "out of status." While ADC encourages and supports all measures to enhance our nation's security, ADC is troubled by the idea that immigration sweeps are being portrayed as successes in the war on terror. To date it is unclear whether the ICE initiative will be selectively carried out against Arabs and Muslims. ADC reiterates its strong objection to any selective enforcement initiative that is based solely on race, national origin, or religion.

Additionally, the Department of Homeland Security (DHS) and ICE have failed to reach out to community leaders to communicate this matter or to address our concerns. This initiative damages efforts made at cooperating with the Arab-American community. ADC has actively worked to build bridges with multiple levels of law enforcement and the community through its successful national Law Enforcement Outreach Program (LEOP) and the ADC Michigan office's outreach program BRIDGES.

Furthermore, ADC, which is nonpartisan, hopes this ICE initiative will not be perceived by the community as intimidation to US citizens who may be relatives of those subjected to the enforcement action and may inhibit these citizens from voting, especially those newly registered to

vote.

ADC suggests you contact the White House and the Department of Homeland Security to relay your concern and opposition to this new ICE initiative.

You may write to them online, via ADC website:

http://capwiz.com/adc/mail/oneclick_compose/?alertid=6480531

If you prefer to call, contact information is listed below.

ICE National Headquarters
Tel: 202-514-2648
Fax: 202-307-1918

White House
Tel: 202-456-1111
Fax: 202-456-2461
Email: president@whitehouse.gov

---

ABOUT US | CURRENT ISSUES | MEDIA DESK | LEGAL SECTION | EDUCATION AND OUTREACH | JOIN ADC

© ADC 2003 All rights reserved.

**News Release**

November 4, 2004

## ICE THREAT DISRUPTION EFFORT RESULTS IN MORE THAN 230 ARRESTS
### -- More than 900 Investigations Completed --

WASHINGTON, D.C. - Michael J. Garcia, the Department of Homeland Security Assistant Secretary for U.S. Immigration and Customs Enforcement (ICE), today announced that, in a one-month period beginning October 1, 2004, ICE has arrested 237 immigration status violators nationwide as part of the government-wide Interagency Security Plan that will remain in effect through the 2005 Presidential Inauguration.

The ongoing initiative is designed to locate immigration status violators who may pose an elevated criminal or national security threat. The initiative combines the resources of ICE's Office of Investigations, Office of Detention and Removal, and the Office of Intelligence to apply real-time threat information to detect, prevent, and disrupt potential terrorist activities. Since October 1, ICE has completed more than 900 investigations as part of the stepped-up enforcement effort.

"Prior to 9/11, there was not an effective system in place to accurately monitor the status of foreign students and other visitors in the United States -- with disastrous consequences. Hani Hanjour, one of the 9/11 hijackers, as well as Eyad Ismoil, one of those who bombed the World Trade Center in 1993, both exploited their student visa status to remain in the United States. We now have systems in place to address this vulnerability and we are doing so aggressively. This initiative demonstrates how we effectively enforce immigration laws in the national security context, bringing legitimate charges against immigration status violators who may also pose an elevated threat," said Assistant Secretary Garcia.

The recent 9/11 Commission Staff monograph on terrorist travel noted that at least three of the 9/11 hijackers violated the terms of their visas before carrying out their attacks. The 9/11 Commission report further added that: "Had the immigration system set a higher bar for determining whether individuals are who or what they claim to be – and ensuring routine consequences for violations – it could have potentially excluded, removed, or come into further contact with several hijackers."

In conducting this initiative, ICE is relying primarily upon its Compliance Enforcement Unit, which was created in June 2003. This unit researches and assigns immigration status violator leads based on information from a variety of sources, including the Student and Exchange Visitor Information System (SEVIS) and the United States Visitor and Immigrant Status Indicator Technology program (US-VISIT). Neither of these databases was in existence before the terror attacks of 9/11.

In recent weeks, the Compliance Enforcement Unit has taken violator leads developed from these databases and reprioritized them according to national security criteria. The re-prioritized leads have been sent to ICE field offices for immediate investigation and potential arrests – without regard to race, ethnicity, or religion. Some of those arrested thus far under the initiative include:

- A 28-year-old Saudi national who violated the terms of his student visa (SEVIS violator) and is the subject of a national security lookout. Last year, the individual was prevented from carrying a high-voltage stun gun aboard a U.S. commercial aircraft. The individual was admitted to the United States in 2003 on a student visa and later terminated by a U.S. university for failing to maintain status as a

student. The individual remains in ICE custody as the investigation continues.

