UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ )<br>)<br>AMERICAN-ARAB ANTI-DISCRIMINATION )<br>COMMITTEE )<br>      Plaintiff, )<br>)<br>      v. )<br>)<br>UNITED STATES DEPARTMENT OF )<br>HOMELAND SECURITY )<br>)<br>and )<br>)<br>IMMIGRATION AND CUSTOMS )<br>ENFORCEMENT )<br>      Defendants. )<br>)<br>_____ ) | Civil Action: 06-01770-JR |

**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56, defendants United States Department of Homeland

Security and Immigration and Customs Enforcement move for summary judgment on the

grounds that there are no disputed material facts and that defendants are entitled to judgment as a

matter of law.  In support of this motion, the federal defendants refer the Court to the attached

Memorandum in Support of Defendants' Motion for Summary Judgment and the Declaration of

John P. Clark.

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
Assistant Branch Director

s/Marcia K. Sowles
MARCIA K. SOWLES, DC Bar No. 369455
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 7114
Washington, D.C.  20530
Tel.: (202) 514- 4960
Fax: (202) 616- 8470
E-mail:  marcia.sowles@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE<br>　　　　　Plaintiff,<br><br>　　　　v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY<br><br>and<br><br>IMMIGRATION AND CUSTOMS ENFORCEMENT<br>　　　　　Defendants. | Civil Action: 06-01770-JR |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

The focus of this action is on two requests submitted by plaintiff American-Arab Anti-Discrimination Committee to defendant United States Department of Homeland Security ("DHS") and its component Immigration and Customs Enforcement ("ICE"), pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. In the FOIA requests, plaintiff seek specific data related to the 237 individuals arrested by ICE in October 2004 for immigration status violations. These arrests were made in connection with a law enforcement investigation conducted by ICE as a result of national security threat information relating to the 2004 Presidential election and Presidential inauguration. Declaration of John Clark ("Clark Decl."), ¶ 18 (Exhibit A). The first request seeks data on the nationality of the individuals, and the

second request plaintiff seeks data on the race, ethnicity, religion and gender of the individuals.

As explained below, defendants are entitled summary judgment with regard to both FOIA requests. ICE does not maintain data on the religion or ethnicity of the individuals, and it has data regarding the race of only 15 of the individuals, which it has provided to plaintiffs. Moreover, ICE properly withheld the data on the nationality and gender of the 237 individuals. Data on the nationality and gender of those arrested is protected from disclosure under Exemption 7(A) because release of such information could reasonably be expected to harm ongoing and prospective enforcement proceedings. 5 U.S.C. § 552(b)(7)(A). While the data on its face seems innocuous, releasing data on the nationality and gender of the individuals arrested during a specific one month time period when combined with information which either is public or known to terrorist groups could reveal the focus of the investigation. See Center for Nat'l Security Studies v. U. S. Department of Justice, 331 U.S. F.3d 918, 928 (D.C. Cir. 2003) (disclosure of names of all individuals arrested or detained in an investigation is protected from disclosure under Exemption 7(A) under the mosaic theory). Revealing the focus of the investigation could harm prospective and ongoing enforcement proceedings by allowing terrorists to evade detection. Clark Decl. ¶¶ 17-18.

The data is also protected from disclosure by Exemption 7(D). The information on the nationality and gender of the individuals suspected of being connected with the threat was provided by confidential sources to the government in the course of a criminal investigation with national security implications. Clark Decl. ¶ 19. As such it is protected by the second clause of Exemption 7(D), which protects "in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a

2

lawful national security intelligence investigation, information furnished by a confidential source." 5 U.S.C. § 552(b)(7)(D). The information is also protected by the first clause of Exemption 7(D) because disclosure of the data when combined with other available information "could reasonably be expected to disclose the identity of the confidential source." Id. Just as terrorist groups could use the data to identify the focus of the investigation, they could also use the information to identify the confidential sources.

The data is further protected from disclosure by Exemption 7(E) because it would reveal the methods used by ICE to prioritize its investigations of immigration status violations. See 5 U.S.C. § 552(b)(7)(E). Disclosure of the data together with other known information could also reveal the techniques and procedures used by ICE to gather information. Knowledge of ICE's methods and techniques could be used by terrorist groups to circumvent the law and avoid detection. Finally, the data is protected from disclosure by Exemption 7(F) because it could be reasonably expected to endanger the life and safety of confidential sources and others. 5 U.S.C. § 552(b)(7)(F).

Accordingly, this Court should grant defendants' motion for summary judgment.

## BACKGROUND

A.    **ICE's Mission and Enforcement Proceedings**

The DHS was created by the Homeland Security Act of 2002, Pub. L. 107-296, by merging several agencies which had responsibilities for protecting the security of the United States. Its mission is "preventing terrorist attacks within the United States, reducing the United States' vulnerability to terrorism, minimizing the dangers from such attacks and assisting in recovery from any attacks, should they occur." H.R. Rep. No. 609, 107th Cong., 2d Sess. 63

(2002). As Congress explained,

> Following September 11th, the Nation is no longer dealing solely
> with hostile nation states that can be held at risk with conventional
> military power, but also with global terrorist organizations such as
> al Qaeda immune to traditional forms of deterrence. Law
> enforcement and anti-terrorist experts believe that numerous
> terrorist cells remain within the borders of the United States. For
> the foreseeable future, the United States will face the threat of
> domestic attack by enemies who will seek to strike in new and
> unexpected ways, perhaps with weapons vastly more deadly than
> those used on September 11[th].

Id. at 64.

Congress recognized that securing the borders of the United States was an essential part

of protecting the United States from such threats. Id. at 66. Under that Act, therefore, the

functions and jurisdictions of several border and security agencies were merged into components

of DHS. DHS's duties include, inter alia, "preventing the entry of terrorists or instruments of

terrorism into the United States" and "carrying out the enforcement functions vested by statute or

performed by the Commissioner of Immigration and Naturalization." 6 U.S.C. § 202.

ICE is the investigative arm of the DHS. It was created by combining the law

enforcement arms of the former U.S. Customs Service, which had been a part of the U.S.

Department of the Treasury, and the former Immigration and Naturalization Service, which had

been part of the U.S. Department of Justice. Clark Decl. ¶ 2. It is the largest investigative arm of

the DHS and the second largest investigative agency in the federal government. Id. ICE derives

its investigatory authorities from Titles 8 and 19 of the United States Code.

One of ICE's primary responsibilities is the enforcement of the immigration laws. Id.

¶ 3. The 9/11 Commission noted that at least three of the 9/11 hijackers violated the terms of

4

their visas before carrying out their attacks. The 9/11 Commission Report, Chapter 12 n. 33

(cited pages from the report are attached as Exhibit B). The 9/11 Commission report found that

"had the immigration system set a higher bar for determining whether individuals are who or

what they claim to be – and ensuring routine consequences for violation – it could have

potentially excluded, removed, or come into further contact with several hijackers who did not

appear to meet the terms for admitting short-term visitors." Id. at 384.

     To address this threat, ICE established the Compliance Enforcement Unit ("CEU") to

detect and track foreign students, exchange visitors and other non-immigrant visitors who violate

immigration status. Clark Decl. ¶ 3. CEU researches and assigns immigration status leads to

ICE's field offices nationwide based on data and information from several sources, including the

National Security Entry/Exit Registration system ("NSEERS"),[1] Student Exchange Visitors

Information System "(SEVIS"),[2] and the United States Visitor and Immigration Status program

(US-VISIT).[3] Clark Decl. ¶ 24.

---

[1] NSEERS (also known as Special Registration) was put in place after September 11, 2002, to keep track of those entering and leaving United States of certain foreign visitors who, based upon country of origin or other intelligence-based criteria, may present an elevated national security concern. See 8 C.F.R. § 264.1. See also 67 Fed. Reg. 67,766 (Nov. 6, 2002) (Iran, Iraq, Libya, Sudan, and Syria); 67 Fed. Reg. 70,526 (Nov. 22, 2002) (Afghanistan, Algeria, Bahrain, Eritrea, Lebanon, Morocco, North Korea, Oman, Qatar, Somalia, Tunisia, United Arab Emirates, and Yemen); 67 Fed. Reg. 77,642 (Dec. 18, 2002) (Pakistan and Saudi Arabia); 68 Fed. Reg. 2363 (Jan. 16, 2003) (Bangladesh, Egypt, Indonesia, Jordon and Kuwait).

[2] SEVIS is an internet-based program administered by ICE to collect and maintain pertinent information relating to nonimmigrant students and exchange visitors, and the schools and exchange visitor program sponsors that host these individuals in the United States. 70 Fed. Reg. 14477.

[3] US-VISIT is the program established by DHS to implement an integrated entry and exit data system to record the entry into and the exit out of the United States of covered individuals (anyone who is not a citizen or national of the United States), verify identity, and confirm

In response to threat information received related to the 2004 Presidential election and Presidential inauguration, ICE implemented a threat disruption effort conducted by its CEU to locate immigrate status violators. Clark Decl. ¶ 17. Several hundreds leads were generated an prioritized according to national security criteria. Id. On November 4, 2004, ICE issued a press release stating that in the one-month period beginning October 1, 2004, ICE arrested 237 immigrant status violators as a result of the threat disruption effort. Complaint, Exhibit 4. The press release also gave brief description of eight of the individuals arrested – a 28 year old Saudi national, a 34 year old Jordanian national, a 24 year old Lebanese national, a 25 year old Pakistani national, a 44 year old Jamaican national, a 25 year old South African national, a 30 year old Thailand national and 26 year old Philippine national. Id. The press release, however did not reveal the nationalities or other details on any of the other 230 individuals.

