## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ) | |
| AMERICAN-ARAB ANTI-DISCRIMINATION ) | |
| COMMITTEE ) | |
| 1732 Wisconsin Avenue, NW ) | |
| Washington, DC   20007 ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.: 06-1770-JR |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| HOMELAND SECURITY ) | |
| Washington, D.C. 20528 ) | |
| ) | |
| IMMIGRATION AND CUSTOMS ) | |
| ENFORCEMENT ) | |
| 425 I Street, NW ) | |
| Washington, D.C. 20536 ) | |
| ) | |
| Defendants. ) | |
| ) | |

## PLAINTIFF AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Plaintiff American-Arab Anti-Discrimination Committee ("ADC") hereby moves for entry of a partial summary judgment ordering Defendants Department of Homeland Security ("DHS") and Immigration and Customs Enforcement ("ICE") immediately to disclose the nationality and gender data requested by ADC, and for a limited remand of this case to Defendants with instructions (1) to perform a thorough search of their records for the requested data on race, ethnicity, and religion, and (2) to disclose any such data to ADC. In support of this cross-motion, ADC refers the Court to the attached Memorandum In Opposition To Defendants' Motion For Summary Judgment And In Support Of Plaintiff's Cross-Motion For Partial Summary Judgment, and the accompanying declaration of Vincent Cannistraro, a former Chief of Operations and Analysis at the CIA's CounterTerrorism Center.

Dated:  April 16, 2007                    Respectfully submitted,


                                          s/ Michael D. Shumsky
                                          _____

                                          Tefft W. Smith (D.C. Bar No. 458441)
                                          Michael D. Shumsky (D.C. Bar No. 495078)
                                          KIRKLAND & ELLIS LLP
                                          655 Fifteenth Street, N.W.
                                          Washington, D.C.  20005
                                          Ph:     (202) 879-5000
                                          Fax:    (202) 879-5200

                                          *Counsel for Plaintiff*
                                          *American-Arab Anti-Discrimination Committee*

**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN-ARAB ANTI-<br>DISCRIMINATION COMMITTEE<br>1732 Wisconsin Avenue, NW<br>Washington, D.C.   20007<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>HOMELAND SECURITY<br>Washington, D.C.   20528<br><br>IMMIGRATION AND CUSTOMS<br>ENFORCEMENT<br>425 I Street, NW<br>Washington, D.C.   20536<br><br>Defendants. | Civil Action No.: 06-1770-JR |

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR PARTIAL
SUMMARY JUDGMENT**

The unstated message of Defendants' motion for summary judgment is "Trust us,

because we say so." But with all due respect to Defendants Department of Homeland Security

("DHS") and Immigration and Customs Enforcement ("ICE"), that is not the American way—

and it is not the law. To the contrary, the whole point of the Freedom of Information Act is "to

pierce the veil of [government] secrecy and to open [governmental] action to the light of public

scrutiny," *Department of Air Force v. Rose*, 425 U.S. 352, 361 (1976), so that an "informed

citizenry" can "hold the governors accountable to the governed." *NLRB v. Robbins Tire &

Rubber Co.*, 437 U.S. 214, 242 (1978). In other words, FOIA entitles us to "Trust, **but verify**,"

and the importance of that basic democratic precept is underscored in this case by the

diametrically conflicting assertions Defendants have made in response to Plaintiff American-

Arab Anti-Discrimination Committee's ("ADC's") inquiries—claiming at the time it carried out the enforcement operation at issue here that it was acting "without regard to race, ethnicity or religion" and was "not profiling" individuals, *see* Complaint Exh. 2, but asserting now that disclosing the data ADC requested "could expose the focus" of the government's investigation, Defs' Brief at 2, and enable "terrorist groups" to identify "the targeted population." *Id*. at 13.

In an effort to verify the truth of Defendants' public representations, ADC—a nonprofit civil rights organization committed to defending the rights of, and addressing discrimination and bias against, Americans of Arab descent—filed two FOIA requests with DHS and ICE. Those requests sought only undifferentiated, non-individualized data on the race, national origin, ethnicity, religion, and gender *of a group* of approximately 240 persons detained by Defendants in connection with the so-called "October Plan," a law enforcement operation carried out three years ago in order to disrupt threats targeting the 2004 presidential election. Those carefully tailored FOIA requests were consciously designed to avoid interfering with any ongoing or prospective law enforcement proceedings—efforts that ADC fully supports and, indeed, actively aids by working directly with Defendants and other agencies of the federal government. Instead, the requests simply sought to determine whether (as Defendants contemporaneously and publicly had asserted) the October Plan had been executed without bias, or (as ADC feared) was based on the impermissible "profiling" of Americans of Arab descent, Arab immigrants, and Muslims.

To that end, ADC's requests did not seek to determine the name of any individual October Plan detainee; nor any other personally identifiable information about any individual October Plan detainee; nor which DHS or ICE employees were involved in the identification or detention of any individual October Plan detainee; nor how DHS and ICE identified and effectuated the detention of any individual October Plan detainee; nor the particular allegations or charges of wrongdoing that led to the detention of any individual October Plan detainee; nor

the date or location or duration of the detention of any individual October Plan detainee; nor the disposition of any criminal case, civil complaint, or administrative proceeding (if any) brought by the Government against any individual October Plan detainee; nor the date or location or duration or any other information relating to any such proceeding brought against any individual October Plan detainee. Rather, the requests merely sought non-specific, wholly generalized demographic data concerning *a group* of 237 out of the more than one million persons detained by DHS and ICE in 2004. *See* DHS, Office of Immigration Statistics, *Immigration Enforcement Actions: 2004* [*2004 Annual Report*], at 1 (Nov. 2005) (attached as Exhibit 1).

Notwithstanding the carefully circumscribed nature of ADC's FOIA requests, Defendants denied those requests on the ground that the release of the requested data would somehow "harm ongoing and prospective enforcement proceedings," Defs' Brief at 2—even though Defendants now have volunteered (notwithstanding that ADC never sought such information) that every single case involving an October Plan detainee has been closed. Defs' Brief at 11. Such harms nonetheless would arise, Defendants assert, because the release of the highly generalized data ADC requested would enable "terrorist groups to identify the focus of the investigation [and] the confidential sources" they relied upon to effectuate the October Plan. Defs' Brief at 3. Were that to happen, Defendants speculate, the terrorists "will resort to physical attacks, threats, harassment and attempted murder of those sources as well as agents gathering information and other third party individuals." Declaration of John P. Clark ¶ 27 (the "Clark Decl.").

But these dire predictions are bereft of any plausible explanation of *how* such consequences reasonably could be expected to result from the release of the non-specific, wholly generalized group data ADC requested. The only support Defendants provide for their claims is a declaration by John P. Clark, a Deputy Assistant Secretary for Operations at Defendant ICE. That declaration is long on hyperbolic conclusions, but offers nothing of substance to explain

how a terrorist organization possibly could use the non-specific, generalized group data ADC requested to determine the identity of any one of the 237 October Plan detainees or identify any confidential source that provided information about the October Plan detainees.

Quite to the contrary, as made clear by the attached declaration of Vincent Cannistraro—a 27-year veteran of the CIA and former Chief of Operations and Analysis at the CIA's CounterTerrorism Center—disclosing the data ADC requested could have no impact on the effectiveness of continued law enforcement or counter-terror efforts. That is so, the Cannistraro declaration explains, because the non-specific, wholly generalized group data ADC requested cannot possibly allow any supposed terrorist or terrorist organization to determine the identity of any one of the 237 October Plan detainees or identify any confidential source that provided information to Defendants about the October Plan detainees. Indeed, in marked contrast to the Clark declaration, the Cannistraro declaration provides concrete reasons and examples as to why his conclusions are factually sound and analytically irrefutable.

Defendants' inability to establish any credible connection between the requested data and the parade of horribles they predict is fatal to their motion for summary judgment. Even in the national security context, it is axiomatic that an agency cannot sustain its burden of justifying non-disclosure "by mere conclusory statements; the agency must show *how* release of the particular material would have the adverse consequence that the Act seeks to guard against." *Washington Post Co. v. Department of Justice*, 863 F.2d 96, 101 (D.C. Cir. 1988).[1]

Make no mistake: ADC fully recognizes that the events of September 11, 2001 offer a chilling reminder of the government's uniquely compelling need to vigorously root out and bring terrorists to justice wherever they seek refuge—no more so than when they attempt to conceal themselves within our borders. That, after all, is why ADC has spent much of the past six years

---

[1]    Unless otherwise indicated, all emphases have been added.

working directly with Defendants DHS and ICE—and with many other federal agencies, including Customs and Border Protection ("CBP"), the Federal Bureau of Investigation ("FBI"), and the Transportation Security Administration ("TSA")—to train law enforcement and counterterrorism personnel for the vital mission of protecting the United States from those who intend it harm. And it also is why ADC is prepared to accept disclosure of the requested data in an even more generalized format than initially sought—a format that, as the Cannistraro declaration makes clear, would decisively prevent the terrorists from obtaining any useful information from the requested data while allowing ADC to verify the truth of Defendants assertions that are not engaged in profiling.

Ultimately, then, Defendants have no legitimate basis for withholding the requested data, and while the terrorists thus far have claimed many innocent victims, the linchpin of our democracy—the right of the people "to know what their government is up to," *U.S. Dep't of Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 773 (1989) (quotations omitted)—need not be among them.