- A 34-year-old Jordanian national who violated the terms of his student visa (SEVIS violator) and is the subject of a national security lookout. The individual had entered the United State in 2000 on an F-1 student visa and was later terminated by a U.S. university for failure to maintain student status. The individual remains in ICE custody as the investigation continues.

- A 24-year-old Lebanese national who had violated the terms of his student visa (SEVIS violator). The State Department had revoked the individual's non-immigrant visa for national security reasons. The ICE investigation revealed that the individual was no longer a student, but was employed at a convenience store. The individual remains in ICE custody as the investigation continues.

- A 25-year-old Pakistani national who had violated the terms of his student visa (SEVIS violator) and is the subject of a national security lookout. The individual was admitted to the United States in 1998 and later terminated from SEVIS for failing to enroll in his master's degree program. The individual remains in ICE custody as the investigation continues.

- A 44-year-old Jamaican national who was identified through U.S.-VISIT as having been previously convicted of a controlled substance charge and having fraudulently entered the United States in 2004 under an alias. The individual was arrested for fraudulently obtaining admission to the United States after previously being deported. The individual remains in ICE custody.

- A 25-year-old South African national who had violated the terms of her J-1 student visa (SEVIS violator). The individual was admitted into the United States in 2004 for the duration of her student program, but was terminated from SEVIS for failing to enroll. The individual was arrested, processed for removal, and released with an electronic monitoring bracelet.

- A 30-year-old Thailand national who had violated the terms of her student visa (SEVIS violator). The individual was admitted into the United States in 2001 but was later terminated from SEVIS for failing to maintain student status. The individual remains in ICE custody.

- A 26-year-old Philippines national who had violated the terms of her student visa (SEVIS violator). The individual was admitted into the United States in 2002 as a student, but was later terminated from SEVIS for failing to comply with the terms of her student program.

The individual was arrested and processed for removal.

# ICE #

> *U.S. Immigration and Customs Enforcement (ICE) is the largest investigative arm of the Department of Homeland Security (DHS).*



Last Modified 06/30/2005

ABOUT | NEWS ROOM | CAREERS
BORDER SECURITY | FINANCIAL &
TRADE INVESTIGATIONS | PUBLIC
SECURITY
Home | Text | Site Map | Search | Legal |
FOIA | Firstgov | DHS



# American-Arab Anti-Discrimination Committee
## Celebrating 25 Years of Dedicated Service to Civil and Human Rights

December 14, 2004

Michael J. Garcia, Assistant Secretary
US Immigration and Customs Enforcement
United States Department of Homeland Security
425 I "Eye" Street
Suite 7100
Washington, DC 20536

***VIA FACSIMILE: 202-307-9911***
***AND UNITED STATES POSTAL SERVICE***

Dear Mr. Garcia:

I am writing as President of the American-Arab Anti-Discrimination Committee (ADC). Established in 1980 by former US Senator James Abourezk, today ADC is our nation's largest membership organization dedicated to protecting the civil rights of Arab Americans.

The purpose of this letter is to request that US Immigration and Customs Enforcement (ICE) release data on nationality of those 230 individuals detained as a result of the recent enforcement initiative by your agency.

According to a September 30, 2004, ICE statement entitled, "Terrorist Threat and Disruption Efforts by ICE," and a November 4, 2004, ICE press release entitled, "ICE Threat Disruption Effort Results in More than 230 Arrests," your agency utilized three databases (namely NSEERS, SEVIS, and US VISIT) to reprioritize leads resulting in the above-referenced arrests. In October, ADC expressed concern apprehensive of the use of NSEERS in the reprioritization of leads in enforcing our nation's immigration laws.

In order to alleviate these concerns, which have since been echoed by numerous members of the Arab-American and Muslim communities, it is our sincere hope that ICE will release the nationality breakdown of those arrested in order to assure the Arab-American and Muslim communities, along with the rest of our nation, that immigration enforcement is not resulting in a disproportionate impact on individuals from Arab or Muslim countries.