## B.    Plaintiff's FOIA Requests

On December 14, 2004, plaintiff submitted a FOIA request to ICE requesting release of "data on nationality of those 230 individuals detained as a result of the enforcement initiative mentioned in a press release issued by ICE on November 4, 2004. Clark Decl. ¶ 6. On February 14, 2005, ICE denied plaintiff's request for such data on the grounds that the requested information is exempt from disclosure under 5 U.S.C. § 552(b)(2)(7)(A), (7)(C), (7)(D), (7)(E), (7)(F). Clark Decl. ¶ 7. On March 3, 2005, plaintiff filed an appeal. Clark Decl. ¶ 8. On September 5, 2005, DHS denied plaintiff's appeal. Clark Decl. ¶ 9. In its letter, DHS explained

---

compliance with the terms of admission to the United States. 8 C.F.R. Parts 215, 235, 232. It conducts certain terrorist, criminal, and immigration violation checks on persons entering the United States and compares biometric identifies to those collected on previously encountered individuals to verify identity.

that "[r]elease of information pertaining to the nationalities of these individuals could harm

ongoing and prospective law enforcement activities by, among other things, revealing where ICE

focuses its resources." Complaint, Exhibit 7.  Release of such information "would thus enable

analysts to discern trends in ICE enforcement operations, to the detriment of those efforts."  Id.

      On February 8, 2006, plaintiff filed a second FOIA request with ICE.  Clark Decl.  ¶ 11.

In that request, plaintiff requested that ICE "release the race, ethnicity, religion, and gender of the

237 detainees identified in the November 4, 2004 press release.  Id.

      ICE does not maintain information relating to the ethnicity or religion of these

individuals.  Id ¶ 14.  ICE also does not generally maintain data on race of immigration status

violators.  Id.  The race of persons detained is generally not known at the time that ICE initiates

an investigation.  Id.  Nor does ICE mandate the collection of such data at the time of the arrest.

Id.  Instead, such information is recorded at the discretion at the discretion of the arresting

officer.  Id.[4]  With respect to the individuals at issue here, ICE has race information on only 15 of

the 237 individuals.  Id.  ICE provided this information to plaintiffs.  Id.  ICE has withheld data

regarding the nationality and gender of the 237 individuals under Exemptions 7(A), 7(D), 7(E)

and 7(F).

## ARGUMENT

## I.    FOIA and Summary Judgment Standards of Review

      The Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), "represents a balance struck

by Congress between the public's right to know and the government's legitimate interest in

---

    [4] To the extent information on race is available, there is no means to verify its accuracy
since such information is based on the arresting officer's personal perception of the subject's race
or the subject's self-reporting of his/her race. Id.

keeping certain information confidential." <u>Center for Nat'l Security Studies v. DOJ</u>, 331 F.3d

918, 925 (D.C. Cir. 2003) (citing <u>John Doe Agency v. John Doe Corp.</u>, 493 U.S. 146, 152 (1989)

(quoting H.R. Rep. 89-1497, 89th Cong., 2d Sess. 6 (1966))).  FOIA requires each federal agency

to make available to the public a wide array of information, and sets forth procedures by which

requesters may obtain such information.  <u>See</u> 5 U.S.C. § 552(a).  At the same time, FOIA

exempts nine categories of information from disclosure, while providing that "[a]ny reasonably

segregable portion of a record shall be provided . . . after deletion of the portions which are

exempt under this subsection." 5 U.S.C. § 552(b).  Thus, while the FOIA requires agency

disclosure under certain circumstances, the statute recognizes "that public disclosure is not

always in the public interest." <u>Baldrige v. Shapiro</u>, 455 U.S. 345, 352 (1982).  The nine FOIA

exemptions "reflect Congress' recognition that the Executive Branch must have the ability to

keep certain types of information confidential." <u>Hale v. DOJ</u>, 973 F.2d 894, 898 (10th Cir.

1992), <u>vacated on other grounds</u>, 509 U.S. 918 (1993).  As the Supreme Court has stressed, the

statutory exemptions must be construed "to have a meaningful reach and application." <u>John Doe</u>,

493 U.S. at 152.

In a FOIA case, the court may award summary judgment to an agency on the basis of

information provided in affidavits or declarations that describe "the documents and the

justifications for nondisclosure with reasonably specific detail, demonstrate that the information

withheld logically falls within the claimed exemption, and are not controverted by either contrary

evidence in the record nor by evidence of agency bad faith." <u>Military Audit Project v. Casey</u>, 656

8

F.2d 724, 738 (D.C. Cir.1981).[5]

In evaluating the applicability of FOIA exemptions for purposes of deciding this summary judgment motion, the Court must be mindful that the information sought by plaintiff "implicat[es] national security, a uniquely executive purview." Center for Nat'l Security Studies v. U.S. Dept. of Justice, 331 F.3d 918, 926 (D.C. Cir. 2003), cert. denied, 540 U.S. 1104 (2004) (applying this deference with respect to information withheld under Exemption 7). Both the Supreme Court and the Court of Appeals have specifically recognized the "propriety of deference to the executive in the context of FOIA claims which implicate national security." Id. at 927-28 (citing, inter alia, CIA v. Sims, 471 U.S. 159, 179-80 (1983); McGehee v. Casey, 718 F.2d 1137 (D.C. Cir. 1983)); see also Center for Nat'l Security Studies, 331 F.3d at 927 ("terrorism or other special circumstances" might warrant "heightened deference to the judgments of the political branches") (citing Zadvydas v. Davis, 533 U.S. 678, 696 (2001)).

Indeed, courts have routinely and repeatedly emphasized that "weigh[ing] the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the [nation's] intelligence-gathering process" is a task best left to the Executive Branch and not attempted by the judiciary. Sims, 471 U.S. at 180; see also Center for Nat'l Security Studies, 331 F.3d at 928 ("the judiciary is in an extremely poor position

---

[5] Defendants believe that summary judgment can be granted for defendants based on the Declaration of John P. Clark, which is filed on the public record. However, if the Court finds that additional information is needed, defendants are willing to provide a more detailed explanation in an ex parte and in camera declaration. Courts have recognized that agencies may rely of such in camera and ex parte declarations where, as here, a more detailed explanation of the basis for the exemptions on the public records would jeopardize the information that the government seeks to protect or other privileged information. United States Department of Justice v. Landano, 508 U.S. 164, 179 (1993); Doyle v. FBI, 722 F.2d 554, 556 (9th Cir. 1983); Hayden v. CIA, 608 F2d 1381, 1385 (D.C. Cir. 1979).

9

to second-guess the executive's judgment in [the] area of national security"); Halperin v. Central

Intelligence Agency, 629 F.2d 144, 148 (D.C. Cir. 1980) ("Judges . . . lack the expertise

necessary to second-guess [] agency opinions in the typical national security FOIA case"). Thus,

courts have "consistently deferred to executive affidavits predicting harm to the national security,

and have found it unwise to undertake searching judicial review." Center for Nat'l Security

Studies, 331 F.3d at 927. Instead, "[a]t least in the national security context, the reviewing court

must give 'substantial weight'" to an agency's declarations. ACLU v. DOJ, 265 F. Supp. 2d 20,

27 (D.D.C. 2003) (quoting King v. Dept. of Justice, 830 F.2d 210, 217 (D.C. Cir. 1987)).

## II.     DEFENDANTS PROPERLY WITHHELD THE DATA ON THE NATIONALITY AND  GENDER OF THE INDIVIDUALS UNDER EXEMPTION 7.

Exemption 7 of FOIA protects from disclosure "records or information compiled for law

enforcement purposes" when they meet specified criteria. 5 U.S.C. § 552(b)(7). Documents are

compiled for law enforcement purposes within the meaning of Exemption 7's threshold

requirement if: (1) the activity that gives rise to the documents is related to the enforcement of

federal laws or the maintenance of national security; and (2) the nexus between the activity and

one of the agency's law enforcement duties is based on information sufficient to support at least a

"colorable claim" of its rationality. See Keys v. U.S. Dept. of Justice, 830 F.2d 337, 340 (D.C.

Cir. 1987); Blanton v. U.S. Dept. of Justice, 63 F.Supp.2d 35, 44 (D.D.C. 1999). Essentially,

this threshold showing requires "that the defendant show a nexus between the agency's activities

and a legitimate law enforcement purpose." Coleman v. Federal Bureau of Investigation, 13 F.

Supp. 2d 75, 83-84 (D.D.C. 1998).

Here, as explained in the Declaration of John P. Clark, the information at issue meets that

criteria. Clark Decl. ¶ 16. Defendant ICE is an agency is specializing in the enforcement of

immigration and customs laws. Id. ¶ 2. The information was complied as part of on its

investigation of suspected immigration status violations. Id. ¶ 16. Thus, there is a direct nexus

between the agency's activities and legitimate law enforcement purposes.