## BACKGROUND

### A.    The National Security Entry/Exit Registration System ("NSEERS")

On June 6, 2002, then-Attorney General John Ashcroft proposed a new federal program to be known as the National Security Entry-Exit Registration System ("NSEERS"). Complaint ¶ 8. As thereafter implemented, NSEERS required foreign nationals from certain countries—to be designated by the Attorney General—to submit to fingerprinting and photography upon entry into the United States; to register periodically with the Immigration and Naturalization Service ("INS"); and to comply with certain exit controls when they departed the country. *Id.* (citing Registration and Monitoring of Certain Nonimmigrants, 67 Fed. Reg. 52,584, 52,591-93 (final

rule Aug. 12, 2002) (codified at 8 CFR § 264.1(f)). That aspect of NSEERS was called "Special Registration." *Id.*

In response to concerns that the government would use the NSEERS database to discriminatorily target "specific minority ethnic groups and members of a specific religion, i.e., Arabs and Muslims" for law enforcement activities, 67 Fed. Reg. at 52,585, the government asserted that it "remains firmly committed to protecting the civil rights of all individuals in the United States while seeking to prevent acts of terrorism. The Department unequivocally rejects the notion that the requirements of the final rule, or the criteria for application of the final rule, to nonimmigrant aliens subject to special registration are, or are intended to be, invidiously discriminatory." *Id.*

Nonetheless, Attorney General Ashcroft eventually required male nationals from just 25 countries—24 of which are predominantly Arab or Muslim (the other being North Korea)—to appear at INS offices for questioning, fingerprinting, and photographing. Complaint ¶ 10 (citing Registration of Certain Nonimmigrant Aliens from Designated Countries, 67 Fed. Reg. 67,766, 67,766 (Nov. 6, 2002) (designating male nationals from Iran, Iraq, Libya, Sudan, and Syria); Registration of Certain Nonimmigrant Aliens from Designated Countries, 67 Fed. Reg. 70,526, 70,526 (Nov. 22, 2002) (designating male nationals from Afghanistan, Algeria, Bahrain, Eritrea, Lebanon, Morocco, North Korea, Oman, Qatar, Somalia, Tunisia, United Arab Emirates, and Yemen); Registration of Certain Nonimmigrant Aliens from Designated Countries, 67 Fed. Reg. 77,642, 77,643 (Dec. 18, 2002) (designating male nationals from Pakistan and Saudi Arabia); Registration of Certain Nonimmigrant Aliens from Designated Countries, 68 Fed. Reg. 2363, 2364 (Jan. 16, 2003) (designating male nationals from Bangladesh, Egypt, Indonesia, Jordan, and Kuwait)). Within weeks, the government detained more than 1100 people as a result of the NSEERS Special Registration program. *Id.* ¶ 11.

**B.    The "October Plan"**

On September 17, 2004, CBS News reported that the FBI had circulated an internal e-mail advisory to supervisory agents detailing "a massive counter-offensive of interrogations, surveillance and possible detentions" that was designed to "disrupt [any] terrorist plans" targeting the 2004 presidential election. *Id*. ¶ 12 & Exh. 1.  According to CBS News, the FBI's e-mail advisory informed agents that "'extraordinary measures' … will go into place 'beginning the first week of October through the elections.'"  *Id*.  Those measures included the use of "'aggressive—even obvious—surveillance' techniques [against] a short list of people suspected of being terrorist sympathizers, but who have not committed a crime."  *Id*.  It also provided that "[o]ther 'persons of interest,' including their family members, may also be brought in for questioning."  Finally, CBS News reported that the FBI "expect[ed] to be criticized for the strategy if it goes too far," and noted that "some officials fear[ed] … a wave of protests from Arab-Americans and civil libertarians."  *Id*.

On September 30, 2004, DHS and ICE issued a press release titled "Terrorist Threat and Disruption Efforts by ICE."  *Id*. ¶ 13 & Exh. 2.  That press release confirmed the existence of the October Plan, and reported that "ICE has been working for the past several months at a heightened level in direct support of the government-wide Interagency Security Plan that will remain in effect through the 2005 Presidential Inauguration."  *Id*.  To assuage fears that the October Plan would rely upon discriminatory profiling, the press release asserted that "[t]his initiative builds upon ICE's continued efforts to target immigration status violators in America—without regard to race, ethnicity or religion," and claimed that ICE "is not conducting a 'round-up' or a 'sweep' in any community," "is not profiling based on race or religious affiliation," and, "is not instituting a blanket detention policy."  *Id*.  Nonetheless, the press release acknowledged that "ICE's Compliance Enforcement Unit routinely researches and assigns immigration status

violator leads to ICE field office nationwide based on data from … the National Security Entry/Exit Registration System (NSEERS)," *id.*, a program that, as implemented by the Attorney General, was and is based precisely on profiling. *See* Complaint ¶ 10.

The same day, ADC issued a press release stating that "officials from the Department of Homeland Security (DHS) and ICE" had responded to ADC's concerns about the October Plan by "stress[ing] their commitment to continuing to build their working relationship with the Arab and Muslim American communities." *Id.* ¶ 14 & Exh. 3. ADC's press release further indicated that government officials had "emphasized that their initiative is not based on racial profiling." *Id.* Nonetheless, ADC reiterated its concern that the government might use NSEERS to select targets for October Plan surveillance, and that NSEERS-based profiling might cause "the ICE initiative [to] be selectively carried out against Arabs and Muslims." *Id.*

On November 4, 2004, DHS and ICE issued a press release titled "ICE Threat Disruption Effort Results in More Than 230 Arrests—More Than 900 Investigations Completed." *Id.* ¶ 15 & Exh. 4. That press release reported that "in a one-month period beginning October 1, 2004, ICE has arrested 237 immigration status violators nationwide as part of the government-wide Interagency Security Plan that will remain in effect through the 2005 Presidential Inauguration." *Id.* The press release further asserted that "leads ha[d] been sent to ICE field offices for immediate investigation and potential arrests—without regard to race, ethnicity, or religion." *Id.* In contrast to the September 30 press release, however, ICE omitted any mention of its reliance on NSEERS. *Id.*

Notably—and apparently without any concern about the consequences it might have on its ongoing enforcement efforts—the November 4, 2004 press release disclosed some of the very information ADC now seeks, including the nationalities of eight of the detainees, four of whom

were from Arab or Muslim countries, including a Saudi national, Jordanian national, Lebanese national, and Pakistani national. *See id.* ¶ 15 & Exh. 4.

C.    **ADC's First FOIA Request (Nationality Data)**

On December 14, 2004, ADC submitted a FOIA request asking Defendants to release group data on the nationalities of the individuals detained in connection with the October Plan. *Id.* ¶ 16 & Exh. 5. That request reiterated ADC's concern that Defendants' acknowledged reliance on NSEERS data might have resulted in selective enforcement of the October Plan against Arabs and Muslims, and explained that "[i]n order to alleviate these concerns, which have since been echoed by numerous members of the Arab-American and Muslim communities, it is our sincere hope that ICE will release the nationality breakdown of those arrested in order to assure the Arab-American and Muslim communities, along with the rest of our nation, that immigration enforcement is not resulting in a disproportionate impact on individuals from Arab or Muslim countries." *Id.*

On February 14, 2005, Defendants denied ADC's FOIA request for nationality data—notwithstanding the fact that they voluntarily had disclosed some of that very information in the November 4, 2004 press release. *Id.* ¶ 18. In contrast to its prior release of such data, Defendants purported to base their denial of ADC's FOIA request on the ground that the requested data is exempt from disclosure under 5 U.S.C. § 522(b)(7), which protects certain records and information compiled in connection with law enforcement proceedings. *Id.*

On March 3, 2005, ADC appealed the denial of its FOIA Request. *Id.* ¶ 19. That appeal explained that mere information on the October Plan detainees' nationalities could not possibly interfere with potential law enforcement proceedings, because it did not seek the disclosure of the "names or individual private information of any kind on the detainees, nor … attempt to gain information of a particularized nature with respect to the investigation." *Id.* On September 5,

2005, DHS denied ADC's appeal—again, notwithstanding the fact that Defendants' November 4, 2004 press release had voluntarily disclosed some of the very information ADC sought in its FOIA request. *Id.* ¶ 20. That decision was expressly based on 5 U.S.C. § 552(b)(7)(A), which shields certain information that would interfere with law enforcement proceedings, and 5 U.S.C. § 552(b)(7)(E), which shields certain information that would disclose law enforcement techniques or guidelines. *See id.*

### D.    ADC's Second FOIA Request (Race, Ethnicity, Religion, and Gender Data)

On February 8, 2006, ADC filed a second FOIA request with Defendants. *Id.* ¶ 22 & Exh. 8. Like its initial request, ADC's second request sought non-specific, generalized data on the race, ethnicity, religion, and gender of the October Plan detainees. Again, that request was intended not to disrupt ongoing law enforcement activities, but rather to assure Arab-Americans and Muslims that their communities were not being selectively targeted by Defendants on the basis of impermissible profiling. *Id.* As in its first FOIA request, ADC reiterated that it was not seeking particularized information about any individual October Plan detainee, such as their name, other personal information, the particular allegations and/or charges of wrongdoing levied against them, or the date and location of their arrest. *Id.* ¶ 23. Defendants did not timely respond to ADC's second FOIA request, *see* 5 U.S.C. § 552(a)(6)(A)(i) (establishing a twenty-day response period), and gave no indication of the "date on which a determination is expected to be dispatched." 5 U.S.C. § 552(a)(6)(B)(i).