Thank you for your kind and continued attention to our concerns and we hope to maintain our good working relationship with US Immigration and Customs Enforcement. I look forward to hearing from you soon on this important and timely matter.

Very truly yours,

Hon. Mary Rose Oakar
President

Cc.    Undersecretary Asa Hutchinson (DHS) via facsimile
       Daniel Sutherland, Civil Rights Officer (DHS) via facsimile
       Legal Department (ADC)



## American-Arab Anti-Discrimination Committee
**Celebrating 25 Years of Dedicated Service to Civil and Human Rights**

March 3, 2005

Privacy Office
US Department of Homeland Security (DHS)
FOIA Appeals
245 Murray Lane SW, Building 410
Washington, DC 20528

**VIA FACSIMILE 202-772-5036 AND UNITED STATES POSTAL SERVICE**

To Whom It May Concern:

I am writing as President of the American-Arab Anti-Discrimination Committee (ADC) headquartered at 4201 Connecticut Avenue, NW, Suite 300, Washington, DC 20008. I am writing to appeal a Freedom of Information Act request made pursuant to 5 U.S.C. § 522 (2000) (FOIA). I received a denial letter on February 14, 2005 *(Encl. 1)* to my request of December 14, 2004.

On September 30, 2004, ICE released a statement entitled, "Terrorist Threat and Disruption Efforts by ICE," *(Encl. 2)* and on November 4, 2004, ICE issued a press release entitled, "ICE Threat Disruption Effort Results in More than 230 Arrests" *(Encl. 3)*. ADC became concerned that ICE was using NSEERS in the reprioritization of leads in enforcing our nation's immigration laws. To alleviate our concerns we requested that DHS release the nationality breakdown of those arrested in order to assure the Arab-American and Muslim communities that they are not being impacted on a disproportionate basis. To be clear our request did not seek, and is not seeking, the names or individual private information of any kind on the detainees, nor did we attempt to gain information of a particularized nature with respect to the investigation. However, this request was denied.

ICE is withholding the data we requested pursuant to Exemption 5 U.S.C. § 522 (b) (7) (A) of FOIA. This exemption states that "pursuant to 5 U.S.C. 552 (b), the Freedom of Information Act does not apply to matters that are--records of information compiled for law enforcement purposes, but only to the extent that the production of such records or information could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 522 (b) (7) (A).

ADC does not believe that Exemption 7 (A) applies to this matter because nationality data on a specific population of detainees is of such a generalized and innocuous nature that its release cannot be reasonably be expected to interfere with enforcement proceedings. To be exempted from release under 7 (A), the information must be compiled for law enforcement purposes and whose release could reasonably be expected to interfere with enforcement proceedings. Although your agency only provided a generalized statement about an ongoing investigation, we do not challenge the veracity of that assertion. However, we do not believe that the data we are requesting and that is in question was compiled for law enforcement. Instead the data was compiled upon our request, and as such does not fall into the exemption.

Furthermore, information may be withheld only when release of the information could reasonably be expected to interfere with enforcement proceedings. DHS, in denying our request, failed to establish how release of generalized data about the nationality of the detainees would interfere with its ongoing investigation. The exemption does not cover information merely because it was compiled for law enforcement purposes. *Solar Sources, Inc. v. United States*, 142 F.3d 1033, 1037 (7th Cir. 1998). Data on



# American-Arab Anti-Discrimination Committee
## Celebrating 25 Years of Dedicated Service to Civil and Human Rights

detainee nationality may have been available before apprehension of the detainees but was unlikely to have any relevance in determining whether a particular detainee was in violation of immigration law. Nationality data provides little if any information on the propensity to violate immigration laws and therefore cannot be said to contribute to either the investigation or enforcement.
Information that cannot be reasonably expected to interfere with enforcement proceedings loses the protection afforded by Exemption 7 (A) and is, therefore, releasable.

Moreover, Exemption 7 is inapplicable in denying this request because DHS has failed to demonstrate that an articulable and distinct harm will result from release of the requested information. Courts have established a two-step analysis in determining applicability of Exemption 7 (A), focusing on (1) whether a law enforcement proceeding is pending or prospective, and (2) whether release of information about it can be expected to cause some articulable harm. *Manna v. United States Dep't of Justice,* 51 F.3d 1158, 1164 (3d Cir. 1995). The denial letter failed to articulate the harm that will result from the release of the detainee's nationality data. Mere pendency of an investigation is an inadequate basis for invoking a 7 (A) Exemption, *Scheer v. United States Dep't of Justice,* 35 F. Supp. 2d 9, 13 (D.D.C. 1999) (holding that an agency must first prove the existence of a law enforcement proceeding and then prove the harm).