Moreover, as explained below, the information is protected from disclosure by specified

criteria for Exemptions 7(A), (D), (E) and (F).

> ### A.    The Withheld Data Is Protected From Disclosure By Exemption 7(A) Because Release of the Data Could Reasonably Be Expected to Harm Pending and Prospective Enforcement Proceedings.

Exemption 7(A) allows an agency to withhold any records or information compiled for

law enforcement purposes, but only to the extent that the production of such law enforcement

records or information "could reasonably be expected to interfere with enforcement proceedings."

5 U.S.C. § 552(b)(7)(A). To satisfy its burden justifying the applicability of this exemption, the

government need only demonstrate that (1) a law enforcement proceeding is pending or

prospective, and (2) release of the information could reasonably be expected to cause some

articulable harm to the proceeding. Voinche v. Fed. Bureau of Investigation, 46 F. Supp. 2d 26,

31 (D.D.C. 1999). The information on the nationality and gender of the 237 individuals arrested

for immigration violations in October 2004 meets these criteria.

First, the data relate to pending and prospective law enforcement proceedings. Clark

Decl. ¶ 18. While immigration status violation cases against 237 individuals arrested during this

period have been closed, these cases are related to other pending and prospective enforcement

proceedings. Id. The cases were part of a larger ongoing investigation designed to locate

immigration status violators who may pose an elevated criminal or national security threat. Id.

Courts have consistently permitted use of exemption 7(A) when the proceedings against some of

the targets are closed when, as here, the proceedings are related to other ongoing or prospective

law enforcement proceedings. <u>Solar Sources, Inc. v. U.S.</u>, 142 F.3d 1033, 1040 (7th Cir. 1998);

<u>New England Medical Center Hospital v. NLRB</u>, 548 F.2d 377, 385-386 (1st Cir. 1977);

<u>Cudzich v. INS</u>, 886 F. Supp. 101,106-07 (D.D.C. 1995).

Second, release of information regarding the nationality and gender of the persons

arrested during this one month period could reasonably be expected to harm the ongoing

investigation. Clark Decl. ¶¶ 17-18.[6] Courts have recognized that Exemption 7(A) allows an

agency to protect those records which "could reveal much about the focus and scope" of the

investigation. <u>Swan v. SEC</u>, 96 F.3d 498, 500 (D.C. Cir. 1996). <u>Accord Solar Source, Inc. v.</u>

<u>United States</u>, 142 F.3d at 1039.

This is exactly the type of harm presented here. Release of data regarding the nationality

and gender of the 237 individuals arrested for immigration status violations in October 2004,

when pieced together with other information which is already publicly available or known to

---

[6] The Government's burden in demonstrating interference with law enforcement
proceedings under Exemption 7(A) has been significantly relaxed by Congress. Section
552(b)(7)(A) originally provided for the withholding of information that "<u>would</u> interfere with
enforcement proceedings," but the Freedom of Information Reform Act of 1986 amended that
language and replaced it with the phrase "<u>could reasonably be expected to</u> interfere with"
enforcement proceedings. <u>See</u> Pub. L. No. 99-570, § 1802, 100 Stat. 3207, 3207-48 (emphasis
added). Courts have repeatedly recognized that this change in the statutory language
substantially broadens the scope of the exemption. <u>See, e.g.,</u> <u>Manna v. DOJ</u>, 51 F.3d 1158, 1164
n.5 (3d Cir. 1995) (purpose of 1986 amendment was "to relax significantly the standard for
demonstrating interference with enforcement proceedings"); <u>Alyeska Pipeline Service Co. v. U.S.
Environmental Protection Agency</u>, 856 F.2d 309, 311 n.18 (D.C. Cir. 1988) (holding that district
court's improper reliance on pre-amendment version of Exemption 7(A) "required EPA to meet a
higher standard than FOIA now demands").

terrorist groups, could reveal where the government has focused its efforts – and perhaps as important – where it was not focusing during that time period. Clark Decl. ¶ 18. Moreover, to the extent plaintiff or another FOIA requester submitted additional requests for such data on a month-to-month basis, the data would reveal the direction and progress of the investigation and provide individuals and groups with a roadmap of its enforcement efforts. Id. ¶ 20. With such information, individuals could thwart the enforcement efforts by introducing person into the United States that fall outside of the targeted population. Id. ¶25.

Moreover, release of the data, when pieced together with other information, could reveal sources and methods used by ICE in these and other related prospective law enforcement proceedings. See infra at 17-21. Revealing the sources and methods used by ICE could harm ongoing and prospective law enforcement proceedings by discouraging confidential sources from providing additional information and allowing terrorist groups to evade detect. Clark Decl. ¶ 22.

In its complaint, plaintiff seeks to rebut this harm in two ways. First, it alleges that data on the nationality "is such a generalized and innocuous nature that its release cannot reasonably be expected to interfere with ongoing or prospective enforcement proceedings." Complaint, ¶ 28. Second, it argues that the government's allegation of harm is undermined by the fact that ICE disclosed information about the nationality of eight individuals in its press release issued on November 4, 2004. Id. ¶ 16. Neither argument is persuasive.

Plaintiff's contention that the information is innocuous in nature is conclusory and ignores the cumulative effect of releasing such data about all persons arrested in connection with an investigation during a specific one month time period. Center for Nat'l Security Studies v. U.S. Dept. of Justice, 331 F.3d at 928. In that case, plaintiffs sought information regarding persons

13

detained in the wake of the 9/11 terrorist attack. While the district court held that the

government was entitled to withhold certain data about the persons detained, it ordered the

government to disclose the names of the detainees and their attorneys. <u>Center for Nat'l Security</u>

<u>Studies v. U.S. Dept. of Justice</u>, 215 F.Supp.2d 94, 113 (D.D.C. 2002). The Court of Appeals

held that the district court erred in ordering the release of such information. In light of the

deference owed to Executive Branch on national security matters, the court found that "the

government's expectation that disclosure of the detainees' name would enable al Qaeda and other

terrorists groups to map the course of the investigation and thus develop the means to impede it

is reasonable." 331 F.3d at 928. The court explained that

> A complete list of names informing terrorists of every suspect
> detained by the government at any point during the September 11
> investigation would give terrorists organizations a composite
> picture of the government investigation, and since these
> organizations would generally know the activities and locations of
> its members on or about September 11, disclosure would inform
> terrorists of both the substantive and geographic focus of the
> investigation. Moreover, disclosure would inform terrorists which
> of their members were compromised by the investigation, and
> which were not. This information could allow terrorists to better
> evade the ongoing investigation and more easily formulate or
> revise counter-efforts.

<u>Id.</u> The court, therefore, found that the names of the detainees were protected from disclosure by

Exemption 7(A).

The court reached the same conclusion regarding plaintiffs' request for dates and

locations of the arrests of the detainees:

> Knowing when and where each individual was arrested would
> provide a chronological and geographic picture of the government's
> investigation. Terrorists could learn from this information not only
> where the government focused its investigation, but how that

investigation progressed step by step. Armed with that knowledge, they could then reach such conclusions as, for example, which cells had been compromised, and which individuals had been cooperative with the United States. They might well be able to derive conclusions as to how more adequately secure their clandestine operations in future terrorists undertaking.

Id. at 933.

Courts have relied upon similar mosaic arguments in other cases involving national security. For example, the Supreme Court cautioned that "bits and pieces" of data "'may aid in piecing together bits of other information even when the individual piece is not of obvious importance in itself." Sims, 471 U.S. at 178 (quoting Halperin v. CIA, 629 F.2d 144, 150 (D.C. Cir. 1980)). As the Fourth Circuit explained in United States v. Marchetti, 466 F.2d 1309, 1318 (4th Cir. 1972), "t]he significance of one item of information may frequently depend upon knowledge of many other items of information. What may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context." Accord Am. Friends Serv. Comm. v. U.S. Dept. of Defense, 831 F.2d 441, 445-46 (3d Cir. 1987); Edmonds v. FBI, 272 F. Supp.2d 35, 37 (D.D.C. 2003); Aftergood v. Central Intelligence Agency, 355 F. Supp.2d 557, 563 (D.D.C. 2005).[7]

---

[7] Courts have also applied "mosaic" principles in analyzing other FOIA exemptions. See Cappabianca v. Commissioner, 847 F. Supp. 1558, 1563 (M.D. Fla. 1994) (upholding Exemption 2 claim applied to codes used to label agency files because "disclosure of the file number, if the code were cracked," could lead to circumvention of the law); Jan-Xin Zang v. FBI, 756 F. Supp. 705, 712 (W.D.N.Y. 1991) (upholding Exemption 2 claim applied to "source symbol numbers" on agency files because "accumulation of information known to be from the same source" could facilitate identification of sources); Timken Co. v. U.S. Custom Serv., 491 F. Supp. 557, 559-560 (D.D.C. 1980) (upholding Exemption 4 claim applied to information about prices because "even if the price data would be insufficient standing by itself, to allow computation of the costs of production, this cost would be ascertainable when coupled with other information either possessed by plaintiff or sought by plaintiff in other pending FOIA actions).