### E.    This Litigation

On October 17, 2006, ADC filed this lawsuit seeking to compel the release of the data requested in ADC's December 14, 2004 and February 8, 2006 FOIA requests. On November 17, 2006, Defendants filed their answer to the complaint. On January 18, 2007, Defendants moved for summary judgment in this case. The same day, Defendants finally responded to ADC's

February 8, 2006 FOIA request. *See* Letter from G. Marshall to J. O'Quinn, Jan. 18, 2007 (attached as Exhibit 2). That response stated that "ICE did not maintain statistics relating to ethnicity or religion," indicated that ICE had compiled only limited information on the race of the October Plan detainees, and denied ADC's request for gender data on the ground that such data were exempt from disclosure under 5 U.S.C. § 522(b)(7)(A), 5 U.S.C. § 522(b)(7)(D), 5 U.S.C. § 522(b)(7)(E), and 5 U.S.C. § 522(b)(7)(F). *See id.* at 1.

## JURISDICTION AND VENUE

This Court has subject-matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. § 552(a)(4)(B) and 552(a)(6)(E)(iii), respectively. Venue lies in this district under 5 U.S.C. § 552(a)(4)(B).

## STANDARDS OF REVIEW

"[D]isclosure, not secrecy, is the dominant objective of the Act," *Rose*, 425 U.S. at 361, and FOIA thus establishes a "strong presumption in favor of disclosure." *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991). To that end, "an agency may withhold documents responsive to a FOIA request only if the responsive documents fall within one of nine enumerated statutory exemptions. Consistent with the Act's 'goal of broad disclosure, these exemptions have been consistently given a narrow compass.'" *Long v. U.S. Dep't of Justice*, 450 F. Supp. 2d 42, 53 (D.D.C. 2006) (quoting *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989)).

Once the government denies a FOIA request, the Act places the burden of justifying its non-disclosure squarely on the responsible agency. "Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'" *Reporters Committee*, 489 U.S. at 754 (quoting 5 U.S.C. § 552(a)(4)(B)). As a result, "the burden of demonstrating that these strictly defined

[e]xemptions apply to a particular case rests with the agency." *Hornbostel v. Dep't of the Interior*, 305 F. Supp. 2d 21, 29 (D.D.C. 2004).

Notwithstanding these well-settled standards, FOIA cases pose a unique challenge for both FOIA plaintiffs and reviewing courts. "[B]ecause the issue [in a FOIA case] is whether one party will disclose documents to the other, only the party opposing disclosure will have access to all the facts." *Wiener v. FBI*, 943 F.2d 972, 977 (9th Cir. 1991). As a result, "the party requesting disclosure must rely upon his adversary's representations as to the material withheld, and the court is deprived of the benefit of informed advocacy to draw its attention to the weaknesses in the withholding agency's arguments." *Id.* To resolve this dilemma and "afford the FOIA requester a meaningful opportunity to contest, and the district court an adequate foundation to review, the soundness of the withholding," *King v. Dep't of Justice*, 830 F.2d 210, 218 (D.C. Cir. 1987), agencies are required to "provide a detailed description of the information withheld through the submission of a so-called '*Vaughn* index,' sufficiently detailed affidavits or declarations, or both." *Long*, 450 F. Supp. 2d at 53 (citing *Oglesby v. U.S. Dep't of the Army*, 79 F.3d 1172, 1178 (D.C. Cir. 1996); *Vaughn v. Rosen*, 484 F.2d 820, 827-28 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974)).

Where the agency seeks to sustain its burden of proving that the withheld information falls within one of FOIA's narrowly circumscribed exceptions through the use of such affidavits or declarations, summary judgment in favor of the agency is appropriate only if the agency's submissions (1) provide "a particularized explanation of how disclosure of the particular [information requested] would damage the interest protected by the claimed exemption," *Wiener*, 943 F.2d at 977, and (2) "are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981); *see also King*, 830 F.2d at 219 ("Specificity is the defining requirement of the *Vaughn*

index and affidavit; affidavits cannot support summary judgment if they are conclusory, merely reciting statutory standards, or if they are too vague or sweeping.  To accept an inadequately supported exemption claim would constitute an abandonment of the trial court's obligation under the FOIA to conduct a de novo review.") (citations and quotations omitted).

Finally, while courts typically afford "some measure of deference to the executive in cases implicating national security," *Center for Nat'l Security Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 927 (D.C. Cir. 2003), it is well-settled that no amount of deference can excuse an agency's "lack of detail and specificity [or] failure to account for contrary record evidence." *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998).  Where the government fails to sustain that burden, the entry of summary judgment in favor of a FOIA plaintiff is appropriate. *See, e.g.*, *Taxation With Representation Fund v. IRS*, 646 F.2d 666 (D.C. Cir. 1981).

## ARGUMENT

### I.  DEFENDANTS HAVE NOT SUSTAINED THEIR BURDEN OF PROVING THAT THE REQUESTED DATA FALLS WITHIN FOIA'S LAW ENFORCEMENT EXEMPTION.

Defendants have not remotely sustained their burden of demonstrating that the requested data fall within any of the FOIA exemptions they invoke.  That is so because Defendants have not provided any explanation—much less a sufficiently particularized explanation—of how disclosing the non-specific, wholly generalized group data sought by ADC reasonably could be expected to compromise any of the interests protected by the asserted law enforcement exemptions.

To the contrary, Defendants' claims that disclosing the requested data would result in catastrophic harm are riddled with obvious analytical gaps—not the least of which is Defendants' failure even to attempt to explain how any terrorist or terrorist organization could use the non-specific, wholly generalized group data at issue in this case to determine the identity

of any specific October Plan detainee, and from there, the source or sources upon which Defendants relied to identify that detainee, effectuate his or her detention, and neutralize any planned or pending terrorist action. Indeed, as the Cannistraro declaration makes clear, there is no basis at all for thinking that Defendants possibly could fill that gap in their "sky is falling" approach to this case. Given Defendants' failure to provide a sufficiently particularized rationale for withholding the requested data, and in light of the credible, contrary record evidence produced by ADC, Defendants' motion for summary judgment should be denied and partial summary judgment instead should be entered for ADC with respect to the gender and nationality data sought in its FOIA requests.

A.    **Exemption 7(A) Does Not Immunize The Requested Data From Disclosure.**

Exemption 7(A) authorizes the government to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A) (enumeration omitted). To satisfy this exemption, the government must demonstrate (1) that a law enforcement proceeding is pending or prospective, and (2) how releasing the requested information might compromise such a proceeding. *Voiche v. FBI*, 46 F. Supp. 2d 26, 31 (D.D.C. 1999).

In this case, ADC neither contests that the data it has requested was compiled by Defendants in connection with law enforcement proceedings, nor seeks to rebut the government's (vague) assertion that related proceedings are ongoing. Instead, the key point here is that Exemption 7(A) was not designed to "endlessly protect material simply because it was in an investigatory file," *Robbins Tire*, 437 U.S. at 230, and thus requires the government to demonstrate with "detail and specificity" how the disclosure of that information could interfere with ongoing law enforcement proceedings. *Campbell*, 164 F.3d at 30; *see also North v. Walsh*,

881 F.2d 1088, 1100 (D.C. Cir. 1989) (holding that the government must demonstrate that "disclosure can reasonably be expected to interfere in a *palpable, particular way*" with pending enforcement proceedings). The government has not met—and cannot remotely sustain—that burden, and its motion for summary judgment under Exemption 7(A) should be denied.

Defendants make three assertions to support their contention that disclosure of the requested data could compromise ongoing law enforcement proceedings. First, Defendants assert that the data "could reveal where the government has focused its efforts—and perhaps as important—where it was not focusing during that time period." Br. at 13 (citing Clark Decl. at ¶ 18). Second, Defendants assert that if such data were requested and disclosed on a month-to-month basis (which, of course, it was not), it "would reveal the direction and progress of the investigation and provide individuals and groups with a roadmap of [Defendants'] enforcement efforts," permitting individuals to "thwart enforcement efforts by introducing person [*sic*] into the United States that fall outside of the targeted population." *Id*. (citing Clark Decl. ¶¶ 22, 25). Finally, Defendants assert that releasing the requested data could reveal "sources and methods used by ICE in these and other prospective law enforcement proceedings." *Id*.

In support of these assertions, Defendants rely principally on the D.C. Circuit's decision in *Center for National Security Studies*, 331 F.3d at 928-29, 933. *See* Defs' Brief at 13-17. But that case could hardly differ more from this one, and it illustrates in spades why the government's invocation of the law enforcement exception is inappropriate and unsupportable on the facts of this case. In *Center for National Security Studies*, the plaintiffs sought the following information *about each of the more than 800 individuals* detained by the government during its investigation into the events of September 11:

> 1) name and citizenship status; 2) location of arrest and place of detention; 3) date of detention/arrest, date any charges were filed, and the date of release; 4) nature of charges or basis for detention, and the disposition of such charges or basis; 5) names and addresses of lawyers representing any detainees; 6) identities of any

courts which have been requested to enter orders sealing any proceedings in connection with any detainees, copies of any such orders, and the legal authorities relied upon by the government in seeking the sealing orders; 7) all policy directives or guidance issued to officials about making public statements or disclosures about these individuals or about the sealing of judicial or immigration proceedings.