The arrest of the 230 detainees suggests that an investigation is either ongoing or completed. However, that is not sufficient to deny the requested information. Nationality of the detainees is a factual matter uncontestable and unrelated to determinations of guilt or innocence. Nationality, though probably relevant in keeping statistics and determining trends, fails to carry the necessary burden of showing interference with enforcement proceedings, *Miller v. USDA,* 13 F.3d 260, 263 (8th Cir. 1993) (holding that government must make specific showing of why disclosure of documents could reasonably be expected to interfere with enforcement proceedings). The standard in measuring the harm is based not on conclusory statements, *Grasso v. IRS,* 785 F.2d 70, 77 (3d Cir. 1986), but whether disclosure can reasonably be expected to interfere in a "palpable, particular way" with enforcement proceedings, *North v. Walsh,* 881 F.2d 1088, 1100 (D.C.C. 1989). DHS has provided nothing more than a conclusory statement concerning the unreleasability of the requested data because of an investigation. DHS has failed to show that an articulable and distinct harm will result from release of the requested data. Accordingly, Exemption 7 (A) cannot operate to prevent release of the requested nationality data.

A generic application of the exemption may not be made because the requested data does not fit into a functionally harmful category of information or documents whose release will threaten law enforcement proceedings. Although determination of the exemption's application may be made generically based on the categorical types of records involved, *NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 236 (U.S. 1978), the withholding agency is still required to identify a distinct category to which the requested data belongs and why that category is exempt. Courts are united in holding that an agency invoking the 7 (A) Exemption must provide at least a general, functional description of the types of documents at issue sufficient to indicate the type of interference threatening the law enforcement proceeding. *See Lion Raisins Inc. v. USDA,* 354 F.3d 1072, 1084 (9th Cir. 2004). DHS simply declared an ongoing investigation and invoked a blanket exemption. No distinct category was identified to which the requested data belongs. Moreover, no articulable harm was provided exempting the unidentified putative category. All that DHS has provided is a blanket reason as the basis for the exemption.

In *Robbins,* the Supreme Court recognized that the purpose of the 1974 Amendment to Exemption 7 (A) of FOIA was designed to eliminate blanket exemptions of government records simply because they were found in investigatory files. *Robbins,* 437 U.S. at 236. By invoking the investigation argument DHS has



# American-Arab Anti-Discrimination Committee
## Celebrating 25 Years of Dedicated Service to Civil and Human Rights

effectively placed all information related to this matter out of reach. Congress did not intend to create an exemption that swallows the FOIA law. But that is precisely what DHS has done in this case. The requested information is of little investigatory value. It provides no indication as to the likelihood of past or future violations of immigration law. On the other hand, national origin is of great relevance in determining whether the government is discharging its law enforcement duties uniformly and neutrally, indifferent to national origin, color, race, or religious affiliation.

The purpose of the FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to hold government accountable to the governed. *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 152 (1975). Invocation of the investigation exemption to prevent release of nationality data circumvents the very purpose for which FOIA was created. The exemption shield provided by the investigation exemption exists to protect the integrity of investigations and enforcement of the law. Nationality data does not threaten or harm legitimate investigations and enforcement even by the strictest investigatory standards.

DHS also stated in their denial letter that Exemption (b) (7) (A) is temporal in nature; however, once all pending or related matters are resolved there are other exemptions that are applicable to these records. ADC does not believe that these other exemptions listed by DHS can be applied to this FIOA request for the following reasons.

Exemption (b) 2 states that matters that are related solely to the internal personnel rules and practices of an agency are exempt from disclosure. However, the data that ADC has requested is unrelated to internal personnel rules and practices of DHS. The request does not require any practice of law enforcement to be defined but merely asks for data relating to the populations affected by this particular law enforcement program. Thus, this exemption cannot apply.