15

Indeed, when Congress reviewed exemption 7 in 1983, the Senate Report specifically

recognized this danger. S. Rep. No. 221, 98th Cong., 2d Sess. 23 (1983). It observed:

> Although Exemption 7 currently attempts to protect confidential
> informants and investigations, this protection can be compromised
> when small pieces of information, insignificant by themselves, are
> released and then pieced together with other previously released
> information and the requester's own personal knowledge to
> complete a whole and accurate picture of information that should
> be confidential and protected, such an a confidential source.

Id.

The same danger of piecing together small bits of information is present here. While the

nationality and gender of the individuals arrested as a result of ICE investigation in October 2004

appear unimportant, the information could be pieced together with other available information to

reveal the focus of the broader investigation. Clark Decl. ¶ 18. This is especially true where, as

here, plaintiff does not seek the nationality and gender of one individual, but every single

individual arrested for immigration status violations during a relatively narrow and specific time

period and in the context of a single investigation. Id. As in National Security Center, 331 F.3d

at 929, "it is more than reasonable to expect" that details about every individual arrested as part

of an investigation could reveal patterns or methods that could interfere with enforcement

proceedings.

Plaintiff's argument that the harm to enforcement proceedings is undermined by the fact

that ICE disclosed information about the nationality and gender of eight individuals is also lacks

merit. This argument is similar to that raised by plaintiffs and rejected by the court in National

Security Center, 331 F.3d at 930-31. In that case, plaintiffs argued that the government's

disclosure of the names of some of the detainees undermined its claim that disclosure of other

names would harm the law enforcement proceedings. The D.C. Circuit held that "[t]he disclosure of a few pieces of information in no way lessens the government's argument that complete disclosure would provide a composite picture of its investigation and have negative effects on the investigation." Id. Accord Sims, 471 U.S. at 180 (rejected contention that "because the Agency has already revealed the names of many of the institutions at which [behavior modification] research was performed, the Agency is somehow estopped from withholding the names of others."); Aftergood v. Central Intelligence Agency, 355 F. Supp.2d 557, 564 (D.D.C. 2005) (disclosure of aggregate intelligence budget data for the CIA for one fiscal year "does not waive the agency's ability to withhold similar information concerning earlier and later periods of time). Thus, the fact that ICE disclosed the nationality and gender of eight of the 237 persons arrested for immigration status violations in October 2004 does not waive its right to withhold such data regarding the other persons.

Accordingly, defendants properly withheld the information sought by plaintiffs under Exemption 7(A).

**B.    The Withheld Data is Protected from Disclosure by Exemption 7(D) Because Disclosure of the Data Could Reveal Confidential Sources and Information Provided by Confidential Sources.**

Exemption 7(D) permits the withholding or redacting of law enforcement records the release of which "could reasonably be expected to disclose the identity of a confidential source, including State, local or foreign agency or authority or any private institution, which furnished information on a confidential basis, or in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting national security intelligence investigation, information furnished by a confidential

17

source." Unlike 7(C), exemption 7(D) requires no balancing of public and private interests. <u>See</u>
<u>Dow Jones & Co. v. U.S. Dep't of Justice</u>, 917 F.2d 571, 575-76 (D.C. Cir. 1990). Moreover,
Exemption 7(D)'s protection of confidential sources and information provided by such sources
applies regardless of whether the investigation is open or closed. <u>Ortiz v. U.S. Dept. of Health</u>
<u>and Human Services</u>, 70 F.3d 729, 733 (2 Cir. 1985); <u>KTVY-TV v. U.S.</u>, 919 F.2d 1465, 1470-
71 (10th Cir. 1990). The exemption applies if the agency establishes that a source has provided
information under either an express or implied promise of confidentiality. <u>See Williams v. FBI</u>,
69 F.3d 1155, 1159 (D.C. Cir. 1995). A confidential source is one who "provided information
under an express assurance of confidentiality or in circumstances from which such an assurance
could be reasonably inferred." <u>U.S. Department of Justice v. Landano</u>, 508 U.S. 165, 172 (1993)
(internal quotation and citation omitted).

The data at issue here fits within both clauses of Exemption 7(D). ICE had received
threat information related to the 2004 Presidential election and inauguration. Clark Decl. ¶ 18.
The purpose of ICE's investigation was to uncover and disrupt criminal activities affecting the
national security of the United States. <u>Id.</u> ¶ 19. Accordingly, the investigation was criminal as
opposed to an administrative investigation into the immigration status violators who had no
known or suspected ties to criminal or terrorists activities. <u>Id.</u> The information regarding the
nationality and gender of possible suspects was received from confidential sources by the
government in the course of this investigation. <u>Id.</u> Accordingly, the data itself is protected
directly by the second clause of Exemption 7.

The information at issue is also protected by the first clause of Exemption 7 because its
release could reasonably be expected to disclose the identity of the confidential source. Clark

18

Decl. ¶ 19-22. Terrorist groups often closely guard operational plans and objectives by compartmentalizing operational information among its members. Id. ¶ 21. By examining the nationality and gender of the persons who were the focus of the investigation, a compartmentalized terrorist group can deduce the government's confidential sources. Id. The potential for compromising these sources is magnified by the fact that the information sought by plaintiffs relates to a specific and condensed time period – October 2004. Id. ¶ 20. Disclosure of the information could pinpoint the perceived threats being investigated, it could identify with specificity such threat information was provided. Id. This could assist persons with terrorist ties to identify which individuals or groups of individuals had access to such information at that time period thereby narrowing the scope of potential sources. Id. Likewise to the extent a FOIA requester were to submit additional requests for such information on a month-to- month basis, the requested data could enable terrorist groups to identify shifts in investigative strategy and more clearly identify the sources having access to information that would induce such shifts. Id. ¶ 21.

Any disclosure of confidential informants' identities could gravely jeopardize their physical safety, which could have a profound chilling effect on the willingness of others to assist law enforcement in a similar matter. Id. ¶ 22. At the very least, compromising such a source may prevent the government from obtaining valuable information relating to investigations in the future. Id.

Accordingly, the data withheld by ICE is protected by Exemption 7(D).

C.     **The Withheld Data is Protected from Disclosure by Exemption 7(E) Because Release of the Data Would Reveal the Methods Used by ICE to Prioritize Its Enforcement Efforts and Law Enforcement Techniques.**

Records compiled for law enforcement purposes may be withheld under Exemption 7(E) if release of the information "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). The first clause of this exemption seeks to protect information related to law enforcement techniques. See Smith v. Bureau of Alcohol, Tobacco and Firearms, 977 F. Supp. 496, 501 (D.D.C. 1997); Fisher v. Dept. of Justice, 772 F. Supp. 7, 12 n. 9 (D.D.C. 1991), aff'd, 968 F.2d 92 (D.C. Cir. 1992). This includes methods used by a law enforcement agency to prioritize its investigations or identify possible violations. Gordon v. FBI, 388 F. Supp.2d 1028, 1035-36 (N.D. Cal. 2005) (documents relating to "watch list" and watch list selection criteria) Polly v. Internal Revenue Services, 939 F. Supp. 429, 428 (E.D. Va. 1996) (statistical techniques used to determine which taxpayers to audit); Jimmenez v. FBI, 938 F. Supp. 21, 30 (D.D.C. 1996) (criteria used by FBI to determine whether a particular individual can be classified as a gang member); Hames v. United States Custom Serv., No. 94 Civ. 4868, 1994 WL 693717 *1 (S.D.N.Y. Dec. 9, 1994) (protecting criteria used by Custom Services to determine which passengers to stop and examine).

Here ICE prioritizes immigration status leads using threat-based targeted approach to focus ICE's resources on the persons considered to be a higher potential threat to national security or public safety. Clark Decl. ¶ 24. The release of information on the nationality and gender of the individuals arrested for immigration status violation during this one month period

20

would reveal the methods used by CEU to prioritize violators leads. <u>Id.</u> ¶ 25. This would

provide a means for terrorist groups to introduce persons into the United States that would fall

outside the targeted priority. <u>Id.</u> Disclosure of these methods would not only limit the

effectiveness of future ICE and other law enforcement operations but would create a vulnerability

to national security. <u>Id.</u>

In addition, disclosure of the nationality and gender of the persons arrested during a

specific time period when pieced together with other available information could also reveal the

law enforcement techniques used to gather the leads. <u>Id.</u> ¶ 26. For example, to the extent that a

terrorist organization is able to identify sources of information used to identify the threats, it will

then be able to scrutinize circumstances and events surrounding the sources at the time the

information was disclosed by the sources and thereby identify the techniques employed to obtain

the information. <u>Id.</u> Even if a law enforcement technique itself has been disclosed, but the

public is not generally aware of the manner and circumstances in which the technique is

employed, or the specific methods used by the particular agency, Exemption 7(E) still applies.

<u>See, e.g.</u>, <u>Blanton</u>, 63 F. Supp. 2d at 49-50; <u>Coleman v. Federal Bureau of Investigation</u>, 13 F.