331 F.3d at 922.

To put that request in perspective, one of the more than 800 requested disclosures in

*Center for National Security Studies* might have looked like this:

> On September 12, 2001, John Q. Public, an American citizen, was arrested in New York, New York, and booked into the Metropolitan Detention Center in Brooklyn, New York. Mr. Public was initially detained based on the government's belief that he was a material witness to the terrorist attacks that occurred on September 11, 2001. On September 30, 2001, a federal grand jury in the Southern District of New York returned an indictment charging Mr. Public with two counts of providing material support to a terrorist organization, in violation of 18 U.S.C. § 2239B. At his arraignment, Mr. Public was represented by John P. Defender, Office of the Federal Public Defender, 16 Court Street, 3d Floor, Brooklyn, NY 11241. On November 1, 2001, Mr. Public retained the law firm of Wilmer Hale, 399 Park Avenue, New York, New York 10022, to represent him in a class action lawsuit alleging that, along with dozens of others, he was abused by guards while being held at the Metropolitan Detention Center. On November 11, 2001, Mr. Public was transferred from the Metropolitan Detention Center to the Metropolitan Correctional Center in New York, New York, where he remains in custody. Shortly thereafter, Wilmer Hale began representing Mr. Public in his criminal case. The United States then moved to seal all proceedings in that case, and the court granted its motion. A copy of the court's order is attached to this disclosure, along with a comprehensive listing of every legal authority cited by the government in both its opening and reply briefs in support of that motion. Mr. Public's case remains pending. However, on January 12, 2007, Mr. Public fired Wilmer Hale after learning that a high-ranking government official had criticized that law firm for "representing terrorists." He is now being represented by John P. Defender II, Office of the Federal Public Defender, 52 Duane Street, Tenth Floor, New York, NY 10007.

Over Judge Tatel's dissent, a divided panel of the D.C. Circuit sanctioned the agency's refusal to provide the plaintiffs in that case with the more than 800 such disclosures on the ground that they would provide the terrorists with "a comprehensive diagram of the law enforcement investigation after September 11," *id*. at 926, and allow terrorists to "map the course of the investigation and thus develop the means to impede it." *Id*. at 928. That was so, the court

-16-

explained, because disclosing the identities of every individual detained in connection with the September 11 investigation, along with the dates and locations of every such individual's detention and the other highly-individuated information requested about each detainee, "would inform terrorists of both the substantive and geographic focus of the investigation," *id*. at 928; "provide a chronological and geographical picture of the government investigation," *id*. at 933; and "inform terrorists which of their members were compromised by the investigation, and which were not," *id*. at 928, thereby allowing the terrorists to deduce "which cells had been compromised, and which individuals had been cooperative with the United States." *Id*. at 933.

In contrast to the clear connection between the information requested and the consequences of disclosure in *Center for National Security Studies*, Defendants make no effort in this case to explain how any comparable harms plausibly could flow from the disclosure of the non-specific, wholly generalized group data ADC requested in this case. As noted above, ADC deliberately refrained from requesting the name of any individual October Plan detainee; any other personally identifiable information about any individual October Plan detainee; which DHS or ICE employees were involved in the identification or detention of any individual October Plan detainee; how DHS and ICE identified and effectuated the detention of any individual October Plan detainee; the particular allegations or charges of wrongdoing that led to the detention of any individual October Plan detainee; the date or location or duration of the detention of any individual October Plan detainee; the disposition of any criminal case, civil complaint, or administrative proceeding (if any) brought by the Government against any individual October Plan detainee; or the date or location or duration or any other information relating to any such proceeding brought against any individual October Plan detainee.

Instead, ADC merely sought non-specific, wholly generalized demographic data concerning a group of 237 individuals—data that, in its entirety, might have looked like this:

Of the 237 October Plan detainees, 220 were men and 17 were women. 82 October Plan detainees were citizens of Mexico; 40 were citizens of Saudi Arabia; 35 were citizens of Egypt; 30 were citizens of Lebanon; 25 were citizens of Jordan; 15 were citizens of the United Kingdom; and 10 were citizens of France. 180 October Plan detainees were Muslim; 40 were Christian; 17 were Jewish. 150 October Plan detainees were of Arab ethnicity; 67 were of Latin ethnicity; 10 were of European ethnicity; and 10 were of African ethnicity. 170 October Plan detainees were White; 20 were African/African-American; 10 were Asian; and the rest were Other.

Given the nature and vagaries of this sort of group data, its disclosure could not possibly inform the terrorists "where" Defendants focused the October Plan, because it does not include the location, and thus the "geographic focus," of the detentions. *Cf. Ctr. for Nat'l Sec. Studies*, 331 F.3d at 928, 931. Nor could disclosing such data provide the terrorists with a "chronological picture" of the October Plan, because it does not include the dates of the detentions and/or any subsequent law enforcement proceedings involving the October Plan detainees. *Cf. id.* at 933. And there is no reasonable probability that disclosing this data could inform the terrorists "which of their members were compromised by the investigation, and which were not," *cf. id.* at 928, because the requested data does not include the names or any other personally identifiable information about the detainees.

In short, contrary to the government's assertions and the facts of *Center for National Security Studies*, this case simply does not involve a request for highly-individualized, case-specific "details about every ***individual*** arrested as part of an investigation," *cf.* Defs' Brief at 16, and thus does not remotely implicate the kinds of legitimate national security concerns recognized by *Center for National Security Studies*.[2]

---

[2] In that respect, ADC's request also differs from those each in of the other cases upon which the government relies. In *CIA v. Sims*, plaintiffs sought disclosure of the institutional affiliations of scientists conducting specific government-sponsored intelligence research, and the Supreme Court sensibly credited the government's explanation of how the disclosure of such information easily could have enabled informed parties to discern the identities of the CIA-affiliated researchers at those institutions. 471 U.S. 159, 179-880 (1985).

As if to underscore Defendants' overreaching and exaggeration, the Clark declaration makes no effort to explain *how* any terrorist organization could connect the non-specific, wholly generalized group data requested by ADC to any individual detainee or particular intelligence source. And as the attached Cannistraro declaration makes clear, there is no reason for thinking it could. Defendants arrested more than one million individuals in 2004, and as the Cannistraro declaration explains, non-individuated data on the demographic characteristics of a group of 237 of those individuals could not possibly reveal the identity of a particular individual. *Id*. ¶ 13 ("[B]ecause the October Plan detainees represent a small fraction of all similarly categorized persons detained by the government in 2004, it is impossible to determine from the release of this data which individuals were detained.").

Cannistraro illustrates the point as follows:

> [I]f the terrorists have planted a single operative from Saudi Arabia in the United States, and the data released in response to ADC's request indicates that 1 Saudi national was detained during the October Plan, the terrorists have no way of knowing whether the detained Saudi national was (a) their operative or (b) one of the many other Saudis detained by the government in 2004. The same principle is true of data requested on the race, gender, ethnicity, or religion of the October Plan detainees.

---

In *American Friends Service Committee v. U.S. Dep't of Defense*, plaintiffs sought the disclosure of chronological series of reports on Defense Department research projects, and the Third Circuit sanctioned the government's explanation that the unrestricted release of such information would enable viewers to assemble a comprehensive "picture of the nation's national defense research program," including detailed chronological information "about the direction of U.S. research into weapons or defensive technologies." 831 F.2d 441, 444, 445 (3d. Cir. 1987).

In *Edmonds v. FBI*, plaintiff sought, among other things, the specific names of various FBI agents involved in an investigation. 272 F. Supp. 2d 35, 47 & n.5 (D.D.C. 2003).

And in *Aftergood v. CIA*, plaintiff sought "historical U.S. intelligence budget information from 1947 to 1970, to include aggregate figures as well as subsidiary agency budget totals." 355 F. Supp. 2d 557, 560 (D.D.C. 2005). The court permitted the agency to withhold that information not under Exemption 7(A), but under Exemption 3, which permits the government to withhold information specifically exempted by another statute—in that case, 50 U.S.C. § 403-3(c)(7). *Id*. at 561-62.

*Id.* Without such individually identifiable information, "it is impossible to identify the particular sources—confidential or not—that led the government to the October Plan detainees." *Id.* ¶ 14. As the Cannistraro declaration thus concludes, "the sort of wholly non-specific, generalized data requested by ADC would be of no use to a potential terrorist [and] would neither identify the source or sources of information used for targeting purposes nor the means by which those targets were recognized and detained." *Id.* ¶ 12.

Nonetheless, in an effort to further insulate Defendants' ongoing law enforcement operations from any possible interference—no matter how speculative or remote—ADC is willing to permit Defendants to disclose the requested information in an even more generalized form than initially requested. Rather than requiring Defendants to provide a country-by-country breakdown of the October Plan detainees, ADC will accept nationality data broken down into two categories: on one hand, the number of October Plan detainees from NSEERS countries, and on the other, the number of October Plan detainees from non-NSEERS countries.

As the Cannistraro declaration makes clear, formatting the disclosure in that fashion will conclusively maintain the continued confidentiality of the identities of both the October Plan detainees themselves and any confidential sources who provided Defendants with information about those individuals. *See* Cannistraro Decl. at ¶ 15 ("Though the requested information already is far too generalized to permit the terrorists to identify targets or sources, this added measure of generality would decisively mask the individual identities of the detained individuals and, thus, the sources relied upon to identify those individuals.").

Under these circumstances, Exemption 7(A) provides no legitimate basis for withholding the requested data. This Court thus should deny Defendants' motion for summary judgment and grant ADC's cross-motion for partial summary judgment with respect to the gender and nationality data withheld by Defendants.

**B.      Exemption 7(D) Does Not Immunize The Requested Data From Disclosure.**

Exemption 7(D) authorizes the government to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information … could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source."  5 U.S.C. § 552(b)(7)(D).