Exemption (b) (7) (C) states that information compiled for law enforcement purposes that could reasonably be expected to constitute an unwarranted invasion of personal privacy cannot be disclosed. In *Judicial Watch Inc. v U.S. Department of Commerce*, 337 F. Supp 2d. 146, 180 (D.D.C. Sept. 30, 2004), the court stated that Exemption 7 (C) protects against the unwarranted invasion of privacy and protects the identities of suspects and others of investigatory interest who are identified in agency records in connection with law enforcement investigations. ADC's request for the nationality breakdown is not an unwarranted invasion of privacy, ADC does not ask for names or individual information of the detainees. The information ADC requested could in no way be considered an unwarranted invasion of personal privacy since nationality in and of itself cannot determine which individuals are involved in this investigation. Furthermore, ADC's request calls for the numbers of individuals detained from each country. Thus, this exemption cannot apply.

Exemption (b) (7) (D) of FOIA allows the withholding of records if their disclosure "could reasonably be expected to disclose the identity of a confidential source...." When using this objection, an agency must demonstrate, through the use of reasonably-detailed affidavits, that the information was compiled for a law enforcement purpose. *Carbe v. Bureau of Alcohol, Tobacco and Firearms*, 2004 WL 2051359 (D.D.C.). Furthermore, the agency must demonstrate that an informant provided the information under either an express or implied promise of confidentiality and that disclosure could reasonably be expected to disclose the source's identity. *Id.* However, ADC is not asking for information that involves a confidential source, the information is provided through a database and not an individual. Thus, this exemption cannot apply.



# American-Arab Anti-Discrimination Committee
## Celebrating 25 Years of Dedicated Service to Civil and Human Rights

Exemption (b) (7) (E) is pertaining to techniques and procedures for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law. In *Judicial Watch,* 337 F. Supp 2d. at 181, the court states that 7 (E)'s protection is generally limited to techniques or procedures that are not well-known to the public. However, this exemption does not apply because ADC is not requesting data concerning techniques and procedures used in law enforcement, instead ADC requests data indicating which populations, by nationality, are affected by certain law enforcement practices. Thus, this exemption cannot apply.

Exemption (b) (7) (F) protects the identity of an individual if release of that information "could reasonably be expected to endanger the life or physical safety of any individual." In *Carbe,* 2004 WL 2051359, the court describes this exemption as permitting the withholding names of identifying information of federal employees and third persons who may be unknown to the requester in connection with a particular law enforcement matter. ADC has not asked for the names or identifying information of anyone, including federal employees and third persons. Thus, this exemption cannot apply.

In conclusion, I would like to appeal the decision of DHS to deny the release of the breakdown of the nationalities from the arrests made by ICE for the reasons described above. I look forward to hearing from you soon on this important and timely matter.

Sincerely,


Hon. Mary Rose Oakar
President



Kareem W. Shora, JD, LL.M.
Director, Legal Policy

Cc:     Daniel Sutherland, Officer for Civil Rights and Civil Liberties, DHS
        Legal Department files

Encl:   1: Denial Letter
        2: ICE Statement
        3: ICE Press Release



U.S. Department of Homeland Security
Washington, DC 20528

# Homeland Security

September 5, 2005

Mary Rose Oakar, President
Kareem W. Shora, Director, Legal Policy
Anti-Discrimination Committee
4201 Connecticut Avenue, NW, Suite 300
Washington, DC 20008

Re: Appeal No. 05-551 American-Arab

Dear President Oakar and Director Shora:

I am writing in further reference to your appeal from the action of the Bureau of Immigration and Customs Enforcement (ICE) on your request for the nationalities of 230 individuals detained as a result of an ICE enforcement initiative that was discussed in a November 4, 2004 press release. The Chief of the Information Disclosure Unit of the Office of Investigations withheld this information on the basis of Exemption 7(A) of the Freedom of Information Act, 5 U.S.C. § 552(b)(7)(A).