Supp. 2d 75 at 83-84. In some cases, even commonly known procedures have been protected

from disclosure when "circumstances of their usefulness . . . may not be widely known," or "their

use in concert with other elements of an investigation and in their totality directed toward a

specific investigative goal constitute a 'technique' which merits protection." <u>Wickline v. FBI</u>,

92-1189 (SSH), 1994 WL 549756, at *5 (D.D.C. Sept. 30, 1994). Disclosure of the

investigative techniques could limit its future effectiveness. <u>See, e.g.</u>, <u>Gonzalez v. Bureau of</u>

<u>Alcohol, Tobacco, and Firearms</u>, 04-2281 (JDB), 2005 WL 3201009, at *10 (D.D.C. Nov. 9,

2005); <u>Edmonds v. FBI</u>, 272 F. Supp. 2d 35, 56 (D.D.C. 2003).

Defendants, therefore, properly withheld data on the nationality and gender under

Exemption 7(E).

### D.    The Withheld Data Is Protected By Exemption 7(F) Because Release of the Withheld Information Could Reasonably Be Expected to Endanger the Life or Physical Safety of Individuals.

Exemption 7(F) provides that documents may be exempted from disclosure under FOIA

if they are "records or information compiled for law enforcement purposes, but only to the extent

that the production of such law enforcement records or information . . . could reasonably be

expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). As

originally drafted, the exemption only protected records that "would . . . endanger the life or

physical safety of law enforcement personnel." Pub. L. No. 93-502, 88 Stat. 1561, 1563 (1974)

(subsequently amended). Following FOIA's amendment in 1986 to protect against disclosure of

records that "could . . . endanger the life or physical safety of any individual," courts applying

Exemption 7(F) have tended to construe it broadly and give substantial deference to the custodial

agency's determination that such a risk exists and warrants withholding of documents. <u>See</u>

<u>Living Rivers, Inc. v. U.S. Bureau of Reclaimation</u>, 272 F. Supp. 1313, 1321 (D. Utah 2003)

(court should defer to agency's assessment of the danger); <u>Linn v. United States Dep't of Justice</u>,

Civ. A. No. 92-1406, 1995 WL 631847, at *9 (D.D.C. Aug. 22, 1995) (in evaluating the validity

of an agency's invocation of Exemption 7(F), the court should "within limits, defer to the

agency's assessment of danger"). "Indeed, both the Supreme Court and [the D.C. Circuit] have

expressly recognized the propriety of deference to the executive in the context of FOIA claims

which implicate national security." <u>Center for Nat'l Security Studies</u>, 331 F.3d at 926-27 (noting

22

that "a court may rely on government affidavits to support the withholding of documents under FOIA exemptions. . . . It is equally well-established that the judiciary owes some measure of deference to the executive in cases implicating national security, a uniquely executive purview.") (citation omitted). The agency's assessment of danger needs to establish a "nexus between the specific material withheld and harm to persons." Linn, 1995 WL 631847, at *9. "Although [Exemption 7(F)] applies equally to information subject to Exemption 7(C), it does not require any balancing test." Shores v. F.B.I., 185 F. Supp. 2d 77, 85 (D.D.C. 2002) (emphasis in original).

In its present, expansive form, Exemption 7(F) clearly may be invoked to protect the lives of persons other than law enforcement personnel. See, e.g., Living Rivers, Inc., 272 F. Supp.2d at 1321 (protecting dam inundation maps because persons occupying areas that could be flooded could be harmed); Garcia v. U.S. Dept. of Justice, 181 F. Supp. 2d 356, 378 (protecting private citizens and third parties); Sanders v. U.S. Department of Justice, Civ. A. No. 91-2263-0, 1992 WL 97785, at *5 (D. Kan. April 21, 1992) (protecting from disclosure plaintiff's mental health records and identities of medical personnel who prepared those records because disclosure could "aggravate her condition to the point that she could harm someone involved in the investigation").

In this case, ICE has identified a reasonable risk that disclosure of data could reveal the identify of confidential sources, and has concluded that were the identities of the informants to become known to terrorists, their lives could well be in danger. Clark Decl. ¶ 27. Moreover, to the extent that ICE agents or other government agents continue to associate with these sources and rely on them for information, such agents could also be placed in danger if the source being

23

contacted has unknowingly been compromised and terrorist groups used the source to gain access to the agents. Id. Accordingly, summary judgment should be granted for the defendants on the basis of this exemption, as well as the other applications of Exemption 7 described above.

## CONCLUSION

For the foregoing reasons, the Court should grant defendants' Motion for Summary Judgment.

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
Assistant Branch Director

s/Marcia K. Sowles
MARCIA K. SOWLES, DC Bar No. 369455
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W. Room 7114
Washington, D.C. 20530
Tel.: (202) 514- 4960
Fax: (202) 616- 8470
E-mail: marcia.sowles@usdoj.gov

Attorneys for Defendants

# Exhibit A - DECLARATION OF JOHN P. CLARK

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Civil Action No. 06-01770-JR ) |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, IMMIGRATION AND CUSTOMS ENFORCEMENT, | ) ) ) ) ) |
| Defendant. | ) ) |

## DECLARATION OF JOHN P. CLARK

### I. INTRODUCTION

1.        I, John P. Clark make the following statement, under penalty of perjury, pertinent to the above styled and numbered cause, and being over 18 years of age, am fully competent to make the statements contained in this declaration.

2.        I am the Deputy Assistant Secretary for Operations of U.S. Immigration and Customs Enforcement (ICE), a component agency within the Department of Homeland Security (DHS). Created in March 2003, ICE is the second largest investigative agency in the Federal Government and is the largest investigative branch of DHS. ICE was created after 9/11, by combining the law enforcement arms of the former Immigration and Naturalization Service (INS) and the former U.S. Customs Service, to more effectively enforce U.S. immigration and customs laws and to protect the United States against terrorist attacks. As the Deputy Assistant Secretary for ICE, I supervise its day-to-day operations.

3.     ICE has been tasked with closing down our nation's vulnerabilities by targeting the people, money and materials that support terrorism and other criminal activities. ICE does this by targeting illegal immigrants and other persons who assist terrorist and criminal organizations through the planning and coordination of, and participation in, unlawful activity in support of terrorism and other criminal acts. ICE is a key component of the DHS's "layered defense" approach to protecting the nation from future terrorist attacks. ICE prioritizes its immigration enforcement actions by targeting the greatest national security and public safety threats -- an approach not taken prior to 9/11. Prior to 9/11, immigration authorities were not widely recognized or used as an effective counter-terrorism tool in the United States. The 9/11 Commission Report noted that several of the 9/11 hijackers could have been detected and removed if the former INS had investigated routine immigration violations. Today, ICE has created a host of new systems to better address national security threats and detect potential terrorist activities in the U.S. For example, in recognition that several of the 9/11 hijackers and the 1993 World Trade Center bombers violated the terms of their visas to embed themselves in America, ICE established the Compliance Enforcement Unit in June 2003 to detect, track, and prioritize for arrest visa violators and other immigration status violators that pose national security or public safety threats. The operation at issue in this case focuses on immigration status violators who posed a higher potential threat to the national security.

4.     This declaration is based upon my personal review and information conveyed to me in the course of my official duties. I am familiar with the facts of this case through discussions with ICE Counsel and my discussions with several ICE Supervisory and Senior Special Agents.

## II. FACTUAL HISTORY

5.     On November 4, 2004, ICE issued a news release through its Public Affairs Office entitled "ICE Threat Disruption Effort Results in More Than 230 Arrests." The purpose of the

**DECLARATION OF JOHN P. CLARK**          Page 2

news release was to outline, for the general public, an ongoing initiative designed to locate "immigration status violators" who pose an elevated criminal or national security threat. The news release stated that leads were sent to ICE field offices for immediate investigation and potential arrests – without regard to race, ethnicity, or religion. The news release listed a sampling of eight (8) arrests initiated under the initiative. The eight (8) arrests listed were a 28 year old Saudi national, a 34 year old Jordanian national, a 24 year old Lebanese national, a 25 year old Pakistani national, a 44 year old Jamaican national, a 25 year old South African national, a 30 year old Thailand national and a 26 year old Philippines national. The operational plan resulting in these arrests was to remain in effect through the 2004 Presidential election.

6.        Plaintiff submitted a FOIA request, dated December 14, 2004, to ICE, requesting that "… ICE release data on [the] nationality of those 230 individuals detained as a result of the recent enforcement initiative. …"

7.        ICE responded to plaintiff's December 14, 2004 FOIA request in a letter, dated February 14, 2005, stating; "… that a search of our database was able to determine the specific information you have requested. However, this data is being withheld in its entirety pursuant to exemption (b)(7)(A) of the FOIA."

8.        Plaintiff appealed the ICE response in a letter, dated March 3, 2005, to the Privacy Office, DHS.

9.        The Privacy Office, DHS affirmed the ICE response in a letter, dated September 5, 2005.

10.        Plaintiff requested reconsideration of the Privacy Office's decision to affirm the ICE response in a letter, dated November 10, 2005.

11.        Plaintiff submitted a second FOIA request to ICE in a letter, dated February 8, 2006,

requesting "... that U.S. Immigration and Customs Enforcement ("ICE" or "the agency") release

data on the race, ethnicity, religion, and gender of the 237 individuals detained as a result of an

immigration enforcement operation in late 2004, identified in an ICE press release of November

4, 2004."