In order to justify non-disclosure under either prong of this exception, the government must demonstrate that it received the requested "information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred." *U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 172 (1993).  Here, Defendants seek to bring the requested data within the scope of this exemption by asserting that because "*some* of the threat data used in the [October Plan], including information relating to the gender and nationality of potential targets of the investigation, was received from confidential sources pursuant to a strict understanding of confidentiality," Clark Decl. ¶ 19, *none* of the requested data can be disclosed. Defs' Brief at 18.

Defendants' "all or nothing" approach to this exception is both factually and legally unsupportable.  As a threshold matter, it is at odds with the well-settled rule that the government is obligated to segregate and release any non-exempt data sought by a FOIA applicant.  *See* 5 U.S.C. § 522(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."); *see also Arieff v. U.S. Dep't of Justice*, 712 F.2d 1462, 1466 (D.C. Cir. 1983) ("[T]he exemptions

-21-

of the FOIA do not apply wholesale.  An item of exempt information does not insulate from disclosure the entire file in which it is contained, or even the entire page on which it appears."); *see also Ctr. for Auto Safety v. EPA*, 731 F.2d 16, 21 (D.C. Cir. 1984) ("The 'segregability' requirement applies to all documents and all exemptions in the FOIA.").

As a result, "an agency cannot justify withholding an entire document simply by showing that it contains some exempt material." *Schiller v. NLRB*, 964 F.2d 1205, 1209 (D.C. Cir. 1992). Instead, the withholding agency is obligated to "supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a [request] to which they apply,'" and to "'specify in detail which portions of the [requested information] are disclosable and which are allegedly exempt.'" *Id.* (quoting *King*, 830 F.2d at 224; *Vaughn*, 484 F.2d at 827).

The Clark Declaration's bald assertion that "***some***" of the data is exempt because it came from confidential sources is thus woefully insufficient to justify withholding ***all*** of the requested data.  On that ground alone, Defendants' motion for summary judgment must be denied.  *See id.* ("It is error for a district court to simply approve the withholding of an entire document without entering a finding on segregability, or the lack thereof.") (internal quotations and alteration omitted) (citing *Powell v. U.S. Bureau of Prisons*, 927 F.2d 1239, 1242 n.4 (D.C. Cir. 1991) (quoting *Church of Scientology v. Dep't of the Army*, 611 F.2d 738, 744 (9th Cir. 1979))).

But even if Defendants could overcome that hurdle, their invocation of the confidential source exemption would fail on the merits.  With respect to the first prong of Exemption 7(A), Defendants have not remotely substantiated their assertion that disclosing the requested information "could reasonably be expected to disclose the identity of a confidential source."  5 U.S.C. § 552(b)(7)(D).  That is so because (as set forth above) Defendants have not even attempted to explain how disclosing the non-specific, wholly generalized group data ADC

requested could lead to the identification of any individual October Plan detainee, and thus to the specific source or sources who provided information about any individual October Plan detainee. *See supra* at xxx (discussing Cannistraro Decl. ¶¶ 12-14).

Again, as the Cannistraro declaration explains, "the sort of wholly non-specific, generalized data requested by ADC would be of no use to a potential terrorist [and] would neither identify the source or sources of information used for targeting purposes nor the means by which those targets were recognized and detained." *Id.* ¶ 12. In sum, because Defendants have not even attempted to explain how a terrorist or terrorist organization could discern any particular October Plan detainee—and thus any particular confidential data source—from the group data ADC requested, Defendants simply cannot sustain their burden of proving that the requested data is exempt from disclosure under the first prong of exemption 7(D).

Defendants' assertion that the requested data is covered by the second prong of Exemption 7(D) because it would reveal "information furnished by a confidential source" fares no better. To be sure, it is irrelevant under this prong of the statute whether the requested information would actually reveal the identity of a particular confidential source. *See, e.g.*, *Duffin v. Carlson*, 636 F.2d 709, 712 (D.C. Cir. 1980). But it also is true that the FOIA exemptions must be interpreted and applied in light of the particular harms they are designed to prevent. *Wiener*, 943 F.2d at 977 (requiring the government to provide "a particularized explanation of how disclosure of the particular [information requested] ***would damage the interest protected by the claimed exemption***"); *Washington Post*, 863 F.2d at 101 ("[T]he agency must show how release of the particular material ***would have the adverse consequence that the Act seeks to guard against***.").

Here, "[t]he purpose of the confidential information exemption is to prevent the FOIA from causing the 'drying up' of sources of information in criminal investigations." *Shaw v. FBI*,

749 F.2d 58, 61 (D.C. Cir. 1984).  But Defendants make no effort to explain how disclosing the sort of non-specific, generalized group data of the sort at issue here would dissuade anyone from providing leads about persons planning to carry out unlawful activities.  As the Cannistraro declaration once again makes clear, there is no conceivable basis for thinking it would.  Noting his "considerable experience in running confidential agents, both abroad and domestically," Cannistraro observes that "none of the agents or informants [he] directed at the terrorist[s] would have failed to provide anti-terrorism information on the prospect that generalized data, of the type included in the FOIA request, would likely be released."  Cannistraro Decl. ¶ 16.

There is little wonder why.  No semi-rational person would decline to inform DHS (for instance) that one "Jordan Johnson," who happens to be a woman and not a man (or who happens to be Canadian and not American), is planning to commit a crime simply because DHS might one day reveal that it arrested nearly 400,000 women (and 1400 Canadians) in a given year.

That, of course, explains why Defendants did not hesitate before releasing data on the gender and nationality of eight of the October Plan detainees in their November 2004 press release.  *See* Complaint Exh. 4.  And it likewise explains why Defendant DHS's Office of Immigration Statistics routinely releases virtually complete, annualized data on the nationality of every deportable alien—notwithstanding that (as it claims here) DHS surely received some of that data from confidential sources who reported that a deportable alien came from a particular country.  *See* DHS, Office of Immigration Statistics, *2005 Yearbook of Immigration Statistics*, *available at* http://www.dhs.gov/xlibrary/assets/statistics/yearbook/2005/table35.xls (last visited April 13, 2007); *see also* DHS, Office of Immigration Statistics, *2004 Yearbook of Immigration Statistics*, *available at* http://www.dhs.gov/xlibrary/assets/statistics/yearbook/2004/Table36.xls (last visited April 13, 2007).

-24-

In sum, given the extent of Defendants' prior disclosures—including such disclosures for the 2004 calendar year, when the October Plan was carried out—their attempt to invoke the confidential information exemption rings especially hollow now.[3]

Moreover, Defendants' overly broad reading of the confidential information exemption should be rejected because it would swallow the law enforcement exemption as a whole. On Defendants' view, it would be impermissible for the FBI to release a tally of the number of arrestees whose names begin with the letter "N" simply because a confidential source provided a lead with respect to a "Nathan Nathanson." And it likewise would be impermissible for the FBI even to confirm or deny that it opened a file on Nathan Nathanson simply because Mr. Nathanson was identified as a suspect by a confidential source.

Such patently absurd results are precisely why courts have "consistently stated that FOIA exemptions are to be narrowly construed," *U.S. Dep't of Justice v. Julian*, 486 U.S. 1, 8 (1988), and there is no basis for departing from that principle here. Because Defendants cannot possibly explain how releasing the sort of non-specific, generalized group data at issue here—data that cannot be traced to a specific law enforcement target or source—would dissuade confidential sources from coming forward with information in the future (and because Defendants have otherwise waived the protections of Exemption 7(E)), their motion for summary judgment under

---

[3]  Indeed, it is well-settled that "materials normally immunized from disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record." *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999) (citing *Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 19 (D.C. Cir. 1999); *Public Citizen v. Dep't of State*, 11 F.3d 198, 201-03 (D.C. Cir. 1993); *Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1279-80 (D.C. Cir. 1992); *Afshar v. Dep't of State*, 702 F.2d 1125, 1130-34 (D.C. Cir. 1983)). At the very least, then, Defendants cannot rely on the confidential information exemption to shield data concerning the nationality of any October Plan detainee from any country for which DHS released complete nationality data in its 2004 Yearbook of Immigration Statistics. For such detainees, DHS plainly has waived its right to invoke Exemption 7(E), and Defendants' motion for summary judgment under that Exemption should be denied.

this exemption should be denied and ADC's cross-motion for partial summary judgment with respect to gender and nationality data should be granted.

### C.    Exemption 7(E) Does Not Immunize The Requested Data From Disclosure.

Exemption 7(E) authorizes the government to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information … would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).   It is well-settled that "Exemption 7(E) applies only to 'investigative techniques and procedures generally unknown to the public.'"  *Blanton v. U.S. Dep't of Justice*, 63 F. Supp. 2d 35, 49 (D.D.C. 1999) (quoting *Malloy v. U.S. Dep't of Justice*, 457 F. Supp. 543, 545 (D.D.C. 1978)); *see also Smith v. Bureau of Alcohol, Tobacco and Firearms*, 977 F. Supp. 496, 501 (D.D.C. 1997) (requiring agency to explain "why the release of the information deleted from the two documents at issue would compromise law enforcement by revealing information about investigatory techniques ***that are not widely known to the general public***"); *Albuquerque Publishing Co. v. U.S. Dep't of Justice*, 726 F. Supp. 851, 858 (D.D.C. 1989) (holding that exemption 7(E) does not apply to "techniques that are commonly described or depicted in movies, popular novels, stories or magazines, or on television [including] techniques such as eavesdropping, wiretapping, and surreptitious tape recording and photographing").