After carefully considering your appeal, I have decided to affirm the initial action taken on your request. The records at issue meet the threshold requirement for application of Exemption 7 of the FOIA because they were compiled for law enforcement purposes. The fact that nationality information on those arrested may exist in other records does not support the conclusion that it is not law enforcement information in this context. See John Doe A enc v John Doe Co oration 493 U. S. 146, 154-55 (1989). In fact, as part of the law enforcement operation discussed in the press release of November 4, 2004, ICE arrested individuals from thirty different countries. Release of information pertaining to the nationalities of these individuals could harm ongoing or prospective law enforcement activities by, among other things, revealing where ICE focuses its resources. Release would thus enable analysts to discern trends in ICE enforcement operations, to the detriment of those efforts. In my judgment, therefore, this information was properly protected not only on the basis of Exemption 7(A), but also on the basis of Exemption 7(E) of the FOIA. Cf. Ctr. for Nat'l Sec. Studies v. United States Dept of Justice, 331 F.3d 918, 929 (D.C. Cir. 2003) (affirming invocation of Exemption 7(A) to protect detainee names because disclosure could reveal substantive and geographic focus of investigation).

If you are dissatisfied with my action on your appeal, you are entitled to seek judicial review consistent with 5 U.S.C. § 552(a)(4xB).

Sincerely,

Nuala O Connor Kelly Chief Privacy Officer

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

655 Fifteenth Street, N.W.
Washington, D.C. 20005

John C. O'Quinn
To Call Writer Directly:
(202) 879-5213
joquinn@kirkland.com

202 879-5000

www.kirkland.com

Facsimile:
202 879-5200

February 8, 2006

*VIA HAND DELIVERY*
*AND FACSIMILE*

FOIA/PA Section
Information Disclosure Unit
Mission Support Division
Office of Investigations
U.S. Immigrations and Customs Enforcement
425 I Street, NW - Room 4038
Washington, D.C. 20536
Fax: (202) 616-7612

Re:    *FOIA Request by the American-Arab Anti-Discrimination Committee*

Dear Sir or Madam:

Pursuant to the Freedom of Information Act, 5 U.S.C. § 552, *et seq.*, ("FOIA"), the American-Arab Anti-Discrimination Committee ("ADC") requests that U.S. Immigration and Customs Enforcement ("ICE" or "the agency") release data on the race, ethnicity, religion, and gender of the 237 individuals detained as a result of an immigration enforcement operation in late 2004, identified in an ICE press release of November 4, 2004.

In the November 4, 2004 ICE press release entitled "ICE Threat Disruption Effort Results in More than 230 Arrests," and in a September 30, 2004 ICE press release entitled "Terrorist Threat and Disruption Efforts by ICE," the agency stated that it utilized information from several databases, including NSEERS, SEVIS and US-VISIT, to "reprioritize" leads resulting in the above-referenced arrests. In those press releases, ICE represented that it was not "profiling based on race or religious affiliation" and that "re-prioritized" leads were determined "without regard to race, ethnicity, or religion."

ADC's FOIA request asks that ICE release the race, ethnicity, religion, and gender of the 237 detainees identified in the November 4, 2004 press release, in order to assure Arab and Muslim-Americans that this action did not disproportionately impact their community and to ensure that ICE is acting in accordance with its public pledge made on September 30, 2005 and again on November 4, 2004, not to partake in racial, ethnic, or religious profiling.

February 8, 2006
Page 2

In this FOIA request, ADC seeks only information relating to the race, ethnicity, religion, and gender of the 237 individuals arrested—similar to the information ICE itself made publicly available for eight of the detainees, in its November 4, 2004 press release.

To be clear, ADC does *not seek any information of a particularized nature* regarding any of the detainees, such as names, personal information, allegations and charges, or date and location of arrest. Moreover, the information ADC requests relates to arrests made over 15 months ago. Thus, the information ADC requests is of little investigatory value and would not disclose any techniques, procedures, or guidelines for law enforcement investigations or prosecutions. However, the information is necessary to determine whether the government is discharging its law enforcement duties uniformly and neutrally, indifferent to race, ethnicity, gender, or religious affiliation.

ADC previously sought the release of information regarding the nationality of these 237 detainees. Following an administrative appeal (DHS APP05-551), that request was denied and ADC is considering whether to seek judicial review of that decision.

Pursuant to 5 U.S.C. § 552(6)(A)(i), please notify me within 20 business days of receipt of this request whether ICE intends to comply with the request or whether it will again withhold information on the basis of a FOIA exemption.

For your reference, we are enclosing the two press releases discussed above. We look forward to working with ICE and the Department of Homeland Security in fulfilling this request. Should you have any questions, please do not hesitate to contact us.