12.        ICE acknowledged receipt of plaintiff's February 8, 2006 FOIA request in a letter,

dated April 6, 2006.

13.        Plaintiff entered their Complaint for Declaratory and Injunctive Relief in the United

States District Court for the District of Columbia on October 17, 2006.

14.        Defendant ICE submitted its "Answer to Complaint for Declaratory and Injunctive

Relief" in the United States District Court for the District of Columbia on November 16, 2006.

With regard to the information sought in plaintiff's February 8, 2006 request, ICE does not

maintain information relating to, ethnicity, and religion. With respect to race data, to the extent

ICE maintains such data, it is collected at the time of arrest, and is not generally known to ICE at

the time ICE initiates an investigation. ICE does not mandate the collection of information

relating to an individual's race and such information is only collected at the discretion of the

arresting officer. Moreover, to the extent that such information is collected, there is no means by

which to verify the accuracy of information relating to an individual's race since often such

information is recorded based on the arresting officer's personal perception of the subject's race,

or based on the subject's self reporting of his or her race. With respect to race information

relating to the 237 persons that are the subject of Plaintiff's request, ICE did not have that

information prior to conducting these investigations, and upon the arrest of the subjects, did not

DECLARATION OF JOHN P. CLARK          Page 4

uniformly collect such information. ICE collected race data on only 15 individuals. ICE released this information to Plaintiff on January 18, 2007.

### III. FREEDOM OF INFORMATION EXEMPTIONS

15.     Exemption (b)(7) – Threshold: To successfully defend the assertion of any (b)(7) exemption as a basis for withholding records and information, an agency must demonstrate that the matters so withheld were compiled for law enforcement purposes.

16.     The information for which FOIA exemption (b)(7) has been asserted in the instant matter satisfies this threshold requirement. The DHS is responsible for protecting the United States against terrorist attacks and other national security threats. As noted above, ICE is the largest investigative arm of DHS, and is responsible for identifying and eliminating vulnerabilities within the nation's borders in order to provide greater security to the United States and prevent future terrorist attacks; and establishing and maintaining economic transportation and infrastructure security. ICE is tasked with preventing any activities that threaten national security and public safety by targeting the people, money and materials that support illegal enterprises. ICE compiled the information requested by plaintiff during its investigation into allegations of Immigration Status Violations in violation of 8 U.S.C. § 1227 and the Immigration and Naturalization Act (INA), i.e., §§ 237(a)(1)(B) and 237(a)(1)(C)(i) *et seq*, and, therefore, the threshold is satisfied.

17.     Exemption (b)(7)(A) – 5 U.S.C. § 552(b)(7)(A): FOIA Exemption (b)(7)(A) allows for the withholding of "records or information compiled for law enforcement purposes" to the extent that their release "could reasonably be expected to interfere with enforcement proceedings," 5 U.S.C. § 552(b)(7)(A). As discussed in paragraphs 2 and 16, ICE is a law enforcement agency responsible for enforcing the immigration and customs laws of the United

**DECLARATION OF JOHN P. CLARK          Page 5**

States and detecting both criminal and civil violations thereof. Release of information relating to the arrestees' nationalities as, sought in plaintiff's December 14, 2004 request, or information relating to the arrestees' genders, as sought in plaintiff's February 8, 2006 request would interfere with the current, open and pending investigation into immigration status violations.

18.       In response to threat information received related to the 2004 Presidential election and the Presidential inauguration, ICE implemented a threat disruption effort conducted by its Compliance Enforcement Unit (CEU) designed to locate "immigration status violators." Several hundred leads were generated and prioritized according to national security criteria. These leads resulted in hundreds of investigations of "status violators" during the threat disruption effort. At the time of the November 4, 2004 news release, 237 "status violators" had been arrested as a result of the investigations initiated during the threat disruption effort. These cases are considered to be interrelated and part of the overarching investigation initiated at that time. While the individual cases relating to the 237 individuals that were the subject of Plaintiff's FOIA request have been individually closed, cases relating to other persons identified and/or investigated as a part of the overarching investigation remain open and ongoing. Disclosure of the information requested by plaintiff in conjunction with other information publicly available or information known to potential terrorists could assist potential terrorists in identifying the sources and methods of the ICE investigations and the focus of the ICE investigations and thereby disrupt ongoing efforts with respect to these investigations. Likewise, and perhaps just as significant, such disclosure could disclose where ICE is not focusing its efforts.

19.       Exemption (b)(7)(D) – 5 U.S.C. § 552(b)(7)(D):  This exemption is asserted to protect from disclosure information compiled for law enforcement purposes, that if released, would disclose the identities of a confidential source, including a state, local, or foreign agency or

DECLARATION OF JOHN P. CLARK       Page 6

authority or any private institution which furnished the information on a confidential bases. Moreover, where confidential sources have provided information during the course of a criminal investigation or in the course of a lawful national security intelligence investigation, the information provided by the confidential source as well as information that could lead to the identification of the confidential source, is exempt from disclosure. Some of the threat data used in the enforcement initiative in question, including information relating to the gender and nationality of potential targets of the investigation, was received from confidential sources pursuant to a strict understanding of confidentiality. Furthermore, the investigation being conducted by ICE went beyond a routine administrative investigation into immigration status violators who had no known or suspected ties to criminal or terrorist activity. Rather, the purpose of the ICE investigation was to pursue the information it had obtained in order to uncover and disrupt criminal and/or terrorist activity that had national security implications, i.e, the disruption of the 2004 Presidential election.

20. The potential for compromising these sources is magnified by the fact that the information sought by Plaintiff relates to a specific and condensed time period. Disclosure of the information sought would not only pinpoint the information received, but would identify with specificity when such information was provided. This could assist persons with terrorist ties to identify which individuals or groups of individuals had access to information at that specific time period and thereby narrow the scope of potential sources and potentially identify the actual sources of information.

21. Likewise, to the extent a FOIA requester were to submit similar requests seeking information relating to national security investigations over a period of time, such information could enable terrorist groups to identify shifts in investigative strategy, and more clearly identify

the source(s) having access to information that could induce such shifts in strategy during each time period.

22.     It is understood that terrorist organizations closely guard operational plans and objectives, and compartmentalize operational information among their members. This compartmentalization affords a terrorist organization the ability to easily identify the source of information should they suspect, based on adjustments in enforcement activities that law enforcement entities are aware of their operational information. Because of this, it is reasonable to believe that a terrorist organization could ascertain the source or sources of information that led to ICE's effort. As with many criminal/terrorist organizations, if a member is identified as cooperating with law enforcement they run the risk of retribution, in the form of bodily injury and even death, against themselves and their family members. Sources, providing information to the Federal government understand this risk but maintain confidence that the Federal government will protect their identities. Any disclosure of confidential informants' identities could gravely jeopardize their physical safety, which could have a profound chilling effect on the willingness of others to assist law enforcement in a similar manner. At the very least, compromising such a source may prevent the government from obtaining valuable information relating to criminal/terrorist plans or operations. A confidential source imparts sensitive information, often otherwise unavailable, regarding violations of law with the expectation that his or her identity will be protected by the recipient law enforcement agency. Maintaining the confidentiality of informants' identities ensures ICE's ability to obtain information in a similar fashion in future investigations since other potential witnesses, free from the fear of exposure and confident that ICE will protect their identities, will be encouraged to cooperate in the administration of justice.

DECLARATION OF JOHN P. CLARK        Page 8

Release of the information sought by plaintiff, can potentially be analyzed such that it would reveal confidential sources and therefore must not be released.

23.     Exemption (b)(7)(E) – 5 U.S.C. § 552(b)(7)(E): This exemption was asserted to protect from disclosure law enforcement information, that if released would disclose techniques, procedures and guidelines for law enforcement investigations or prosecutions, where such disclosures could reasonably be expected to risk circumvention of law.

24.     ICE oversees the generation and assignment of status violator leads derived from various sources, including the Student and Exchange Visitor Information System (SEVIS), 70 Fed. Reg. 14477, and the United States Visitor and Immigrant Status Indicator Technology (US-VISIT) program, 8 CFR 215, 235, and 252, and National Security Entry Exit Registration (NSEERS), 68 Fed. Reg. 8046. ICE conducts a thorough review of each lead to determine the validity of the lead. The leads are prioritized using a threat-based targeted approach to focus ICE resources on persons considered to be a higher potential threat to national security or public safety. These investigative leads are then assigned to ICE field offices nationwide for further investigation and enforcement action.

25.     ICE uses current threat data to prioritize the potential status violator leads that ICE receives annually. If the information requested by plaintiffs were disclosed, it could reveal the methods used by ICE to prioritize violator leads by identifying the specific targets developed as a result of the prioritization process during this specific and condensed time period. This would provide a means for terrorist organizations to introduce persons into the United States that would fall outside of the targeted priority. Disclosure of these methods would not only limit the effectiveness of future ICE and other federal law enforcement operations but would also create a vulnerability to our national security.