In order to sustain its burden of proving this exemption applies, then, Defendants thus must demonstrate not only that "release of the information 'could reasonably be expected to risk circumvention of the law,'" *Coleman v. FBI*, 13 F. Supp. 2d 75, 83 (D.D.C. 1998) (quoting *FBI v. Abramson*, 456 U.S. 615, 622 (1982)), but that it would do so by exposing law enforcement

methods not known to the public. On this point, Defendants offer two putative justifications for their nondisclosure. First, they assert that *if* the terrorists are able to identify a particular source from the disclosed data, they may "be able to scrutinize circumstances and events surrounding the sources at the time the information was disclosed by the sources and thereby identify the techniques employed to obtain the information." *Id.* (citing Clark Decl. ¶ 26. Second, they assert that releasing the requested data would "reveal the methods used … to prioritize violators leads [*sic*]," and thereby enable "terrorist groups to introduce persons into the United States that would fall outside the targeted priority." Defs' Brief at 21 (citing Clark Decl. ¶ 25). Neither response is sufficient to sustain Defendants' burden of proof under this exemption.

### 1.    Disclosure of the Requested Information Would Not Expose Unknown Law Enforcement Techniques.

As an initial matter, Defendants' assertion that disclosure of the requested information would expose law enforcement techniques is far too speculative to sustain the government's burden of proof. As set forth above, Defendants have not provided this Court with any rational explanation of how their disclosure of the non-specific, wholly generalized data ADC requested would enable terrorists or terrorist organizations to identify any particular October Plan detainee—and thus any particular source of information about any particular October Plan detainee—and the Cannistraro Declaration demonstrates that Defendants cannot do so. *See supra* at xxx-xxx (citing Cannistraro Decl. at ¶¶ 12-14).

As a result, even if the requested data is disclosed, the terrorists will not know **what** "circumstances and events surrounding" **which** particular sources they would need "to scrutinize" in order to identify the techniques employed to obtain the information. Here, then, there is no reasonable probability that the terrorists could deduce Defendants' reliance on any particular law enforcement technique from the requested data. *Cf.* Defs' Brief at 21.

But even if disclosing the requested data could enable terrorists or terrorist organizations to determine which particular individuals were targeted during the October Plan, and then to determine which particular sources provided information to Defendants about those particular October Plan targets, Defendants have not remotely demonstrated that disclosing the requested data would reveal any previously unknown law enforcement techniques to those individuals. *See, e.g.*, *Blanton*, 63 F. Supp. 2d at 49; *Malloy*, 457 F. Supp. at 545. To the contrary, the Clark Declaration states only that Defendants relied on "surveillance, intelligence, employment of undercover personnel and informants," and it expressly concedes that "these techniques may not be unknown to the public." Clark Decl. ¶ 26.

That is something of an understatement; those methods are well known and widely discussed in the targeted communities, *see* Cannistraro Decl. at ¶ 12, and they are precisely the kind of techniques that *Albuquerque Publishing* admonished the government not to bother invoking in connection with Exemption 7(E). *See* 726 F. Supp. at 858 (warning the government to "avoid burdening the Court with … information pertaining to techniques that are commonly described or depicted in movies, popular novels, stories or magazines, or on television [including] eavesdropping, wiretapping, and surreptitious tape recording and photographing").

Defendants' only answer is that such well-known techniques occasionally have been immunized from disclosure "when 'circumstances of their usefulness … may not be widely known.'" Defs' Brief at 21 (quoting *Wickline v. FBI*, No. 92-1189, 1994 WL 549756, at *5). But the only support they provide for invoking that principle here is a sentence in the Clark Declaration that does nothing but paraphrase the same quotation from *Wickline*—albeit without attribution. Clark Decl. ¶ 26 ("[T]he usefulness under the particular circumstances of obtaining information from these sources is not generally known."). Defendants make no effort to explain how or why there is any remaining mystery to the "usefulness" of using "surveillance,

intelligence, employment of undercover personnel and informants" to disrupt criminal activity (much less how the release of the requested data would compromise the usefulness of those methods), *see id.*, and the Clark Declaration's plagiarized *ipse dixit* is precisely the kind of factually unsupported assertion that courts routinely reject as insufficient to discharge the government's burden of proof under FOIA. *See, e.g.*, *King*, 830 F.2d at 219 ("Specificity is the defining requirement of the *Vaughn* index and affidavit; affidavits cannot support summary judgment if they are conclusory, **merely reciting statutory standards**, or if they are too vague or sweeping.").[4]

### 2.    Disclosure of the Requested Information Would Not Expose Unknown Law Enforcement Guidelines.

Nor is there any merit to Defendants' equally bare assertion that disclosing the requested data would expose unknown law enforcement guidelines and thereby help terrorists or terrorist organizations evade unexpected methods of detection. After all, even if the requested data demonstrates that the October Plan led to the arrest of a disproportionate number of Arab or Muslim men (and, thus, that Defendants are in fact engaged in invidious profiling despite their repeated public and private protestations to the contrary), Defendants themselves have already publicized the fact that they rely on NSSERS data to develop and prioritize their enforcement

---

[4]    In any event, the cases Defendants rely upon to shield such widely known techniques are plainly distinguishable. *Blanton* involved a request for information that would reveal unknown, unpublicized "specifics" about the FBI's procedures for conducting polygraph examinations, including "the structure, pattern and sequence of questions, along with their varying degrees of intensity." 63 F. Supp. 2d at 49-50. *Edmonds v. FBI* likewise sought to protect non-public details about the FBI's polygraph methods. 272 F. Supp. 2d 35, 56 (D.D.C. 2003). *Coleman* not only involved a request for polygraph details, but additional information regarding previously undisclosed FBI behavioral assessment techniques. 13 F. Supp. 2d at 83-84. And *Wickline* involved a request for information regarding "the details of recording equipment used" by law enforcement agencies, disclosure of which could have enabled criminals to evade the operation of such equipment in the future. 1994 WL 549756, at *4-*5.

activities.   As ICE noted in its September 30, 2004 press release regarding the very law

enforcement action at issue in this case:

> ICE's Compliance Enforcement Unit routinely assigns immigration status violator
> leads to ICE field office nationwide based on data from the Student Exchange
> Visitor Information System (SEVIS), **the National Security Entry/Exit**
> **Registration System (NSEERS)**, and the United States Visitor and Immigrant
> Status Indicator Technology program (USVISIT).

Complaint Exh. 2 at 2.

Given Defendants' own public pronouncements about their (inappropriate) use of

NSEERS data to prioritize law enforcement activities, it thus would surprise no one if disclosing

the requested data confirms that the October Plan detainees disproportionately came from

NSEERS countries and disproportionately were male.   Indeed, the people least likely to be

surprised by such a disclosure are the terrorists themselves, who presumably are smart enough to

recruit operatives that are not subject to the intrusive process of NSEERS Special Registration

(including its interviews, fingerprinting, and photography) the moment they enter the country,

and who thereafter remain subject to (what ICE itself describes as) "routine" monitoring

designed to produce "further contact" with those individuals in the future.   *See* Complaint Ex. 2

(quoting 9/11 Commission Report).

In sum, if the government cannot sustain non-disclosure under Exemption 7(E) based on

law enforcement methods and techniques depicted in movies, popular novels, stories or

magazines, or on television shows, it cannot sustain non-disclosure under Exemption 7(E) based

on law enforcement guidelines depicted in its own public pronouncements.   *See, e.g.*, *Blanton*, 63

F. Supp. 2d at 49; *Albuquerque Publishing Co.*, 726 F. Supp. at 858; *Malloy*, 457 F. Supp. at

545.[5]   As a result, the Court should deny Defendants' motion for summary judgment and grant

---

[5]    Yet again, the handful of cases Defendants rely upon are distinguishable on this basis.
*Gordon v. FBI* involved a request for disclosure of the specific (and previously undisclosed)
criteria TSA uses to select individuals for inclusion on its watch lists. 388 F. Supp. 2d 1028,

ADC's motion for partial summary judgment with respect to the gender and nationality data withheld by Defendants.

**D.    Exemption 7(F) Does Not Immunize The Requested Data From Disclosure.**

Exemption 7(F) authorizes the government to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information … could reasonably be expected to endanger the life or physical safety of any individual."  5 U.S.C. § 552(b)(7)(F).

Weighty as that exemption may be, it plays no independent role in this case.  After all, Defendants' assertion that disclosing the requested data could endanger individuals is predicated entirely on their earlier invocation of the confidential source exemption contained in Exemption 7(D).  *See* Defs' Brief at 23 ("[D]isclosure of data could reveal the identity of confidential sources, and … were the identities of the informants to become known to terrorists, their lives well could be in danger.").  As a result, Defendants' alarmist invocation of this exemption fails for the same reasons its invocation of the confidential source exemption fails.  *See supra* xxx-xxx (addressing Exemption 7(D)).[6]

---

1035-36 (N.D. Cal. 2005).  *Pully v. IRS* sought the disclosure of specific (and previously undisclosed) IRS audit guidelines.  939 F. Supp. 429, 438 (E.D. Va. 1996).  *Jimenez v. FBI* sought the disclosure of specific (and previously undisclosed) criteria used to determine whether a given individual should be classified as a gang member.  938 F. Supp. 21, 30 (D.D.C. 1996).  And the one-paragraph, unpublished disposition in *Hammes v. U.S. Customs Service* apparently sought disclosure of the specific (and previously undisclosed) criteria used by U.S. Customs agents to conduct searches and seizures.  No. 94-4868, 1994 WL 693717, *1 (S.D.N.Y. 1994).