Sincerely,

Tefft W. Smith
Amanda J. Wong
John C. O'Quinn
*Counsel for ADC*

Attachments

cc:    Julie L. Myers, Assistant Secretary, ICE
       Daniel Sutherland, Office for Civil Rights and Civil Liberties, DHS
       Deana Amendolia, Office for Civil Rights and Civil Liberties, DHS
       Rebekah Tosado, Office for Civil Rights and Civil Liberties, DHS
       Maureen Cooney, Acting Chief Privacy Officer, DHS
       Hon. Mary Rose Oakar, President, ADC
       Kareem W. Shora, Esq., Director of Legal Policy, ADC
       (*all via U.S. Mail and/or e-mail*)

*Office of Public Affairs*
U.S. Department of Homeland Security



**U.S. Immigration and Customs Enforcement**

September 30, 2004
Contact:
ICE Public Affairs
202-514-2648

# Statement

## TERRORIST THREAT AND DISRUPTION EFFORTS BY ICE

U.S. Immigration and Customs Enforcement (ICE) is the largest investigative arm of the Department of Homeland Security. As part of its homeland security mission, ICE seeks to maintain the integrity of the immigration system through effective enforcement of our immigration laws. ICE also seeks to protect the homeland by targeting immigration violators who may pose a threat to national security.

ICE has been working for the past several months at a heightened level in direct support of the government-wide Interagency Security Plan that will remain in effect through the 2005 Presidential Inauguration. ICE's stepped-up enforcement actions involve the re-prioritization of existing leads on suspected immigration status violators according to national security criteria. This initiative combines the resources of the ICE Office of Investigations, the Office of Detention and Removal and the Office of Intelligence to apply real-time threat information to detect, prevent, and disrupt potential terrorist activities.

**This initiative builds upon ICE's continued efforts to target immigration status violators in America – without regard to race, ethnicity or religion.**

Acting on the prioritized leads, ICE agents in the field will locate suspected immigration status violators. If ICE investigators determine that the individual is out of status, then the individual will be arrested. Determinations on detention will be decided on a case-by-case basis in keeping with standard ICE detention policy. Anyone subject to detention will be afforded access to counsel as permitted under national standards.

When appropriate, and as resources allow, ICE agents will be supported by other law enforcement agencies through the nation's Joint Terrorism Task Forces.

What ICE is not doing:
- ICE is not conducting a "round-up" or a "sweep" in any community.
- ICE is not profiling based on race or religious affiliation.
- ICE is not instituting a blanket detention policy.

Page 2 of 2

As the recent 9/11 Commission Staff monograph on terrorist travel notes, at least three of the 9/11 hijackers violated the terms of their visas before carrying out their attacks. The 9/11 Commission report further added that: "Had the immigration system set a higher bar for determining whether individuals are who or what they claim to be – and ensuring routine consequences for violations – it could have potentially excluded, removed, or come into further contact with several hijackers."

To detect and deter such abuses, ICE's Compliance Enforcement Unit routinely researches and assigns immigration status violator leads to ICE field offices nationwide based on data from the Student Exchange Visitor Information System (SEVIS), the National Security Entry/Exit Registration System (NSEERS), and the United States Visitor and Immigrant Status Indicator Technology program (USVISIT).

# ICE #

*U.S. Immigration and Customs Enforcement (ICE) is the largest investigative arm of the Department of Homeland Security*

**News Release**

November 4, 2004

## ICE THREAT DISRUPTION EFFORT RESULTS IN MORE THAN 230 ARRESTS
### -- More than 900 Investigations Completed --

WASHINGTON, D.C. - Michael J. Garcia, the Department of Homeland Security Assistant Secretary for U.S. Immigration and Customs Enforcement (ICE), today announced that, in a one-month period beginning October 1, 2004, ICE has arrested 237 immigration status violators nationwide as part of the government-wide Interagency Security Plan that will remain in effect through the 2005 Presidential Inauguration.

The ongoing initiative is designed to locate immigration status violators who may pose an elevated criminal or national security threat. The initiative combines the resources of ICE's Office of Investigations, Office of Detention and Removal, and the Office of Intelligence to apply real-time threat information to detect, prevent, and disrupt potential terrorist activities. Since October 1, ICE has completed more than 900 investigations as part of the stepped-up enforcement effort.