DECLARATION OF JOHN P. CLARK          Page 9

26.      In addition, disclosure of the results of ICE investigative efforts by revealing

characteristics of individuals arrested or investigated during a specific period of time, could also

reveal other law enforcement techniques used during the course of obtaining information from

the sources. During the course of the investigation, certain investigative techniques such as

surveillance, intelligence, employment of undercover personnel and informants to investigate

alleged violations of the INA were used in order to detect, deter, and disrupt terrorist operations.

These techniques and procedures are particularly susceptible to circumvention because they rely

on the covert nature of their use and the predictability of human behavior. If ICE were to

disclose the requested information, and thereby reveal the sources of the information and time

period in which such information was obtained, it could also compromise techniques employed

during that time period to further investigations. To the extent a terrorist organization is able to

identify sources of information used to disrupt terrorist activities, it will then be able to scrutinize

circumstances and events surrounding potential sources at the time the information was disclosed

by the sources and thereby identify other techniques employed, such as those listed above, to

obtain information at that time. Although some of these techniques may not be unknown to the

public, the usefulness under the particular circumstances of obtaining information from these

sources is not generally known.

27.      Exemption (b)(7)(F) – 5 U.S.C. § 552(b)(7)(F): This exemption permits the

withholding of law enforcement information the disclosure of which could reasonably be

expected to endanger the life or physical safety of any individual. As discussed above,

disclosure of the information requested by Plaintiff could reveal the sources of such information.

Some of these sources provided information pursuant to a strict understanding of confidentiality.

Disclosure of information leading to the identification of these sources by terrorist groups could

put the lives and physical safety of these sources, their family members, and other individuals

having close relationships with these sources in jeopardy. Moreover, to the extent that agents

continue to associate with these sources and rely on them for information, they will also be

placed in danger if the source being contacted has unknowingly been compromised and terrorist

groups use the source to gain access to the agents. Members of terrorist groups are known to be

armed and many have known violent tendencies. The ultimate purpose of persons involved in

terrorist activities is to cause terror, mayhem and death on a massive scale. There is reason to

believe that having knowledge of the identities of sources and an opportunity to identify agents

tapping these sources, such groups will resort to physical attacks, threats, harassment and

attempted murder of those sources as well as agents gathering information and other third party

individuals.

## IV. JURAT CLAUSE

I declare under penalty of perjury that the forgoing is true and correct to the best of my

knowledge and belief. Executed on this 18th day of January 2007, in Washington, D.C.

John P. Clark, Deputy Assistant Secretary
U.S. Immigration and Customs Enforcement
United States Department of Homeland Security

**Exhibit B -  THE 9/11 COMMISSION REPORT,
Pages 383-85 and fn. 33**

diminish and their activities come under more scrutiny, and others have been put out of business, although controlling overseas branches of Gulf-area charities remains a challenge. The Saudi crackdown after the May 2003 terrorist attacks in Riyadh has apparently reduced the funds available to al Qaeda—perhaps drastically—but it is too soon to know if this reduction will last.

Though progress apparently has been made, terrorists have shown considerable creativity in their methods of moving money. If al Qaeda is replaced by smaller, decentralized terrorist groups, the premise behind the government's efforts—that terrorists need a financial support network—may become outdated. Moreover, some terrorist operations do not rely on outside sources of money and may now be self-funding, either through legitimate employment or low-level criminal activity.[30]

## 12.4    PROTECT AGAINST AND PREPARE FOR TERRORIST ATTACKS

In the nearly three years since 9/11, Americans have become better protected against terrorist attack. Some of the changes are due to government action, such as new precautions to protect aircraft. A portion can be attributed to the sheer scale of spending and effort. Publicity and the vigilance of ordinary Americans also make a difference.

But the President and other officials acknowledge that although Americans may be safer, they are not safe. Our report shows that the terrorists analyze defenses. They plan accordingly.

Defenses cannot achieve perfect safety. They make targets harder to attack successfully, and they deter attacks by making capture more likely. Just increasing the attacker's odds of failure may make the difference between a plan attempted, or a plan discarded. The enemy also may have to develop more elaborate plans, thereby increasing the danger of exposure or defeat.

Protective measures also prepare for the attacks that may get through, containing the damage and saving lives.

### Terrorist Travel

More than 500 million people annually cross U.S. borders at legal entry points, about 330 million of them noncitizens. Another 500,000 or more enter illegally without inspection across America's thousands of miles of land borders or remain in the country past the expiration of their permitted stay. The challenge for national security in an age of terrorism is to prevent the very few people who may pose overwhelming risks from entering or remaining in the United States undetected.[31]

In the decade before September 11, 2001, border security—encompassing

384         THE 9/11 COMMISSION REPORT

travel, entry, and immigration—was not seen as a national security matter. Public figures voiced concern about the "war on drugs," the right level and kind of immigration, problems along the southwest border, migration crises originating in the Caribbean and elsewhere, or the growing criminal traffic in humans. The immigration system as a whole was widely viewed as increasingly dysfunctional and badly in need of reform. In national security circles, however, only smuggling of weapons of mass destruction carried weight, not the entry of terrorists who might use such weapons or the presence of associated foreign-born terrorists.

For terrorists, travel documents are as important as weapons. Terrorists must travel clandestinely to meet, train, plan, case targets, and gain access to attack. To them, international travel presents great danger, because they must surface to pass through regulated channels, present themselves to border security officials, or attempt to circumvent inspection points.

In their travels, terrorists use evasive methods, such as altered and counterfeit passports and visas, specific travel methods and routes, liaisons with corrupt government officials, human smuggling networks, supportive travel agencies, and immigration and identity fraud. These can sometimes be detected.

Before 9/11, no agency of the U.S. government systematically analyzed terrorists' travel strategies. Had they done so, they could have discovered the ways in which the terrorist predecessors to al Qaeda had been systematically but detectably exploiting weaknesses in our border security since the early 1990s.

We found that as many as 15 of the 19 hijackers were potentially vulnerable to interception by border authorities. Analyzing their characteristic travel documents and travel patterns could have allowed authorities to intercept 4 to 15 hijackers and more effective use of information available in U.S. government databases could have identified up to 3 hijackers.[32]

Looking back, we can also see that the routine operations of our immigration laws—that is, aspects of those laws not specifically aimed at protecting against terrorism—inevitably shaped al Qaeda's planning and opportunities. Because they were deemed not to be bona fide tourists or students as they claimed, five conspirators that we know of tried to get visas and failed, and one was denied entry by an inspector. We also found that had the immigration system set a higher bar for determining whether individuals are who or what they claim to be—and ensuring routine consequences for violations—it could potentially have excluded, removed, or come into further contact with several hijackers who did not appear to meet the terms for admitting short-term visitors.[33]

Our investigation showed that two systemic weaknesses came together in our border system's inability to contribute to an effective defense against the 9/11 attacks: a lack of well-developed counterterrorism measures as a part of border security and an immigration system not able to deliver on its basic commitments, much less support counterterrorism. These weaknesses have been reduced but are far from being overcome.

**Recommendation: Targeting travel is at least as powerful a weapon against terrorists as targeting their money. The United States should combine terrorist travel intelligence, operations, and law enforcement in a strategy to intercept terrorists, find terrorist travel facilitators, and constrain terrorist mobility.**

Since 9/11, significant improvements have been made to create an integrated watchlist that makes terrorist name information available to border and law enforcement authorities. However, in the already difficult process of merging border agencies in the new Department of Homeland Security—"changing the engine while flying" as one official put it[34]—new insights into terrorist travel have not yet been integrated into the front lines of border security.

The small terrorist travel intelligence collection and analysis program currently in place has produced disproportionately useful results. It should be expanded. Since officials at the borders encounter travelers and their documents first and investigate travel facilitators, they must work closely with intelligence officials.

Internationally and in the United States, constraining terrorist travel should become a vital part of counterterrorism strategy. Better technology and training to detect terrorist travel documents are the most important immediate steps to reduce America's vulnerability to clandestine entry. Every stage of our border and immigration system should have as a part of its operations the detection of terrorist indicators on travel documents. Information systems able to authenticate travel documents and detect potential terrorist indicators should be used at consulates, at primary border inspection lines, in immigration services offices, and in intelligence and enforcement units. All frontline personnel should receive some training. Dedicated specialists and ongoing linkages with the intelligence community are also required. The Homeland Security Department's Directorate of Information Analysis and Infrastructure Protection should receive more resources to accomplish its mission as the bridge between the frontline border agencies and the rest of the government counterterrorism community.

**A Biometric Screening System**

When people travel internationally, they usually move through defined channels, or portals. They may seek to acquire a passport. They may apply for a visa. They stop at ticket counters, gates, and exit controls at airports and seaports. Upon arrival, they pass through inspection points. They may transit to another gate to get on an airplane. Once inside the country, they seek another form of identification and try to enter a government or private facility. They may seek to change immigration status in order to remain.

Each of these checkpoints or portals is a screening—a chance to establish that people are who they say they are and are seeking access for their stated purpose, to intercept identifiable suspects, and to take effective action.