[6]    While Defendants suggest that they may be able fill the gaps in their affidavits by submitting an *ex parte*, *in camera* declaration to the Court, they identify no compelling basis for permitting them to do so on the facts of this case.  Such submissions are highly disfavored because they deprive FOIA plaintiffs of the opportunity to contest the government's assertions, and district courts thus have wide discretion to deny such requests.  *Center for Auto Safety*, 731 F.2d at 20-22; *Lykins v. U.S. Dep't of Justice*, 725 F.2d 1455, 1463 (D.C. Cir. 1984) (explaining that "in camera examination is not a substitute for the government's obligation to provide detailed public indexes and justifications").  Given FOIA's strong

## II.    DEFENDANTS HAVE NOT SUSTAINED THEIR BURDEN OF PROVING THEY CONDUCTED AN ADEQUATE SEARCH FOR RESPONSIVE DATA.

Separate and apart from the issue of whether Defendants properly withheld data on the gender and nationality of the October Plan detainees, Defendants have not sustained their burden of demonstrating that they conducted an adequate search for data responsive to ADC's request for information concerning the religious, ethnic, and racial characteristics of the October Plan detainees.  To date, Defendants have not disclosed the religious affiliation or ethnicity of a single October Plan detainee, and they have provided ADC with information regarding the racial identity of just 15 of the more than 230 October Plan detainees.

Defendants offer two justifications for their omissions.  With respect to their failure to disclose information on the religious and ethnic characteristics of the detainees, Defendants assert only that "ICE does not maintain information relating to, ethnicity, and religion."  Clark Decl. ¶ 14 (punctuation in original).  With respect to their failure to disclose data about the racial identities of the detainees, Defendants assert that "such information is only collected at the discretion of the arresting officer" and was not uniformly collected "at the time of arrest."  *Id*.  Neither explanation is sufficient to discharge Defendants' burden of proving they conducted an adequate search for responsive data.

"It is elementary that an agency responding to a FOIA request must 'conduct a search reasonably calculated to uncover all relevant documents,' and, if challenged, must demonstrate 'beyond material doubt' that the search was reasonable."  *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990) (quoting *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983)); *see also McGehee v. CIA*, 697 F.2d 1095, 1101, *vacated in part on other grounds*, 711

---

preference for public disclosure and the fact that the government has not even attempted to sustain its burden in this case, the government's request for an *ex parte* second bite at the apple should be denied.

F.2d 1076 (D.C. Cir. 1983) (holding that the government must take all reasonable steps "to ferret out requested documents"). To discharge that burden, it is well-settled that the agency must submit detailed declarations or affidavits "setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Oglesby*, 920 F.2d at 68 (holding that agency affidavits were insufficient to discharge government's burden where they did "not show, with reasonable detail, that the search method … was reasonably calculated to uncover all relevant documents [or] identify the terms searched or explain how the search was conducted"); *James v. U.S. Customs & Border Protection*, __ F. Supp. 2d __, No. 06-562, 2007 WL 548816, *3 (D.D.C. 2007) (agency declarations must "explain in reasonable detail and in a non-conclusory fashion the scope and method of the agency's search" in order to sustain burden) (citing *Perry v. Block*, 684 F.2d 121, 126 (D.C. Cir. 1982) (holding that sufficient "affidavits [must] explain in reasonable detail the scope and method of the search conducted by the agency")).

Defendants have not even attempted to satisfy this standard. Indeed, the Clark Declaration fails even to aver that Defendants conducted a single search for the requested information; it states only that Defendants either "do[] not maintain [the requested information]" or "did not uniformly collect [it]." Clark Decl. ¶ 14. But those naked assertions hardly demonstrate that the requested data could not be located within Defendants' files if Defendants would bother to search for it.

To the contrary, there is every reason to think that such information could be uncovered in agency files. That is so because information regarding an individual's race, ethnicity, or religious background is often elicited in the course of immigration proceedings, where such characteristics are common grounds for claiming entitlement to asylum or withholding of removal. *See, e.g.*, *Knezevic v. Ashcroft*, 367 F.3d 1206 (9th Cir. 2004) ("To be eligible for

asylum or withholding of deportation, an applicant must prove that he is a person who is unable or unwilling to return to his country of origin because of persecution or a well-founded fear of persecution on account of **race, religion, nationality, membership in a particular social group, or political opinion**.") (internal quotation omitted); *see also* 8 U.S.C. § 1101(a)(42).

That fact is critical, because we now know (despite the fact that ADC did not request such information) that Defendants initiated immigration enforcement proceedings against some (if not all) of the October Plan detainees. *See* Complaint Exh. 4 (noting that certain detainees were processed for removal); Defs' Brief at 11 (noting that "immigration status violation cases against 237 individuals arrested during this period have been closed"). There is thus a reasonable possibility that a search of Defendants' records of the immigration enforcement proceedings against the October Plan detainees might reveal information on at least some of the detainees' racial, ethnic, or religious characteristics, and Defendants thus are obligated to conduct a search for such data.

At bottom, then, there is simply no excuse for Defendants' apparent failure to perform a meaningful search of its records, or to document any such search with sufficient specificity in its summary judgment affidavit. Because Defendants thus have failed to prove even that they "conduct[ed] a search reasonably calculated to uncover all relevant documents"—and much less "demonstrate[d] beyond material doubt that the search was reasonable"—their motion for summary judgment should be denied, *Truitt*, 897 F.2d at 542, and the case should be remanded to the agency with instructions to conduct a thorough search of its records for data responsive to ADC's request for data on the religion, race, and ethnicity of the October Plan detainees.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion for Summary Judgment, grant ADC's Motion for Partial Summary Judgment with respect to the gender and

nationality data sought in its FOIA requests, and remand this case to the agency with instructions to conduct a thorough search of its records for data responsive to ADC's FOIA request for religion, race, and ethnicity data.

Dated:  April 16, 2007                    Respectfully submitted,


                                          s/ Michael D. Shumsky_____

                                          Tefft W. Smith (D.C. Bar No. 458441)
                                          Michael D. Shumsky (D.C. Bar No. 495078)
                                          KIRKLAND & ELLIS LLP
                                          655 Fifteenth Street, N.W.
                                          Washington, D.C.  20005
                                          Ph:    (202) 879-5000
                                          Fax:   (202) 879-5200

                                          *Counsel for Plaintiff*
                                          *American-Arab Anti-Discrimination Committee*

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN-ARAB ANTI-<br>DISCRIMINATION COMMITTEE<br>1732 Wisconsin Avenue, NW<br>Washington, D.C. 20007<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>HOMELAND SECURITY<br>Washington, D.C. 20528<br><br>IMMIGRATION AND CUSTOMS<br>ENFORCEMENT<br>425 I Street, NW<br>Washington, D.C. 20536<br><br>Defendants. | Civil Action No.: 06-1770-JR |

DECLARATION OF VINCENT CANNISTRARO IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1.    My name is Vincent Cannistraro.  I make this declaration under penalty of perjury and pursuant to 28 U.S.C. § 1746.

2.    I have an extensive background in counterterrorism.  Between 1963 and 1984, I served as an officer with the Central Intelligence Agency's ("CIA's") Directorate of Operations in the Middle East, Africa, Europe, and Central America.  From 1984 to 1987, I served as Director of Intelligence Programs for the U.S. National Security Council ("NSC").  From 1987 to 1998, I served as Special Assistant for Intelligence in the office of the Secretary of Defense; and from 1988 to 1991, I served as Chief of Operations and Analysis at the CIA's CounterTerrorism Center.  Since that time I have consulted with the federal government and an array of corporate clients on terrorism and security matters and have lectured at many international conferences and American universities.

3.    In my experience, racial and ethnic profiling is an appalling waste of government resources and is not an effective means of combating planned, pending, or future terrorist actions.

4.    To the contrary, such profiling breeds a deep and abiding fear in the communities that have been targeted by the government on the basis of race, ethnicity, religious belief, or national origin.  Indeed, based on my experience as a former operations officer focused

on the detection and preemption of terrorist threats directed at the United States, I would categorize such practices and policies as not only ineffective in preventing terrorism, but actually harmful.

5.     That is so because such profiling pointlessly alienates large numbers of people with whom the government needs to establish excellent relations in order to assist legitimate law enforcement efforts. This kind of social alienation can be dangerous. Indeed, it may be a factor in fomenting the spread of al Qaeda-style terrorism now being observed in Britain, and is a model that in the future may be replicated both in Europe and in the United States.

6.     To avoid this sort of social isolation, it is imperative to recognize that Americans of Arab descent, and Arab and Muslim immigrants, are not uniform groups that can serve as an appropriate focus for anti-terrorism law enforcement measures. Governmental engagement with these communities should not be based on convenient fictions that certain social, religious, or cultural groups have a propensity to generate violent activity. Instead, American counterterrorism policy should be based on a recognition that Americans of Arab descent, and Arab and Muslim immigrants to this country, are rational, individual human beings who believe in America and its values and have a stake in this country's success. Indeed, many of them have fled repression and persecution in their native countries. They should be treated no differently from other Americans whose ancestors emigrated from Western Europe or who can trace their ethnic origins to a Christian or Jewish progenitor.

7.     For the United States in particular, it is important to establish clarity on its counterterrorism policies. It is my understanding that Americans of Arab descent, and Arab and Muslim immigrants, are becoming increasingly isolated and insecure as a result of perceived racial, ethnic, and religious profiling by the government. The government's rote denials that it is targeting these communities have fallen on deaf ears. To reverse the drift towards a politics of alienation, members of these communities must feel that they are being taken seriously, that they have a voice, and that their concerns are being heard in the corridors of power.