"Prior to 9/11, there was not an effective system in place to accurately monitor the status of foreign students and other visitors in the United States -- with disastrous consequences. Hani Hanjour, one of the 9/11 hijackers, as well as Eyad Ismoil, one of those who bombed the World Trade Center in 1993, both exploited their student visa status to remain in the United States. We now have systems in place to address this vulnerability and we are doing so aggressively. This initiative demonstrates how we effectively enforce immigration laws in the national security context, bringing legitimate charges against immigration status violators who may also pose an elevated threat," said Assistant Secretary Garcia.

The recent 9/11 Commission Staff monograph on terrorist travel noted that at least three of the 9/11 hijackers violated the terms of their visas before carrying out their attacks. The 9/11 Commission report further added that: "Had the immigration system set a higher bar for determining whether individuals are who or what they claim to be -- and ensuring routine consequences for violations -- it could have potentially excluded, removed, or come into further contact with several hijackers."

In conducting this initiative, ICE is relying primarily upon its Compliance Enforcement Unit, which was created in June 2003. This unit researches and assigns immigration status violator leads based on information from a variety of sources, including the Student and Exchange Visitor Information System (SEVIS) and the United States Visitor and Immigrant Status Indicator Technology program (US-VISIT). Neither of these databases was in existence before the terror attacks of 9/11.

In recent weeks, the Compliance Enforcement Unit has taken violator leads developed from these databases and reprioritized them according to national security criteria. The re-prioritized leads have been sent to ICE field offices for immediate investigation and potential arrests -- without regard to race, ethnicity, or religion. Some of those arrested thus far under the initiative include:

- A 28-year-old Saudi national who violated the terms of his student visa (SEVIS violator) and is the subject of a national security lookout. Last year, the individual was prevented from carrying a high-voltage stun gun aboard a U.S. commercial aircraft. The individual was admitted to the United States in 2003 on a student visa and later terminated by a U.S. university for failing to maintain status as a

student. The individual remains in ICE custody as the investigation continues.

- A 34-year-old Jordanian national who violated the terms of his student visa (SEVIS violator) and is the subject of a national security lookout. The individual had entered the United State in 2000 on an F-1 student visa and was later terminated by a U.S. university for failure to maintain student status. The individual remains in ICE custody as the investigation continues.

- A 24-year-old Lebanese national who had violated the terms of his student visa (SEVIS violator). The State Department had revoked the individual's non-immigrant visa for national security reasons. The ICE investigation revealed that the individual was no longer a student, but was employed at a convenience store. The individual remains in ICE custody as the investigation continues.

- A 25-year-old Pakistani national who had violated the terms of his student visa (SEVIS violator) and is the subject of a national security lookout. The individual was admitted to the United States in 1998 and later terminated from SEVIS for failing to enroll in his master's degree program. The individual remains in ICE custody as the investigation continues.

- A 44-year-old Jamaican national who was identified through U.S.-VISIT as having been previously convicted of a controlled substance charge and having fraudulently entered the United States in 2004 under an alias. The individual was arrested for fraudulently obtaining admission to the United States after previously being deported. The individual remains in ICE custody.

- A 25-year-old South African national who had violated the terms of her J-1 student visa (SEVIS violator). The individual was admitted into the United States in 2004 for the duration of her student program, but was terminated from SEVIS for failing to enroll. The individual was arrested, processed for removal, and released with an electronic monitoring bracelet.

- A 30-year-old Thailand national who had violated the terms of her student visa (SEVIS violator). The individual was admitted into the United States in 2001 but was later terminated from SEVIS for failing to maintain student status. The individual remains in ICE custody.

- A 26-year-old Philippines national who had violated the terms of her student visa (SEVIS violator). The individual was admitted into the United States in 2002 as a student, but was later terminated from SEVIS for failing to comply with the terms of her student program.

The individual was arrested and processed for removal.

# ICE #

U.S. Immigration and Customs Enforcement (ICE) is the largest investigative arm of the Department of Homeland Security (DHS).



Last Modified 06/30/2005

ABOUT | NEWS ROOM | CAREERS
BORDER SECURITY | FINANCIAL &
TRADE INVESTIGATIONS | PUBLIC
SECURITY
Home | Text | Site Map | Search | Legal |
FOIA | Firstgov | DHS