Waleed al Shehri, Mohand al Shehri, Hani Hanjour, Majed Moqed, Nawaf al Hazmi, Hamza al Ghamdi, Ahmed al Ghamdi, Saeed al Ghamdi, Ahmed al Nami, and Ahmad al Haznawi) held passports containing these same fraudulent features, but their passports have not been found so we cannot be sure. Khalid al Mihdhar and Salem al Hazmi presented passports with a suspicious indicator of Islamic extremism. There is reason to believe that the passports of three other hijackers (Nawaf al Hazmi, Ahmed al Nami, and Ahmad al Haznawi) issued in the same Saudi passport office may have contained this same indicator; however, their passports have not been found, so we cannot be sure.

33. Khallad Bin Attash, Ramzi Binalshibh, Zakariya Essabar, Ali Abdul Aziz Ali, and Saeed al Ghamdi (not the individual by the same name who became a hijacker) tried to get visas and failed. Kahtani was unable to prove his admissibility and withdrew his application for admission after an immigration inspector remained unpersuaded that he was a tourist. All the hijackers whose visa applications we reviewed arguably could have been denied visas because their applications were not filled out completely. Had State visa officials routinely had a practice of acquiring more information in such cases, they likely would have found more grounds for denial. For example, three hijackers made statements on their visa applications that could have been proved false by U.S. government records (Hani Hanjour, Saeed al Ghamdi, and Khalid al Mihdhar), and many lied about their employment or educational status. Two hijackers could have been denied admission at the port of entry based on violations of immigration rules governing terms of admission—Mohamed Atta overstayed his tourist visa and then failed to present a proper vocational school visa when he entered in January 2001; Ziad Jarrah attended school in June 2000 without properly adjusting his immigration status, an action that violated his immigration status and rendered him inadmissible on each of his six subsequent reentries into the United States between June 2000 and August 5, 2001. There were possible grounds to deny entry to a third hijacker (Marwan al Shehhi). One hijacker violated his immigration status by failing to enroll as a student after entry (Hani Hanjour); two hijackers overstayed their terms of admission by four and eight months respectively (Satam al Suqami and Nawaf al Hazmi). Atta and Shehhi attended a flight school (Huffman Aviation) that the Justice Department's Inspector General concluded should not have been certified to accept foreign students, see DOJ Inspector General's report, "The INS' Contacts with Two September 11 Terrorists: A Review of the INS's Admissions of Atta and Shehhi, its Processing of their Change of Status Applications, and its Efforts to Track Foreign Students in the United States," May 20, 2002.

34. John Gordon interview (May 13, 2004).

35. For a description of a layering approach, see Stephen Flynn, *America the Vulnerable: How the U.S. Has Failed to Secure the Homeland and Protect Its People from Terrorism* (HarperCollins, 2004), p. 69.

36. The logical and timely rollout of such a program is hampered by an astonishingly long list of congressional mandates. The system originated in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 and applied to all non-U.S. citizens who enter or exit the United States at any port of entry. Pub. L. No. 104-208, 110 Stat. 3009 (1996), § 110. The Data Management Improvement Act of 2000 altered this mandate by incorporating a requirement for a searchable centralized database, limiting the government's ability to require new data from certain travelers and setting a series of implementation deadlines. Pub. L. No. 106-215, 114 Stat. 337 (2000), § 2(a). The USA PATRIOT Act mandated that the Attorney General and Secretary of State "particularly focus" on having the entry-exit system include biometrics and tamper-resistant travel documents readable at all ports of entry. Pub. L. No. 107-56, 115 Stat. 272 (2001), § 1008(a). In the Enhanced Border Security and Visa Entry Reform Act, Congress directed that, not later than October 26, 2004, the attorney general and the secretary of state issue to all non-U.S. citizens only machine-readable, tamper-resistant visas and other travel and entry documents that use biometric identifiers and install equipment at all U.S. ports of entry to allow biometric authentication of such documents. Pub. L. No. 107-173, 116 Stat. 543 (2002), § 303(b). The Act also required that increased security still facilitate the free flow of commerce and travel. Ibid. § 102(a)(1)(C). The administration has requested a delay of two years for the requirement of tamper-proof passports. Testimony of Thomas Ridge before the House Judiciary Committee, Apr. 21, 2004 (online at www.dhs.gov/dhspublic/display?theme=45&content=3498&print=true). Program planners have set a goal of collecting information, confirming identity, providing information about foreign nationals throughout the entire immigration system, and ultimately enabling each point in the system to assess the lawfulness of travel and any security risks.

37. There are at least three registered traveler programs underway, at different points in the system, designed and run by two different agencies in the Department of Homeland Security (outside the U.S.VISIT system), which must ultimately be the basis for access to the United States.

38. For the statistics, see DOS report, "Workload Statistics by Post Regions for All Visa Classes" June 18, 2004. One post-9/11 screening process, known as Condor, has conducted over 130,000 extra name-checks. DOS letter, Karl Hofmann to the Commission, Apr. 5, 2004. The checks have caused significant delays in some cases but have never resulted in visas being denied on terrorism grounds. For a discussion of visa delays, see General Accounting Office report, "Border Security: Improvements Needed to Reduce Time Taken to Adjudicate Visas for Science Students and Scholars," Feb. 2004. We do not know all the reasons why visa applications have dropped so significantly. Several factors beyond the visa process itself include the National Security Entry-Exit Registration System, which requires additional screening processes for certain groups from Arab and Muslim countries; the Iraq war; and per-

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ )<br>)<br>AMERICAN-ARAB ANTI-DISCRIMINATION )<br>COMMITTEE )<br>       Plaintiff, )<br>)<br>       v. )<br>)<br>UNITED STATES DEPARTMENT OF )<br>HOMELAND SECURITY )<br>)<br>and )<br>)<br>IMMIGRATION AND CUSTOMS )<br>ENFORCEMENT )<br>       Defendants. )<br>)<br>_____) | Civil Action: 06-01770-JR |

**STATEMENT OF MATERIAL FACTS AS TO WHICH
THERE IS NO GENUINE ISSUE**

Pursuant to Fed. R. Civ. P. 56 and Local Civil Rule 56.1, defendants United States

Department of Homeland Security ("DHS") and the Immigration and Custom Enforcement

("ICE") set forth the following statement of material facts as to which there is no genuine issue:

1.      By letter dated December 14, 2004, plaintiff submitted a FOIA request to ICE

requesting release of "data on nationality of those 230 individuals detained as a result of the

enforcement initiative mentioned in a press release issued by ICE on November 4, 2004.

Complaint, Exhibit 5; Declaration of John P. Clark ("Clark Decl."), ¶ 6.

2.      On February 14, 2005, ICE denied plaintiff's request for such data on the grounds

that the requested information is exempt from disclosure under 5 U.S.C. § 552(b)(2)(7)(A),

(7)(C), (7)(D), (7)(E), (7)(F).  Complaint, ¶ 18; Clark Decl. ¶ 7.

3.     By letter dated March 3, 2005, plaintiff filed an appeal.  Complaint, Exhibit 6;

Clark Decl.  ¶ 8.

4.     On September 5, 2005, DHS denied plaintiff's appeal.  Complaint, Exhibit 7;

Clark Decl. ¶ 9.

5.     By letter dated February 8, 2006, plaintiff filed a second FOIA request with ICE

seeking data on the race, ethnicity, religion, and gender of the 237 detainees identified in the

November 4, 2004 press release.  Complaint, ¶ 22; Clark Decl.  ¶ 11.

6.     ICE does not maintain information relating to the ethnicity or religion of the

individuals.   Clark Decl. ¶ 14.

7.     ICE has information on the race of only 15 of the 237 individuals at issue.  Clark

Decl. ¶ 14.

8.     ICE has provided plaintiff with the race data on these 15 individuals.  Clark Decl.

¶ 14.

9.     ICE has withheld data regarding the nationality and gender of the individuals

under Exemptions 7(A), 7(D), 7(E) and 7(F).

                                                 Respectfully Submitted,

                                                 PETER D. KEISLER
                                                 Assistant Attorney General

                                                 JEFFREY A. TAYLOR
                                                 United States Attorney

                                                 ELIZABETH J. SHAPIRO
                                                 Assistant Branch Director

                                                 s/Marcia K. Sowles_____
                                                 MARCIA K. SOWLES, DC Bar No. 369455
                                                 Senior Counsel
                                                 United States Department of Justice

Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 7114
Washington, D.C.  20530
Tel.: (202) 514- 4960
Fax: (202) 616- 8470
E-mail:  marcia.sowles@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

_____
                                                    )
                                                    )
AMERICAN-ARAB ANTI-DISCRIMINATION    )
COMMITTEE                                            )
                    Plaintiff,                       )
                                                    )
            v.                                       )         Civil Action: 06-01770-JR
                                                    )
UNITED STATES DEPARTMENT OF             )
HOMELAND SECURITY                            )
                                                    )
and                                                 )
                                                    )
IMMIGRATION AND CUSTOMS                    )
ENFORCEMENT                                       )
                    Defendants.                     )
                                                    )
_____)

ORDER

     Upon consideration of defendants' motion for summary judgment, and plaintiff's

opposition thereto, it is hereby

     **ORDERED** that defendant's motion for summary judgment is **granted**.


_____                    _____
Date                                              UNITED STATES DISTRICT JUDGE