8.     If the government is being honest when it denies that it has engaged in such profiling, it should welcome the release of the data requested by the American-Arab Anti-Discrimination Committee ("ADC"), because that data will help dispel the widespread perception that the government is singling out Americans of Arab descent and Arab and Muslim immigrants for counterterrorist surveillance and law enforcement activities. Indeed, by helping dispel that perception, the release of the requested data could help reverse a dangerous drift toward social alienation in those communities.

9.     Regardless of what the data reveal, however, the government's asserted rationales for withholding it are erroneous and disingenuous. I have carefully reviewed the declaration of John P. Clark, and based on my 27 years of experience as a CIA officer—including three years as Chief of Operations and Analysis at the CIA's CounterTerrorism Center—I believe that Mr. Clark's assertions are without merit.

10. As a general matter, Mr. Clark's assertions fall into two categories. First, Mr. Clark asserts that the disclosure of the requested data will "assist potential terrorists in identifying the sources and methods of the ICE investigations and the focus of the ICE investigations." Clark Decl. ¶ 18; *id.* ¶ 19 (disclosure of the requested data may "disclose the identities of a confidential source"); *id.* ¶ 20 (disclosure of the requested data may "narrow the scope of potential sources and potentially identify the actual sources of information"); *id.* ¶ 21 (disclosure of the requested information "could enable terrorist groups to identify shifts in investigative strategy and more clearly identify the source(s) having access to information that could induce such shifts in strategy"); *id.* ¶ 22 (disclosure of the requested data may enable "a terrorist organization [to] ascertain the course or sources of information that led to ICE's effort"); *id.* ¶ 27 (disclosure of the requested data may "reveal the sources of such information"). And second, Mr. Clark asserts that disclosure of the requested information could help terrorists "identify[] the specific targets" of the October Plan. *Id.* ¶ 25.

11. As a threshold matter, it bears reiterating that the law enforcement operation at issue in this case was intended "to uncover and disrupt criminal and/or terrorist activity that [were aimed at] disrupt[ing] the 2004 Presidential election." *Id.* ¶ 19. But if there were any such activities planned in connection with the 2004 Presidential election—and despite publicizing an array of allegedly disrupted terrorist plots since September 11, *see* http://www.whitehouse.gov/news/releases/2005/10/20051006-7.html (identifying 15 disrupted plots or "casings"), the government has not identified any—the terrorists responsible for those activities know not only what those operations were, but which individuals were responsible for carrying them out, and which other individuals could have been potential sources of the identifying information that enabled the government to foil those plots. In short, by disclosing the operational targets of the October Plan, the government has already led potential terrorists to all of the information it now claims that the disclosure of the requested data would reveal.

12. Equally important, the sort of wholly non-specific, generalized data requested by ADC would be of no use to a potential terrorist who might want to take preventative action to avoid law enforcement detection. Further, the data requested would neither identify the source or sources of information used for targeting purposes nor the means by which those targets were recognized and detained. It should be noted that within targeted communities there tends to be general knowledge that their phones, their places of worship, their homes and meeting places are subject to government monitoring. Further, individuals in the community who may be providing information to the government are often identified by other members of the community; this information is often widely discussed and absent an ICE cooperative relationship with community leaders, leads to suspicion and distrust and the purveying of inaccurate information. The FBI has made a significant, and mostly successful effort, to establish friendly and collaborative relations with community leaders. ICE has not, and therefore its success in anti-terrorist efforts has been minimal.

13. The release of the data requested cannot harm law enforcement activity because the Defendants arrest more than 1 million people every year, and there is no way to determine from the data ADC has requested whether a given individual was detained as part of the October Plan or part of some other law enforcement operation. In other

words, if the terrorists have planted a single operative from Saudi Arabia in the United States, and the data released in response to ADC's request indicates that 1 Saudi national was detained during the October Plan, the terrorists have no way of knowing whether the detained Saudi national was (a) their operative or (b) one of the many other Saudis detained by the government in 2004. The same principle is true of data requested on the race, gender, ethnicity, or religion of the October Plan detainees: because the October Plan detainees represent a small fraction of all similarly categorized persons detained by the government in 2004, it is impossible to determine from the release of this data which individuals were detained.

14.    Because it is therefore impossible to identify the particular individuals detained by the government in connection with the October Plan, it is impossible to identify the particular sources—confidential or not—that led the government to the October Plan detainees.

15.    In any event, there is a simple solution to the government's perceived dilemma. Instead of presenting the requested data to ADC on a country-by-country basis, it could simply disclose the number of detained individuals from NSEERS-designated countries. Though the requested information already is far too generalized to permit the terrorists to identify targets or sources, this added measure of generality would decisively mask the individual identities of the detained individuals and, thus, the sources relied upon to identify those individuals. Again, based on my 27 years of experience as a CIA officer, including three years as Chief of Operations and Analysis at the CIA's CounterTerrorism Center, I can say without any hesitation that it would be impossible for the terrorists to identify any individual detainee from data indicating (for instance) that 200 of the October Plan detainees came from the 25 NSEERS-designated countries and 37 did not come from those countries, and that 220 of the detainees were male and 17 were not.

16.    Finally, I wish to note my considerable experience in running confidential agents, both abroad and domestically. None of the agents or informants I directed at the terrorist objective would have failed to provide anti-terrorism information on the prospect that generalized data, of the type included in the FOIA request, would likely be released. Their identities, and confidential roles, were not at risk.


Dated:  April 15, 2007                Respectfully submitted,

                                     Vincent Cannistraro

                                     1609 Longfellow St.
                                     McLean, VA 22101
                                     Ph:    (703) 734-1990
                                     Email:  vincecan@verizon.net

-4-

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE<br>1732 Wisconsin Avenue, NW<br>Washington, D.C.  20007<br><br>          Plaintiff,<br><br>     v.<br><br>UNITED STATES DEPARTMENT OF<br>HOMELAND SECURITY<br>Washington, D.C.  20528<br><br>IMMIGRATION AND CUSTOMS<br>ENFORCEMENT<br>425 I Street, NW<br>Washington, D.C.  20536<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No.: 06-1770-JR |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

1.      Admitted.

2.      Admitted.

3.      Admitted.

4.      Admitted.

5.      Admitted.

6.      Denied.  *See* Memorandum In Opposition To Defendants' Motion For Summary Judgment And In Support Of Plaintiff's Cross-Motion For Partial Summary Judgment at 31-34.

7.      Denied. *Id*.

8.      Admitted, except insofar as this statement implies that Defendants have conducted an adequate search for responsive data. *Id*.

9.      Admitted, except insofar as this statement implies that Defendants properly withheld the requested data pursuant to the cited FOIA exemptions.

10. Disclosing non-specific, wholly generalized group data regarding the national origin, gender, race, ethnicity, and religion of the October Plan detainees could not reasonably be expected to interfere with ongoing or prospective law enforcement proceedings. Cannistraro Decl. ¶¶ 11-15.

11. Disclosing non-specific, wholly generalized group data regarding the national origin, gender, race, ethnicity, and religion of the October Plan detainees could not reasonably be expected to disclose the identity of a confidential source or dissuade current or prospective sources from assisting law enforcement. Cannistraro Decl. ¶¶ 11-15.

12. Disclosing non-specific, wholly generalized group data regarding the national origin, gender, race, ethnicity, and religion of the October Plan detainees could not reasonably be expected to disclose unknown techniques, procedures, or guidelines for law enforcement investigations or prosecutions, or enable potential terrorists or terrorist organizations to circumvent the law. Cannistraro Decl. ¶¶ 11-15.

13. Disclosing non-specific, wholly generalized group data regarding the national origin, gender, race, ethnicity, and religion of the October Plan detainees could not reasonably be expected to endanger the life or physical safety of any individual. Cannistraro Decl. ¶¶ 11-15.


Dated:  April 16, 2007                    Respectfully submitted,


                                          s/ Michael D. Shumsky

                                          Tefft W. Smith (D.C. Bar No. 458441)
                                          Michael D. Shumsky (D.C. Bar No. 495078)
                                          KIRKLAND & ELLIS LLP
                                          655 Fifteenth Street, N.W.
                                          Washington, D.C.  20005
                                          Ph:    (202) 879-5000
                                          Fax:   (202) 879-5200

                                          *Counsel for Plaintiff*
                                          *American-Arab Anti-Discrimination Committee*

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ) | |
| AMERICAN-ARAB ANTI-DISCRIMINATION ) | |
| COMMITTEE ) | |
| 1732 Wisconsin Avenue, NW ) | |
| Washington, DC   20007 ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.: 06-1770-JR |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| HOMELAND SECURITY ) | |
| Washington, D.C. 20528 ) | |
| ) | |
| IMMIGRATION AND CUSTOMS ) | |
| ENFORCEMENT ) | |
| 425 I Street, NW ) | |
| Washington, D.C. 20536 ) | |
| ) | |
| Defendants. ) | |
| ) | |

## ORDER

Upon consideration of Defendants' Motion for Summary Judgment, Plaintiff's opposition thereto, and Plaintiff's Cross-Motion for Partial Summary Judgment, it is hereby ordered that:

(1) Defendants' Motion for Summary Judgment is **DENIED** and Plaintiff's Cross-Motion for Partial Summary Judgment is **GRANTED**.

(2) Within thirty (30) days of this Order, Defendants must disclose to Plaintiff all requested data regarding the national origin and gender of the October Plan detainees.

(3) Within thirty (30) days of this Order, Defendants must conduct a thorough search of their records for any data regarding the race, ethnicity, and religion of the October Plan detainees; submit a detailed affidavit or declaration setting forth the manner and means through which that search was executed; and disclose all such data to Plaintiff.

Dated: _____

_____

UNITED STATES DISTRICT JUDGE