**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE<br>1732 Wisconsin Avenue, NW<br>Washington, DC  20007 | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No.: 06-1770-JR |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY<br>Washington, D.C. 20528 | ) ) ) ) | |
| IMMIGRATION AND CUSTOMS ENFORCEMENT<br>425 I Street, NW<br>Washington, D.C. 20536 | ) ) ) ) ) | |
| Defendants. | ) ) | |

**NOTICE OF ERRATA**

Plaintiff American-Arab Anti-Discrimination Committee respectfully submits the following errata to its April 16, 2007 Memorandum In Opposition To Defendants' Motion For Summary Judgment And In Support Of Its Motion For Partial Summary Judgment.

Page 23, line 3: replace "xxx" with "19-20"

Page 27, line 19: replace "xxx-xxx" with "19-20"

Page 31, line 14: replace "xxx-xxx" with "27-28"

Along with a corrected version of the Memorandum, the undersigned counsel has attached copies of Exhibits 1 and 2, which were referenced in the April 16, 2007 filing but were not appended at the time the Memorandum was uploaded.  The undersigned counsel offers his sincerest apologizes to both the Court and to Defendants for these omissions.

Dated:  April 17, 2007                    Respectfully submitted,


                                          s/ Michael D. Shumsky                        

                                          Tefft W. Smith (D.C. Bar No. 458441)
                                          Michael D. Shumsky (D.C. Bar No. 495078)
                                          KIRKLAND & ELLIS LLP
                                          655 Fifteenth Street, N.W.
                                          Washington, D.C.  20005
                                          Ph:    (202) 879-5000
                                          Fax:   (202) 879-5200

                                          *Counsel for Plaintiff*
                                          *American-Arab Anti-Discrimination Committee*

**UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| AMERICAN-ARAB ANTI-<br>DISCRIMINATION COMMITTEE<br>1732 Wisconsin Avenue, NW<br>Washington, D.C.  20007 | ) ) ) ) ) ) |  |
| Plaintiff, | ) ) |  |
| v. | ) ) | Civil Action No.: 06-1770-JR |
| UNITED STATES DEPARTMENT OF<br>HOMELAND SECURITY<br>Washington, D.C.  20528 | ) ) ) ) |  |
| IMMIGRATION AND CUSTOMS<br>ENFORCEMENT<br>425 I Street, NW<br>Washington, D.C.  20536 | ) ) ) ) ) |  |
| Defendants. | ) ) ) |  |

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR PARTIAL
SUMMARY JUDGMENT**

The unstated message of Defendants' motion for summary judgment is "Trust us,

because we say so."  But with all due respect to Defendants Department of Homeland Security

("DHS") and Immigration and Customs Enforcement ("ICE"), that is not the American way—

and it is not the law.  To the contrary, the whole point of the Freedom of Information Act is "to

pierce the veil of [government] secrecy and to open [governmental] action to the light of public

scrutiny," *Department of Air Force v. Rose*, 425 U.S. 352, 361 (1976), so that an "informed

citizenry" can "hold the governors accountable to the governed."  *NLRB v. Robbins Tire &*

*Rubber Co.*, 437 U.S. 214, 242 (1978).  In other words, FOIA entitles us to "Trust, **but verify**,"

and the importance of that basic democratic precept is underscored in this case by the

diametrically conflicting assertions Defendants have made in response to Plaintiff American-

Arab Anti-Discrimination Committee's ("ADC's") inquiries—claiming at the time it carried out the enforcement operation at issue here that it was acting "without regard to race, ethnicity or religion" and was "not profiling" individuals, *see* Complaint Exh. 2, but asserting now that disclosing the data ADC requested "could expose the focus" of the government's investigation, Defs' Brief at 2, and enable "terrorist groups" to identify "the targeted population." *Id.* at 13.

In an effort to verify the truth of Defendants' public representations, ADC—a nonprofit civil rights organization committed to defending the rights of, and addressing discrimination and bias against, Americans of Arab descent—filed two FOIA requests with DHS and ICE. Those requests sought only undifferentiated, non-individualized data on the race, national origin, ethnicity, religion, and gender *of a group* of approximately 240 persons detained by Defendants in connection with the so-called "October Plan," a law enforcement operation carried out three years ago in order to disrupt threats targeting the 2004 presidential election. Those carefully tailored FOIA requests were consciously designed to avoid interfering with any ongoing or prospective law enforcement proceedings—efforts that ADC fully supports and, indeed, actively aids by working directly with Defendants and other agencies of the federal government. Instead, the requests simply sought to determine whether (as Defendants contemporaneously and publicly had asserted) the October Plan had been executed without bias, or (as ADC feared) was based on the impermissible "profiling" of Americans of Arab descent, Arab immigrants, and Muslims.

To that end, ADC's requests did not seek to determine the name of any individual October Plan detainee; nor any other personally identifiable information about any individual October Plan detainee; nor which DHS or ICE employees were involved in the identification or detention of any individual October Plan detainee; nor how DHS and ICE identified and effectuated the detention of any individual October Plan detainee; nor the particular allegations or charges of wrongdoing that led to the detention of any individual October Plan detainee; nor

the date or location or duration of the detention of any individual October Plan detainee; nor the disposition of any criminal case, civil complaint, or administrative proceeding (if any) brought by the Government against any individual October Plan detainee; nor the date or location or duration or any other information relating to any such proceeding brought against any individual October Plan detainee. Rather, the requests merely sought non-specific, wholly generalized demographic data concerning *a group* of 237 out of the more than one million persons detained by DHS and ICE in 2004. *See* DHS, Office of Immigration Statistics, *Immigration Enforcement Actions: 2004* [*2004 Annual Report*], at 1 (Nov. 2005) (attached as Exhibit 1).

Notwithstanding the carefully circumscribed nature of ADC's FOIA requests, Defendants denied those requests on the ground that the release of the requested data would somehow "harm ongoing and prospective enforcement proceedings," Defs' Brief at 2—even though Defendants now have volunteered (notwithstanding that ADC never sought such information) that every single case involving an October Plan detainee has been closed. Defs' Brief at 11. Such harms nonetheless would arise, Defendants assert, because the release of the highly generalized data ADC requested would enable "terrorist groups to identify the focus of the investigation [and] the confidential sources" they relied upon to effectuate the October Plan. Defs' Brief at 3. Were that to happen, Defendants speculate, the terrorists "will resort to physical attacks, threats, harassment and attempted murder of those sources as well as agents gathering information and other third party individuals." Declaration of John P. Clark ¶ 27 (the "Clark Decl.").

But these dire predictions are bereft of any plausible explanation of *how* such consequences reasonably could be expected to result from the release of the non-specific, wholly generalized group data ADC requested. The only support Defendants provide for their claims is a declaration by John P. Clark, a Deputy Assistant Secretary for Operations at Defendant ICE. That declaration is long on hyperbolic conclusions, but offers nothing of substance to explain

how a terrorist organization possibly could use the non-specific, generalized group data ADC requested to determine the identity of any one of the 237 October Plan detainees or identify any confidential source that provided information about the October Plan detainees.

Quite to the contrary, as made clear by the attached declaration of Vincent Cannistraro— a 27-year veteran of the CIA and former Chief of Operations and Analysis at the CIA's CounterTerrorism Center—disclosing the data ADC requested could have no impact on the effectiveness of continued law enforcement or counter-terror efforts. That is so, the Cannistraro declaration explains, because the non-specific, wholly generalized group data ADC requested cannot possibly allow any supposed terrorist or terrorist organization to determine the identity of any one of the 237 October Plan detainees or identify any confidential source that provided information to Defendants about the October Plan detainees. Indeed, in marked contrast to the Clark declaration, the Cannistraro declaration provides concrete reasons and examples as to why his conclusions are factually sound and analytically irrefutable.

Defendants' inability to establish any credible connection between the requested data and the parade of horribles they predict is fatal to their motion for summary judgment. Even in the national security context, it is axiomatic that an agency cannot sustain its burden of justifying non-disclosure "by mere conclusory statements; the agency must show *how* release of the particular material would have the adverse consequence that the Act seeks to guard against." *Washington Post Co. v. Department of Justice*, 863 F.2d 96, 101 (D.C. Cir. 1988).[1]

Make no mistake: ADC fully recognizes that the events of September 11, 2001 offer a chilling reminder of the government's uniquely compelling need to vigorously root out and bring terrorists to justice wherever they seek refuge—no more so than when they attempt to conceal themselves within our borders. That, after all, is why ADC has spent much of the past six years

---

[1]    Unless otherwise indicated, all emphases have been added.

working directly with Defendants DHS and ICE—and with many other federal agencies, including Customs and Border Protection ("CBP"), the Federal Bureau of Investigation ("FBI"), and the Transportation Security Administration ("TSA")—to train law enforcement and counterterrorism personnel for the vital mission of protecting the United States from those who intend it harm. And it also is why ADC is prepared to accept disclosure of the requested data in an even more generalized format than initially sought—a format that, as the Cannistraro declaration makes clear, would decisively prevent the terrorists from obtaining any useful information from the requested data while allowing ADC to verify the truth of Defendants assertions that are not engaged in profiling.

Ultimately, then, Defendants have no legitimate basis for withholding the requested data, and while the terrorists thus far have claimed many innocent victims, the linchpin of our democracy—the right of the people "to know what their government is up to," *U.S. Dep't of Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 773 (1989) (quotations omitted)—need not be among them.

## BACKGROUND

### A.    The National Security Entry/Exit Registration System ("NSEERS")

On June 6, 2002, then-Attorney General John Ashcroft proposed a new federal program to be known as the National Security Entry-Exit Registration System ("NSEERS"). Complaint ¶ 8. As thereafter implemented, NSEERS required foreign nationals from certain countries—to be designated by the Attorney General—to submit to fingerprinting and photography upon entry into the United States; to register periodically with the Immigration and Naturalization Service ("INS"); and to comply with certain exit controls when they departed the country. *Id*. (citing Registration and Monitoring of Certain Nonimmigrants, 67 Fed. Reg. 52,584, 52,591-93 (final

rule Aug. 12, 2002) (codified at 8 CFR § 264.1(f)).  That aspect of NSEERS was called "Special Registration."  *Id*.

In response to concerns that the government would use the NSEERS database to discriminatorily target "specific minority ethnic groups and members of a specific religion, i.e., Arabs and Muslims" for law enforcement activities, 67 Fed. Reg. at 52,585, the government asserted that it "remains firmly committed to protecting the civil rights of all individuals in the United States while seeking to prevent acts of terrorism.  The Department unequivocally rejects the notion that the requirements of the final rule, or the criteria for application of the final rule, to nonimmigrant aliens subject to special registration are, or are intended to be, invidiously discriminatory."  *Id*.

Nonetheless, Attorney General Ashcroft eventually required male nationals from just 25 countries—24 of which are predominantly Arab or Muslim (the other being North Korea)—to appear at INS offices for questioning, fingerprinting, and photographing.  Complaint ¶ 10 (citing Registration of Certain Nonimmigrant Aliens from Designated Countries, 67 Fed. Reg. 67,766, 67,766 (Nov. 6, 2002) (designating male nationals from Iran, Iraq, Libya, Sudan, and Syria); Registration of Certain Nonimmigrant Aliens from Designated Countries, 67 Fed. Reg. 70,526, 70,526 (Nov. 22, 2002) (designating male nationals from Afghanistan, Algeria, Bahrain, Eritrea, Lebanon, Morocco, North Korea, Oman, Qatar, Somalia, Tunisia, United Arab Emirates, and Yemen); Registration of Certain Nonimmigrant Aliens from Designated Countries, 67 Fed. Reg. 77,642, 77,643 (Dec. 18, 2002) (designating male nationals from Pakistan and Saudi Arabia); Registration of Certain Nonimmigrant Aliens from Designated Countries, 68 Fed. Reg. 2363, 2364 (Jan. 16, 2003) (designating male nationals from Bangladesh, Egypt, Indonesia, Jordan, and Kuwait)).  Within weeks, the government detained more than 1100 people as a result of the NSEERS Special Registration program.  *Id.* ¶ 11.

### B.    The "October Plan"

On September 17, 2004, CBS News reported that the FBI had circulated an internal e-mail advisory to supervisory agents detailing "a massive counter-offensive of interrogations, surveillance and possible detentions" that was designed to "disrupt [any] terrorist plans" targeting the 2004 presidential election. *Id.* ¶ 12 & Exh. 1.  According to CBS News, the FBI's e-mail advisory informed agents that "'extraordinary measures' … will go into place 'beginning the first week of October through the elections.'" *Id.*  Those measures included the use of "'aggressive—even obvious—surveillance' techniques [against] a short list of people suspected of being terrorist sympathizers, but who have not committed a crime." *Id.*  It also provided that "[o]ther 'persons of interest,' including their family members, may also be brought in for questioning."  Finally, CBS News reported that the FBI "expect[ed] to be criticized for the strategy if it goes too far," and noted that "some officials fear[ed] … a wave of protests from Arab-Americans and civil libertarians." *Id.*

On September 30, 2004, DHS and ICE issued a press release titled "Terrorist Threat and Disruption Efforts by ICE." *Id.* ¶ 13 & Exh. 2.  That press release confirmed the existence of the October Plan, and reported that "ICE has been working for the past several months at a heightened level in direct support of the government-wide Interagency Security Plan that will remain in effect through the 2005 Presidential Inauguration." *Id.*  To assuage fears that the October Plan would rely upon discriminatory profiling, the press release asserted that "[t]his initiative builds upon ICE's continued efforts to target immigration status violators in America— without regard to race, ethnicity or religion," and claimed that ICE "is not conducting a 'round-up' or a 'sweep' in any community," "is not profiling based on race or religious affiliation," and, "is not instituting a blanket detention policy." *Id.*  Nonetheless, the press release acknowledged that "ICE's Compliance Enforcement Unit routinely researches and assigns immigration status

violator leads to ICE field office nationwide based on data from … the National Security Entry/Exit Registration System (NSEERS)," *id*., a program that, as implemented by the Attorney General, was and is based precisely on profiling. *See* Complaint ¶ 10.

The same day, ADC issued a press release stating that "officials from the Department of Homeland Security (DHS) and ICE" had responded to ADC's concerns about the October Plan by "stress[ing] their commitment to continuing to build their working relationship with the Arab and Muslim American communities." *Id*. ¶ 14 & Exh. 3. ADC's press release further indicated that government officials had "emphasized that their initiative is not based on racial profiling." *Id*. Nonetheless, ADC reiterated its concern that the government might use NSEERS to select targets for October Plan surveillance, and that NSEERS-based profiling might cause "the ICE initiative [to] be selectively carried out against Arabs and Muslims." *Id*.

On November 4, 2004, DHS and ICE issued a press release titled "ICE Threat Disruption Effort Results in More Than 230 Arrests—More Than 900 Investigations Completed." *Id*. ¶ 15 & Exh. 4. That press release reported that "in a one-month period beginning October 1, 2004, ICE has arrested 237 immigration status violators nationwide as part of the government-wide Interagency Security Plan that will remain in effect through the 2005 Presidential Inauguration." *Id*. The press release further asserted that "leads ha[d] been sent to ICE field offices for immediate investigation and potential arrests—without regard to race, ethnicity, or religion." *Id*. In contrast to the September 30 press release, however, ICE omitted any mention of its reliance on NSEERS. *Id*.

Notably—and apparently without any concern about the consequences it might have on its ongoing enforcement efforts—the November 4, 2004 press release disclosed some of the very information ADC now seeks, including the nationalities of eight of the detainees, four of whom

were from Arab or Muslim countries, including a Saudi national, Jordanian national, Lebanese national, and Pakistani national. *See id.* ¶ 15 & Exh. 4.

### C.    ADC's First FOIA Request (Nationality Data)

On December 14, 2004, ADC submitted a FOIA request asking Defendants to release group data on the nationalities of the individuals detained in connection with the October Plan. *Id.* ¶ 16 & Exh. 5.  That request reiterated ADC's concern that Defendants' acknowledged reliance on NSEERS data might have resulted in selective enforcement of the October Plan against Arabs and Muslims, and explained that "[i]n order to alleviate these concerns, which have since been echoed by numerous members of the Arab-American and Muslim communities, it is our sincere hope that ICE will release the nationality breakdown of those arrested in order to assure the Arab-American and Muslim communities, along with the rest of our nation, that immigration enforcement is not resulting in a disproportionate impact on individuals from Arab or Muslim countries." *Id.*

On February 14, 2005, Defendants denied ADC's FOIA request for nationality data— notwithstanding the fact that they voluntarily had disclosed some of that very information in the November 4, 2004 press release.  *Id.* ¶ 18.  In contrast to its prior release of such data, Defendants purported to base their denial of ADC's FOIA request on the ground that the requested data is exempt from disclosure under 5 U.S.C. § 522(b)(7), which protects certain records and information compiled in connection with law enforcement proceedings.  *Id.*

On March 3, 2005, ADC appealed the denial of its FOIA Request.  *Id.* ¶ 19.  That appeal explained that mere information on the October Plan detainees' nationalities could not possibly interfere with potential law enforcement proceedings, because it did not seek the disclosure of the "names or individual private information of any kind on the detainees, nor … attempt to gain information of a particularized nature with respect to the investigation." *Id.*  On September 5,

2005, DHS denied ADC's appeal—again, notwithstanding the fact that Defendants' November 4, 2004 press release had voluntarily disclosed some of the very information ADC sought in its FOIA request. *Id.* ¶ 20. That decision was expressly based on 5 U.S.C. § 552(b)(7)(A), which shields certain information that would interfere with law enforcement proceedings, and 5 U.S.C. § 552(b)(7)(E), which shields certain information that would disclose law enforcement techniques or guidelines. *See id.*

### D.    ADC's Second FOIA Request (Race, Ethnicity, Religion, and Gender Data)

On February 8, 2006, ADC filed a second FOIA request with Defendants. *Id.* ¶ 22 & Exh. 8. Like its initial request, ADC's second request sought non-specific, generalized data on the race, ethnicity, religion, and gender of the October Plan detainees. Again, that request was intended not to disrupt ongoing law enforcement activities, but rather to assure Arab-Americans and Muslims that their communities were not being selectively targeted by Defendants on the basis of impermissible profiling. *Id.* As in its first FOIA request, ADC reiterated that it was not seeking particularized information about any individual October Plan detainee, such as their name, other personal information, the particular allegations and/or charges of wrongdoing levied against them, or the date and location of their arrest. *Id.* ¶ 23. Defendants did not timely respond to ADC's second FOIA request, *see* 5 U.S.C. § 552(a)(6)(A)(i) (establishing a twenty-day response period), and gave no indication of the "date on which a determination is expected to be dispatched." 5 U.S.C. § 552(a)(6)(B)(i).

### E.    This Litigation

On October 17, 2006, ADC filed this lawsuit seeking to compel the release of the data requested in ADC's December 14, 2004 and February 8, 2006 FOIA requests. On November 17, 2006, Defendants filed their answer to the complaint. On January 18, 2007, Defendants moved for summary judgment in this case. The same day, Defendants finally responded to ADC's

February 8, 2006 FOIA request.  *See* Letter from G. Marshall to J. O'Quinn, Jan. 18, 2007 (attached as Exhibit 2).  That response stated that "ICE did not maintain statistics relating to ethnicity or religion," indicated that ICE had compiled only limited information on the race of the October Plan detainees, and denied ADC's request for gender data on the ground that such data were exempt from disclosure under 5 U.S.C. § 522(b)(7)(A), 5 U.S.C. § 522(b)(7)(D), 5 U.S.C. § 522(b)(7)(E), and 5 U.S.C. § 522(b)(7)(F).  *See id*. at 1.

## JURISDICTION AND VENUE

This Court has subject-matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. § 552(a)(4)(B) and 552(a)(6)(E)(iii), respectively.  Venue lies in this district under 5 U.S.C. § 552(a)(4)(B).

## STANDARDS OF REVIEW

"[D]isclosure, not secrecy, is the dominant objective of the Act," *Rose*, 425 U.S. at 361, and FOIA thus establishes a "strong presumption in favor of disclosure."  *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991).  To that end, "an agency may withhold documents responsive to a FOIA request only if the responsive documents fall within one of nine enumerated statutory exemptions.  Consistent with the Act's 'goal of broad disclosure, these exemptions have been consistently given a narrow compass.'"  *Long v. U.S. Dep't of Justice*, 450 F. Supp. 2d 42, 53 (D.D.C. 2006) (quoting *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989)).

Once the government denies a FOIA request, the Act places the burden of justifying its non-disclosure squarely on the responsible agency.  "Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden 'on the agency to sustain its action' and directs the district courts to 'determine the matter de novo.'"  *Reporters Committee*, 489 U.S. at 754 (quoting 5 U.S.C. § 552(a)(4)(B)).  As a result, "the burden of demonstrating that these strictly defined

[e]xemptions apply to a particular case rests with the agency." *Hornbostel v. Dep't of the Interior*, 305 F. Supp. 2d 21, 29 (D.D.C. 2004).

Notwithstanding these well-settled standards, FOIA cases pose a unique challenge for both FOIA plaintiffs and reviewing courts. "[B]ecause the issue [in a FOIA case] is whether one party will disclose documents to the other, only the party opposing disclosure will have access to all the facts." *Wiener v. FBI*, 943 F.2d 972, 977 (9th Cir. 1991). As a result, "the party requesting disclosure must rely upon his adversary's representations as to the material withheld, and the court is deprived of the benefit of informed advocacy to draw its attention to the weaknesses in the withholding agency's arguments." *Id.* To resolve this dilemma and "afford the FOIA requester a meaningful opportunity to contest, and the district court an adequate foundation to review, the soundness of the withholding," *King v. Dep't of Justice*, 830 F.2d 210, 218 (D.C. Cir. 1987), agencies are required to "provide a detailed description of the information withheld through the submission of a so-called 'Vaughn index,' sufficiently detailed affidavits or declarations, or both." *Long*, 450 F. Supp. 2d at 53 (citing *Oglesby v. U.S. Dep't of the Army*, 79 F.3d 1172, 1178 (D.C. Cir. 1996); *Vaughn v. Rosen*, 484 F.2d 820, 827-28 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974)).

Where the agency seeks to sustain its burden of proving that the withheld information falls within one of FOIA's narrowly circumscribed exceptions through the use of such affidavits or declarations, summary judgment in favor of the agency is appropriate only if the agency's submissions (1) provide "a particularized explanation of how disclosure of the particular [information requested] would damage the interest protected by the claimed exemption," *Wiener*, 943 F.2d at 977, and (2) "are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981); *see also King*, 830 F.2d at 219 ("Specificity is the defining requirement of the *Vaughn*

index and affidavit; affidavits cannot support summary judgment if they are conclusory, merely reciting statutory standards, or if they are too vague or sweeping. To accept an inadequately supported exemption claim would constitute an abandonment of the trial court's obligation under the FOIA to conduct a de novo review.") (citations and quotations omitted).

Finally, while courts typically afford "some measure of deference to the executive in cases implicating national security," *Center for Nat'l Security Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 927 (D.C. Cir. 2003), it is well-settled that no amount of deference can excuse an agency's "lack of detail and specificity [or] failure to account for contrary record evidence." *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998). Where the government fails to sustain that burden, the entry of summary judgment in favor of a FOIA plaintiff is appropriate. *See, e.g.*, *Taxation With Representation Fund v. IRS*, 646 F.2d 666 (D.C. Cir. 1981).

## ARGUMENT

I.  **DEFENDANTS HAVE NOT SUSTAINED THEIR BURDEN OF PROVING THAT THE REQUESTED DATA FALLS WITHIN FOIA'S LAW ENFORCEMENT EXEMPTION.**

Defendants have not remotely sustained their burden of demonstrating that the requested data fall within any of the FOIA exemptions they invoke. That is so because Defendants have not provided any explanation—much less a sufficiently particularized explanation—of how disclosing the non-specific, wholly generalized group data sought by ADC reasonably could be expected to compromise any of the interests protected by the asserted law enforcement exemptions.

To the contrary, Defendants' claims that disclosing the requested data would result in catastrophic harm are riddled with obvious analytical gaps—not the least of which is Defendants' failure even to attempt to explain how any terrorist or terrorist organization could use the non-specific, wholly generalized group data at issue in this case to determine the identity

of any specific October Plan detainee, and from there, the source or sources upon which Defendants relied to identify that detainee, effectuate his or her detention, and neutralize any planned or pending terrorist action. Indeed, as the Cannistraro declaration makes clear, there is no basis at all for thinking that Defendants possibly could fill that gap in their "sky is falling" approach to this case. Given Defendants' failure to provide a sufficiently particularized rationale for withholding the requested data, and in light of the credible, contrary record evidence produced by ADC, Defendants' motion for summary judgment should be denied and partial summary judgment instead should be entered for ADC with respect to the gender and nationality data sought in its FOIA requests.

### A.    Exemption 7(A) Does Not Immunize The Requested Data From Disclosure.

Exemption 7(A) authorizes the government to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A) (enumeration omitted). To satisfy this exemption, the government must demonstrate (1) that a law enforcement proceeding is pending or prospective, and (2) how releasing the requested information might compromise such a proceeding. *Voiche v. FBI*, 46 F. Supp. 2d 26, 31 (D.D.C. 1999).

In this case, ADC neither contests that the data it has requested was compiled by Defendants in connection with law enforcement proceedings, nor seeks to rebut the government's (vague) assertion that related proceedings are ongoing. Instead, the key point here is that Exemption 7(A) was not designed to "endlessly protect material simply because it was in an investigatory file," *Robbins Tire*, 437 U.S. at 230, and thus requires the government to demonstrate with "detail and specificity" how the disclosure of that information could interfere with ongoing law enforcement proceedings. *Campbell*, 164 F.3d at 30; *see also North v. Walsh*,

881 F.2d 1088, 1100 (D.C. Cir. 1989) (holding that the government must demonstrate that "disclosure can reasonably be expected to interfere in a ***palpable, particular way***" with pending enforcement proceedings). The government has not met—and cannot remotely sustain—that burden, and its motion for summary judgment under Exemption 7(A) should be denied.

Defendants make three assertions to support their contention that disclosure of the requested data could compromise ongoing law enforcement proceedings. First, Defendants assert that the data "could reveal where the government has focused its efforts—and perhaps as important—where it was not focusing during that time period." Br. at 13 (citing Clark Decl. at ¶ 18). Second, Defendants assert that if such data were requested and disclosed on a month-to-month basis (which, of course, it was not), it "would reveal the direction and progress of the investigation and provide individuals and groups with a roadmap of [Defendants'] enforcement efforts," permitting individuals to "thwart enforcement efforts by introducing person [*sic*] into the United States that fall outside of the targeted population." *Id*. (citing Clark Decl. ¶¶ 22, 25). Finally, Defendants assert that releasing the requested data could reveal "sources and methods used by ICE in these and other prospective law enforcement proceedings." *Id*.

In support of these assertions, Defendants rely principally on the D.C. Circuit's decision in *Center for National Security Studies*, 331 F.3d at 928-29, 933. *See* Defs' Brief at 13-17. But that case could hardly differ more from this one, and it illustrates in spades why the government's invocation of the law enforcement exception is inappropriate and unsupportable on the facts of this case. In *Center for National Security Studies*, the plaintiffs sought the following information *about each of the more than 800 individuals* detained by the government during its investigation into the events of September 11:

> 1) name and citizenship status; 2) location of arrest and place of detention; 3) date of detention/arrest, date any charges were filed, and the date of release; 4) nature of charges or basis for detention, and the disposition of such charges or basis; 5) names and addresses of lawyers representing any detainees; 6) identities of any

courts which have been requested to enter orders sealing any proceedings in connection with any detainees, copies of any such orders, and the legal authorities relied upon by the government in seeking the sealing orders; 7) all policy directives or guidance issued to officials about making public statements or disclosures about these individuals or about the sealing of judicial or immigration proceedings.

331 F.3d at 922.

To put that request in perspective, one of the more than 800 requested disclosures in

*Center for National Security Studies* might have looked like this:

> On September 12, 2001, John Q. Public, an American citizen, was arrested in New York, New York, and booked into the Metropolitan Detention Center in Brooklyn, New York. Mr. Public was initially detained based on the government's belief that he was a material witness to the terrorist attacks that occurred on September 11, 2001. On September 30, 2001, a federal grand jury in the Southern District of New York returned an indictment charging Mr. Public with two counts of providing material support to a terrorist organization, in violation of 18 U.S.C. § 2239B. At his arraignment, Mr. Public was represented by John P. Defender, Office of the Federal Public Defender, 16 Court Street, 3d Floor, Brooklyn, NY 11241. On November 1, 2001, Mr. Public retained the law firm of Wilmer Hale, 399 Park Avenue, New York, New York 10022, to represent him in a class action lawsuit alleging that, along with dozens of others, he was abused by guards while being held at the Metropolitan Detention Center. On November 11, 2001, Mr. Public was transferred from the Metropolitan Detention Center to the Metropolitan Correctional Center in New York, New York, where he remains in custody. Shortly thereafter, Wilmer Hale began representing Mr. Public in his criminal case. The United States then moved to seal all proceedings in that case, and the court granted its motion. A copy of the court's order is attached to this disclosure, along with a comprehensive listing of every legal authority cited by the government in both its opening and reply briefs in support of that motion. Mr. Public's case remains pending. However, on January 12, 2007, Mr. Public fired Wilmer Hale after learning that a high-ranking government official had criticized that law firm for "representing terrorists." He is now being represented by John P. Defender II, Office of the Federal Public Defender, 52 Duane Street, Tenth Floor, New York, NY 10007.

Over Judge Tatel's dissent, a divided panel of the D.C. Circuit sanctioned the agency's refusal to provide the plaintiffs in that case with the more than 800 such disclosures on the ground that they would provide the terrorists with "a comprehensive diagram of the law enforcement investigation after September 11," *id*. at 926, and allow terrorists to "map the course of the investigation and thus develop the means to impede it." *Id*. at 928. That was so, the court

-16-

explained, because disclosing the identities of every individual detained in connection with the September 11 investigation, along with the dates and locations of every such individual's detention and the other highly-individuated information requested about each detainee, "would inform terrorists of both the substantive and geographic focus of the investigation," *id.* at 928; "provide a chronological and geographical picture of the government investigation," *id.* at 933; and "inform terrorists which of their members were compromised by the investigation, and which were not," *id.* at 928, thereby allowing the terrorists to deduce "which cells had been compromised, and which individuals had been cooperative with the United States." *Id.* at 933.

In contrast to the clear connection between the information requested and the consequences of disclosure in *Center for National Security Studies*, Defendants make no effort in this case to explain how any comparable harms plausibly could flow from the disclosure of the non-specific, wholly generalized group data ADC requested in this case. As noted above, ADC deliberately refrained from requesting the name of any individual October Plan detainee; any other personally identifiable information about any individual October Plan detainee; which DHS or ICE employees were involved in the identification or detention of any individual October Plan detainee; how DHS and ICE identified and effectuated the detention of any individual October Plan detainee; the particular allegations or charges of wrongdoing that led to the detention of any individual October Plan detainee; the date or location or duration of the detention of any individual October Plan detainee; the disposition of any criminal case, civil complaint, or administrative proceeding (if any) brought by the Government against any individual October Plan detainee; or the date or location or duration or any other information relating to any such proceeding brought against any individual October Plan detainee.

Instead, ADC merely sought non-specific, wholly generalized demographic data concerning a group of 237 individuals—data that, in its entirety, might have looked like this:

Of the 237 October Plan detainees, 220 were men and 17 were women. 82 October Plan detainees were citizens of Mexico; 40 were citizens of Saudi Arabia; 35 were citizens of Egypt; 30 were citizens of Lebanon; 25 were citizens of Jordan; 15 were citizens of the United Kingdom; and 10 were citizens of France. 180 October Plan detainees were Muslim; 40 were Christian; 17 were Jewish. 150 October Plan detainees were of Arab ethnicity; 67 were of Latin ethnicity; 10 were of European ethnicity; and 10 were of African ethnicity. 170 October Plan detainees were White; 20 were African/African-American; 10 were Asian; and the rest were Other.

Given the nature and vagaries of this sort of group data, its disclosure could not possibly inform the terrorists "where" Defendants focused the October Plan, because it does not include the location, and thus the "geographic focus," of the detentions. *Cf. Ctr. for Nat'l Sec. Studies*, 331 F.3d at 928, 931. Nor could disclosing such data provide the terrorists with a "chronological picture" of the October Plan, because it does not include the dates of the detentions and/or any subsequent law enforcement proceedings involving the October Plan detainees. *Cf. id*. at 933. And there is no reasonable probability that disclosing this data could inform the terrorists "which of their members were compromised by the investigation, and which were not," *cf. id*. at 928, because the requested data does not include the names or any other personally identifiable information about the detainees.

In short, contrary to the government's assertions and the facts of *Center for National Security Studies*, this case simply does not involve a request for highly-individualized, case-specific "details about every **individual** arrested as part of an investigation," *cf*. Defs' Brief at 16, and thus does not remotely implicate the kinds of legitimate national security concerns recognized by *Center for National Security Studies*.[2]

---

[2]    In that respect, ADC's request also differs from those each in of the other cases upon which the government relies. In *CIA v. Sims*, plaintiffs sought disclosure of the institutional affiliations of scientists conducting specific government-sponsored intelligence research, and the Supreme Court sensibly credited the government's explanation of how the disclosure of such information easily could have enabled informed parties to discern the identities of the CIA-affiliated researchers at those institutions. 471 U.S. 159, 179-880 (1985).

As if to underscore Defendants' overreaching and exaggeration, the Clark declaration makes no effort to explain *how* any terrorist organization could connect the non-specific, wholly generalized group data requested by ADC to any individual detainee or particular intelligence source. And as the attached Cannistraro declaration makes clear, there is no reason for thinking it could. Defendants arrested more than one million individuals in 2004, and as the Cannistraro declaration explains, non-individuated data on the demographic characteristics of a group of 237 of those individuals could not possibly reveal the identity of a particular individual. *Id.* ¶ 13 ("[B]ecause the October Plan detainees represent a small fraction of all similarly categorized persons detained by the government in 2004, it is impossible to determine from the release of this data which individuals were detained.").

Cannistraro illustrates the point as follows:

> [I]f the terrorists have planted a single operative from Saudi Arabia in the United States, and the data released in response to ADC's request indicates that 1 Saudi national was detained during the October Plan, the terrorists have no way of knowing whether the detained Saudi national was (a) their operative or (b) one of the many other Saudis detained by the government in 2004. The same principle is true of data requested on the race, gender, ethnicity, or religion of the October Plan detainees.

---

In *American Friends Service Committee v. U.S. Dep't of Defense*, plaintiffs sought the disclosure of chronological series of reports on Defense Department research projects, and the Third Circuit sanctioned the government's explanation that the unrestricted release of such information would enable viewers to assemble a comprehensive "picture of the nation's national defense research program," including detailed chronological information "about the direction of U.S. research into weapons or defensive technologies." 831 F.2d 441, 444, 445 (3d. Cir. 1987).

In *Edmonds v. FBI*, plaintiff sought, among other things, the specific names of various FBI agents involved in an investigation. 272 F. Supp. 2d 35, 47 & n.5 (D.D.C. 2003).

And in *Aftergood v. CIA*, plaintiff sought "historical U.S. intelligence budget information from 1947 to 1970, to include aggregate figures as well as subsidiary agency budget totals." 355 F. Supp. 2d 557, 560 (D.D.C. 2005). The court permitted the agency to withhold that information not under Exemption 7(A), but under Exemption 3, which permits the government to withhold information specifically exempted by another statute—in that case, 50 U.S.C. § 403-3(c)(7). *Id.* at 561-62.

*Id.* Without such individually identifiable information, "it is impossible to identify the particular sources—confidential or not—that led the government to the October Plan detainees." *Id.* ¶ 14. As the Cannistraro declaration thus concludes, "the sort of wholly non-specific, generalized data requested by ADC would be of no use to a potential terrorist [and] would neither identify the source or sources of information used for targeting purposes nor the means by which those targets were recognized and detained." *Id.* ¶ 12.

Nonetheless, in an effort to further insulate Defendants' ongoing law enforcement operations from any possible interference—no matter how speculative or remote—ADC is willing to permit Defendants to disclose the requested information in an even more generalized form than initially requested. Rather than requiring Defendants to provide a country-by-country breakdown of the October Plan detainees, ADC will accept nationality data broken down into two categories: on one hand, the number of October Plan detainees from NSEERS countries, and on the other, the number of October Plan detainees from non-NSEERS countries.

As the Cannistraro declaration makes clear, formatting the disclosure in that fashion will conclusively maintain the continued confidentiality of the identities of both the October Plan detainees themselves and any confidential sources who provided Defendants with information about those individuals. *See* Cannistraro Decl. at ¶ 15 ("Though the requested information already is far too generalized to permit the terrorists to identify targets or sources, this added measure of generality would decisively mask the individual identities of the detained individuals and, thus, the sources relied upon to identify those individuals.").

Under these circumstances, Exemption 7(A) provides no legitimate basis for withholding the requested data. This Court thus should deny Defendants' motion for summary judgment and grant ADC's cross-motion for partial summary judgment with respect to the gender and nationality data withheld by Defendants.

**B.     Exemption 7(D) Does Not Immunize The Requested Data From Disclosure.**

Exemption 7(D) authorizes the government to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information … could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source."  5 U.S.C. § 552(b)(7)(D).

In order to justify non-disclosure under either prong of this exception, the government must demonstrate that it received the requested "information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred." *U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 172 (1993).  Here, Defendants seek to bring the requested data within the scope of this exemption by asserting that because "***some*** of the threat data used in the [October Plan], including information relating to the gender and nationality of potential targets of the investigation, was received from confidential sources pursuant to a strict understanding of confidentiality," Clark Decl. ¶ 19, ***none*** of the requested data can be disclosed. Defs' Brief at 18.

Defendants' "all or nothing" approach to this exception is both factually and legally unsupportable.  As a threshold matter, it is at odds with the well-settled rule that the government is obligated to segregate and release any non-exempt data sought by a FOIA applicant.  *See* 5 U.S.C. § 522(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."); *see also Arieff v. U.S. Dep't of Justice*, 712 F.2d 1462, 1466 (D.C. Cir. 1983) ("[T]he exemptions

-21-

of the FOIA do not apply wholesale.  An item of exempt information does not insulate from disclosure the entire file in which it is contained, or even the entire page on which it appears."); *see also Ctr. for Auto Safety v. EPA*, 731 F.2d 16, 21 (D.C. Cir. 1984) ("The 'segregability' requirement applies to all documents and all exemptions in the FOIA.").

As a result, "an agency cannot justify withholding an entire document simply by showing that it contains some exempt material." *Schiller v. NLRB*, 964 F.2d 1205, 1209 (D.C. Cir. 1992). Instead, the withholding agency is obligated to "supply 'a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a [request] to which they apply,'" and to "'specify in detail which portions of the [requested information] are disclosable and which are allegedly exempt.'" *Id*. (quoting *King*, 830 F.2d at 224; *Vaughn*, 484 F.2d at 827).

The Clark Declaration's bald assertion that "***some***" of the data is exempt because it came from confidential sources is thus woefully insufficient to justify withholding ***all*** of the requested data.  On that ground alone, Defendants' motion for summary judgment must be denied.  *See id*. ("It is error for a district court to simply approve the withholding of an entire document without entering a finding on segregability, or the lack thereof.") (internal quotations and alteration omitted) (citing *Powell v. U.S. Bureau of Prisons*, 927 F.2d 1239, 1242 n.4 (D.C. Cir. 1991) (quoting *Church of Scientology v. Dep't of the Army*, 611 F.2d 738, 744 (9th Cir. 1979))).

But even if Defendants could overcome that hurdle, their invocation of the confidential source exemption would fail on the merits.  With respect to the first prong of Exemption 7(A), Defendants have not remotely substantiated their assertion that disclosing the requested information "could reasonably be expected to disclose the identity of a confidential source."  5 U.S.C. § 552(b)(7)(D).  That is so because (as set forth above) Defendants have not even attempted to explain how disclosing the non-specific, wholly generalized group data ADC

requested could lead to the identification of any individual October Plan detainee, and thus to the specific source or sources who provided information about any individual October Plan detainee. *See supra* at 19-20 (discussing Cannistraro Decl. ¶¶ 12-14).

Again, as the Cannistraro declaration explains, "the sort of wholly non-specific, generalized data requested by ADC would be of no use to a potential terrorist [and] would neither identify the source or sources of information used for targeting purposes nor the means by which those targets were recognized and detained." *Id*. ¶ 12. In sum, because Defendants have not even attempted to explain how a terrorist or terrorist organization could discern any particular October Plan detainee—and thus any particular confidential data source—from the group data ADC requested, Defendants simply cannot sustain their burden of proving that the requested data is exempt from disclosure under the first prong of exemption 7(D).

Defendants' assertion that the requested data is covered by the second prong of Exemption 7(D) because it would reveal "information furnished by a confidential source" fares no better. To be sure, it is irrelevant under this prong of the statute whether the requested information would actually reveal the identity of a particular confidential source. *See, e.g.*, *Duffin v. Carlson*, 636 F.2d 709, 712 (D.C. Cir. 1980). But it also is true that the FOIA exemptions must be interpreted and applied in light of the particular harms they are designed to prevent. *Wiener*, 943 F.2d at 977 (requiring the government to provide "a particularized explanation of how disclosure of the particular [information requested] ***would damage the interest protected by the claimed exemption***"); *Washington Post*, 863 F.2d at 101 ("[T]he agency must show how release of the particular material ***would have the adverse consequence that the Act seeks to guard against***.").

Here, "[t]he purpose of the confidential information exemption is to prevent the FOIA from causing the 'drying up' of sources of information in criminal investigations." *Shaw v. FBI*,

749 F.2d 58, 61 (D.C. Cir. 1984).  But Defendants make no effort to explain how disclosing the sort of non-specific, generalized group data of the sort at issue here would dissuade anyone from providing leads about persons planning to carry out unlawful activities.  As the Cannistraro declaration once again makes clear, there is no conceivable basis for thinking it would.  Noting his "considerable experience in running confidential agents, both abroad and domestically," Cannistraro observes that "none of the agents or informants [he] directed at the terrorist[s] would have failed to provide anti-terrorism information on the prospect that generalized data, of the type included in the FOIA request, would likely be released."  Cannistraro Decl. ¶ 16.

There is little wonder why.  No semi-rational person would decline to inform DHS (for instance) that one "Jordan Johnson," who happens to be a woman and not a man (or who happens to be Canadian and not American), is planning to commit a crime simply because DHS might one day reveal that it arrested nearly 400,000 women (and 1400 Canadians) in a given year.

That, of course, explains why Defendants did not hesitate before releasing data on the gender and nationality of eight of the October Plan detainees in their November 2004 press release.  *See* Complaint Exh. 4.  And it likewise explains why Defendant DHS's Office of Immigration Statistics routinely releases virtually complete, annualized data on the nationality of every deportable alien—notwithstanding that (as it claims here) DHS surely received some of that data from confidential sources who reported that a deportable alien came from a particular country.  *See* DHS, Office of Immigration Statistics, *2005 Yearbook of Immigration Statistics*, *available at* http://www.dhs.gov/xlibrary/assets/statistics/yearbook/2005/table35.xls (last visited April 13, 2007); *see also* DHS, Office of Immigration Statistics, *2004 Yearbook of Immigration Statistics*, *available at* http://www.dhs.gov/xlibrary/assets/statistics/yearbook/2004/Table36.xls (last visited April 13, 2007).

-24-

In sum, given the extent of Defendants' prior disclosures—including such disclosures for the 2004 calendar year, when the October Plan was carried out—their attempt to invoke the confidential information exemption rings especially hollow now.[3]

Moreover, Defendants' overly broad reading of the confidential information exemption should be rejected because it would swallow the law enforcement exemption as a whole. On Defendants' view, it would be impermissible for the FBI to release a tally of the number of arrestees whose names begin with the letter "N" simply because a confidential source provided a lead with respect to a "Nathan Nathanson." And it likewise would be impermissible for the FBI even to confirm or deny that it opened a file on Nathan Nathanson simply because Mr. Nathanson was identified as a suspect by a confidential source.

Such patently absurd results are precisely why courts have "consistently stated that FOIA exemptions are to be narrowly construed," *U.S. Dep't of Justice v. Julian*, 486 U.S. 1, 8 (1988), and there is no basis for departing from that principle here. Because Defendants cannot possibly explain how releasing the sort of non-specific, generalized group data at issue here—data that cannot be traced to a specific law enforcement target or source—would dissuade confidential sources from coming forward with information in the future (and because Defendants have otherwise waived the protections of Exemption 7(E)), their motion for summary judgment under

---

[3]    Indeed, it is well-settled that "materials normally immunized from disclosure under FOIA lose their protective cloak once disclosed and preserved in a permanent public record." *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999) (citing *Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 19 (D.C. Cir. 1999); *Public Citizen v. Dep't of State*, 11 F.3d 198, 201-03 (D.C. Cir. 1993); *Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1279-80 (D.C. Cir. 1992); *Afshar v. Dep't of State*, 702 F.2d 1125, 1130-34 (D.C. Cir. 1983)). At the very least, then, Defendants cannot rely on the confidential information exemption to shield data concerning the nationality of any October Plan detainee from any country for which DHS released complete nationality data in its 2004 Yearbook of Immigration Statistics. For such detainees, DHS plainly has waived its right to invoke Exemption 7(E), and Defendants' motion for summary judgment under that Exemption should be denied.

this exemption should be denied and ADC's cross-motion for partial summary judgment with respect to gender and nationality data should be granted.

##### C. Exemption 7(E) Does Not Immunize The Requested Data From Disclosure.

Exemption 7(E) authorizes the government to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information … would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).   It is well-settled that "Exemption 7(E) applies only to 'investigative techniques and procedures generally unknown to the public.'"  *Blanton v. U.S. Dep't of Justice*, 63 F. Supp. 2d 35, 49 (D.D.C. 1999) (quoting *Malloy v. U.S. Dep't of Justice*, 457 F. Supp. 543, 545 (D.D.C. 1978)); *see also Smith v. Bureau of Alcohol, Tobacco and Firearms*, 977 F. Supp. 496, 501 (D.D.C. 1997) (requiring agency to explain "why the release of the information deleted from the two documents at issue would compromise law enforcement by revealing information about investigatory techniques ***that are not widely known to the general public***"); *Albuquerque Publishing Co. v. U.S. Dep't of Justice*, 726 F. Supp. 851, 858 (D.D.C. 1989) (holding that exemption 7(E) does not apply to "techniques that are commonly described or depicted in movies, popular novels, stories or magazines, or on television [including] techniques such as eavesdropping, wiretapping, and surreptitious tape recording and photographing").

In order to sustain its burden of proving this exemption applies, then, Defendants thus must demonstrate not only that "release of the information 'could reasonably be expected to risk circumvention of the law,'" *Coleman v. FBI*, 13 F. Supp. 2d 75, 83 (D.D.C. 1998) (quoting *FBI v. Abramson*, 456 U.S. 615, 622 (1982)), but that it would do so by exposing law enforcement

methods not known to the public.  On this point, Defendants offer two putative justifications for their nondisclosure.  First, they assert that *if* the terrorists are able to identify a particular source from the disclosed data, they may "be able to scrutinize circumstances and events surrounding the sources at the time the information was disclosed by the sources and thereby identify the techniques employed to obtain the information."  *Id.*  (citing Clark Decl. ¶ 26.  Second, they assert that releasing the requested data would "reveal the methods used … to prioritize violators leads [*sic*]," and thereby enable "terrorist groups to introduce persons into the United States that would fall outside the targeted priority."  Defs' Brief at 21 (citing Clark Decl. ¶ 25).  Neither response is sufficient to sustain Defendants' burden of proof under this exemption.

### 1.    Disclosure of the Requested Information Would Not Expose Unknown Law Enforcement Techniques.

As an initial matter, Defendants' assertion that disclosure of the requested information would expose law enforcement techniques is far too speculative to sustain the government's burden of proof.  As set forth above, Defendants have not provided this Court with any rational explanation of how their disclosure of the non-specific, wholly generalized data ADC requested would enable terrorists or terrorist organizations to identify any particular October Plan detainee—and thus any particular source of information about any particular October Plan detainee—and the Cannistraro Declaration demonstrates that Defendants cannot do so.  *See supra* at 19-20 (citing Cannistraro Decl. at ¶¶ 12-14).

As a result, even if the requested data is disclosed, the terrorists will not know *what* "circumstances and events surrounding" *which* particular sources they would need "to scrutinize" in order to identify the techniques employed to obtain the information.  Here, then, there is no reasonable probability that the terrorists could deduce Defendants' reliance on any particular law enforcement technique from the requested data.  *Cf.* Defs' Brief at 21.

But even if disclosing the requested data could enable terrorists or terrorist organizations to determine which particular individuals were targeted during the October Plan, and then to determine which particular sources provided information to Defendants about those particular October Plan targets, Defendants have not remotely demonstrated that disclosing the requested data would reveal any previously unknown law enforcement techniques to those individuals. *See, e.g.*, *Blanton*, 63 F. Supp. 2d at 49; *Malloy*, 457 F. Supp. at 545. To the contrary, the Clark Declaration states only that Defendants relied on "surveillance, intelligence, employment of undercover personnel and informants," and it expressly concedes that "these techniques may not be unknown to the public." Clark Decl. ¶ 26.

That is something of an understatement; those methods are well known and widely discussed in the targeted communities, *see* Cannistraro Decl. at ¶ 12, and they are precisely the kind of techniques that *Albuquerque Publishing* admonished the government not to bother invoking in connection with Exemption 7(E). *See* 726 F. Supp. at 858 (warning the government to "avoid burdening the Court with … information pertaining to techniques that are commonly described or depicted in movies, popular novels, stories or magazines, or on television [including] eavesdropping, wiretapping, and surreptitious tape recording and photographing").

Defendants' only answer is that such well-known techniques occasionally have been immunized from disclosure "when 'circumstances of their usefulness … may not be widely known.'" Defs' Brief at 21 (quoting *Wickline v. FBI*, No. 92-1189, 1994 WL 549756, at *5). But the only support they provide for invoking that principle here is a sentence in the Clark Declaration that does nothing but paraphrase the same quotation from *Wickline*—albeit without attribution. Clark Decl. ¶ 26 ("[T]he usefulness under the particular circumstances of obtaining information from these sources is not generally known."). Defendants make no effort to explain how or why there is any remaining mystery to the "usefulness" of using "surveillance,

-28-

intelligence, employment of undercover personnel and informants" to disrupt criminal activity (much less how the release of the requested data would compromise the usefulness of those methods), *see id.*, and the Clark Declaration's plagiarized *ipse dixit* is precisely the kind of factually unsupported assertion that courts routinely reject as insufficient to discharge the government's burden of proof under FOIA. *See, e.g.*, *King*, 830 F.2d at 219 ("Specificity is the defining requirement of the *Vaughn* index and affidavit; affidavits cannot support summary judgment if they are conclusory, **merely reciting statutory standards**, or if they are too vague or sweeping.").[4]

### 2.    Disclosure of the Requested Information Would Not Expose Unknown Law Enforcement Guidelines.

Nor is there any merit to Defendants' equally bare assertion that disclosing the requested data would expose unknown law enforcement guidelines and thereby help terrorists or terrorist organizations evade unexpected methods of detection. After all, even if the requested data demonstrates that the October Plan led to the arrest of a disproportionate number of Arab or Muslim men (and, thus, that Defendants are in fact engaged in invidious profiling despite their repeated public and private protestations to the contrary), Defendants themselves have already publicized the fact that they rely on NSSERS data to develop and prioritize their enforcement

---

[4]    In any event, the cases Defendants rely upon to shield such widely known techniques are plainly distinguishable. *Blanton* involved a request for information that would reveal unknown, unpublicized "specifics" about the FBI's procedures for conducting polygraph examinations, including "the structure, pattern and sequence of questions, along with their varying degrees of intensity." 63 F. Supp. 2d at 49-50. *Edmonds v. FBI* likewise sought to protect non-public details about the FBI's polygraph methods. 272 F. Supp. 2d 35, 56 (D.D.C. 2003). *Coleman* not only involved a request for polygraph details, but additional information regarding previously undisclosed FBI behavioral assessment techniques. 13 F. Supp. 2d at 83-84. And *Wickline* involved a request for information regarding "the details of recording equipment used" by law enforcement agencies, disclosure of which could have enabled criminals to evade the operation of such equipment in the future. 1994 WL 549756, at *4-*5.

activities.   As ICE noted in its September 30, 2004 press release regarding the very law

enforcement action at issue in this case:

> ICE's Compliance Enforcement Unit routinely assigns immigration status violator
> leads to ICE field office nationwide based on data from the Student Exchange
> Visitor Information System (SEVIS), **the National Security Entry/Exit
> Registration System (NSEERS)**, and the United States Visitor and Immigrant
> Status Indicator Technology program (USVISIT).

Complaint Exh. 2 at 2.

Given Defendants' own public pronouncements about their (inappropriate) use of

NSEERS data to prioritize law enforcement activities, it thus would surprise no one if disclosing

the requested data confirms that the October Plan detainees disproportionately came from

NSEERS countries and disproportionately were male.   Indeed, the people least likely to be

surprised by such a disclosure are the terrorists themselves, who presumably are smart enough to

recruit operatives that are not subject to the intrusive process of NSEERS Special Registration

(including its interviews, fingerprinting, and photography) the moment they enter the country,

and who thereafter remain subject to (what ICE itself describes as) "routine" monitoring

designed to produce "further contact" with those individuals in the future.   *See* Complaint Ex. 2

(quoting 9/11 Commission Report).

In sum, if the government cannot sustain non-disclosure under Exemption 7(E) based on

law enforcement methods and techniques depicted in movies, popular novels, stories or

magazines, or on television shows, it cannot sustain non-disclosure under Exemption 7(E) based

on law enforcement guidelines depicted in its own public pronouncements.   *See, e.g.*, *Blanton*, 63

F. Supp. 2d at 49; *Albuquerque Publishing Co.*, 726 F. Supp. at 858; *Malloy*, 457 F. Supp. at

545.[5]   As a result, the Court should deny Defendants' motion for summary judgment and grant

---

[5]   Yet again, the handful of cases Defendants rely upon are distinguishable on this basis.
*Gordon v. FBI* involved a request for disclosure of the specific (and previously undisclosed)
criteria TSA uses to select individuals for inclusion on its watch lists.  388 F. Supp. 2d 1028,

ADC's motion for partial summary judgment with respect to the gender and nationality data withheld by Defendants.

### D.    Exemption 7(F) Does Not Immunize The Requested Data From Disclosure.

Exemption 7(F) authorizes the government to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information … could reasonably be expected to endanger the life or physical safety of any individual."  5 U.S.C. § 552(b)(7)(F).

Weighty as that exemption may be, it plays no independent role in this case.  After all, Defendants' assertion that disclosing the requested data could endanger individuals is predicated entirely on their earlier invocation of the confidential source exemption contained in Exemption 7(D).  *See* Defs' Brief at 23 ("[D]isclosure of data could reveal the identity of confidential sources, and … were the identities of the informants to become known to terrorists, their lives well could be in danger.").  As a result, Defendants' alarmist invocation of this exemption fails for the same reasons its invocation of the confidential source exemption fails.  *See supra* 27-28 (addressing Exemption 7(D)).[6]

---

1035-36 (N.D. Cal. 2005).  *Pully v. IRS* sought the disclosure of specific (and previously undisclosed) IRS audit guidelines.  939 F. Supp. 429, 438 (E.D. Va. 1996).  *Jimenez v. FBI* sought the disclosure of specific (and previously undisclosed) criteria used to determine whether a given individual should be classified as a gang member.  938 F. Supp. 21, 30 (D.D.C. 1996).  And the one-paragraph, unpublished disposition in *Hammes v. U.S. Customs Service* apparently sought disclosure of the specific (and previously undisclosed) criteria used by U.S. Customs agents to conduct searches and seizures.  No. 94-4868, 1994 WL 693717, *1 (S.D.N.Y. 1994).

[6]    While Defendants suggest that they may be able fill the gaps in their affidavits by submitting an *ex parte*, *in camera* declaration to the Court, they identify no compelling basis for permitting them to do so on the facts of this case.  Such submissions are highly disfavored because they deprive FOIA plaintiffs of the opportunity to contest the government's assertions, and district courts thus have wide discretion to deny such requests.  *Center for Auto Safety*, 731 F.2d at 20-22; *Lykins v. U.S. Dep't of Justice*, 725 F.2d 1455, 1463 (D.C. Cir. 1984) (explaining that "in camera examination is not a substitute for the government's obligation to provide detailed public indexes and justifications").  Given FOIA's strong

## II.    DEFENDANTS HAVE NOT SUSTAINED THEIR BURDEN OF PROVING THEY CONDUCTED AN ADEQUATE SEARCH FOR RESPONSIVE DATA.

Separate and apart from the issue of whether Defendants properly withheld data on the gender and nationality of the October Plan detainees, Defendants have not sustained their burden of demonstrating that they conducted an adequate search for data responsive to ADC's request for information concerning the religious, ethnic, and racial characteristics of the October Plan detainees.  To date, Defendants have not disclosed the religious affiliation or ethnicity of a single October Plan detainee, and they have provided ADC with information regarding the racial identity of just 15 of the more than 230 October Plan detainees.

Defendants offer two justifications for their omissions.  With respect to their failure to disclose information on the religious and ethnic characteristics of the detainees, Defendants assert only that "ICE does not maintain information relating to, ethnicity, and religion."  Clark Decl. ¶ 14 (punctuation in original).  With respect to their failure to disclose data about the racial identities of the detainees, Defendants assert that "such information is only collected at the discretion of the arresting officer" and was not uniformly collected "at the time of arrest."  *Id*.  Neither explanation is sufficient to discharge Defendants' burden of proving they conducted an adequate search for responsive data.

"It is elementary that an agency responding to a FOIA request must 'conduct a search reasonably calculated to uncover all relevant documents,' and, if challenged, must demonstrate 'beyond material doubt' that the search was reasonable."  *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990) (quoting *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983)); *see also McGehee v. CIA*, 697 F.2d 1095, 1101, *vacated in part on other grounds*, 711

---

preference for public disclosure and the fact that the government has not even attempted to sustain its burden in this case, the government's request for an *ex parte* second bite at the apple should be denied.

F.2d 1076 (D.C. Cir. 1983) (holding that the government must take all reasonable steps "to ferret out requested documents"). To discharge that burden, it is well-settled that the agency must submit detailed declarations or affidavits "setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Oglesby*, 920 F.2d at 68 (holding that agency affidavits were insufficient to discharge government's burden where they did "not show, with reasonable detail, that the search method … was reasonably calculated to uncover all relevant documents [or] identify the terms searched or explain how the search was conducted"); *James v. U.S. Customs & Border Protection*, __ F. Supp. 2d __, No. 06-562, 2007 WL 548816, *3 (D.D.C. 2007) (agency declarations must "explain in reasonable detail and in a non-conclusory fashion the scope and method of the agency's search" in order to sustain burden) (citing *Perry v. Block*, 684 F.2d 121, 126 (D.C. Cir. 1982) (holding that sufficient "affidavits [must] explain in reasonable detail the scope and method of the search conducted by the agency")).

Defendants have not even attempted to satisfy this standard. Indeed, the Clark Declaration fails even to aver that Defendants conducted a single search for the requested information; it states only that Defendants either "do[] not maintain [the requested information]" or "did not uniformly collect [it]." Clark Decl. ¶ 14. But those naked assertions hardly demonstrate that the requested data could not be located within Defendants' files if Defendants would bother to search for it.

To the contrary, there is every reason to think that such information could be uncovered in agency files. That is so because information regarding an individual's race, ethnicity, or religious background is often elicited in the course of immigration proceedings, where such characteristics are common grounds for claiming entitlement to asylum or withholding of removal. *See, e.g.*, *Knezevic v. Ashcroft*, 367 F.3d 1206 (9th Cir. 2004) ("To be eligible for

-33-

asylum or withholding of deportation, an applicant must prove that he is a person who is unable or unwilling to return to his country of origin because of persecution or a well-founded fear of persecution on account of *race, religion, nationality, membership in a particular social group, or political opinion*.") (internal quotation omitted); *see also* 8 U.S.C. § 1101(a)(42).

That fact is critical, because we now know (despite the fact that ADC did not request such information) that Defendants initiated immigration enforcement proceedings against some (if not all) of the October Plan detainees. *See* Complaint Exh. 4 (noting that certain detainees were processed for removal); Defs' Brief at 11 (noting that "immigration status violation cases against 237 individuals arrested during this period have been closed"). There is thus a reasonable possibility that a search of Defendants' records of the immigration enforcement proceedings against the October Plan detainees might reveal information on at least some of the detainees' racial, ethnic, or religious characteristics, and Defendants thus are obligated to conduct a search for such data.

At bottom, then, there is simply no excuse for Defendants' apparent failure to perform a meaningful search of its records, or to document any such search with sufficient specificity in its summary judgment affidavit. Because Defendants thus have failed to prove even that they "conduct[ed] a search reasonably calculated to uncover all relevant documents"—and much less "demonstrate[d] beyond material doubt that the search was reasonable"—their motion for summary judgment should be denied, *Truitt*, 897 F.2d at 542, and the case should be remanded to the agency with instructions to conduct a thorough search of its records for data responsive to ADC's request for data on the religion, race, and ethnicity of the October Plan detainees.

## CONCLUSION

For the foregoing reasons, this Court should deny Defendants' Motion for Summary Judgment, grant ADC's Motion for Partial Summary Judgment with respect to the gender and

nationality data sought in its FOIA requests, and remand this case to the agency with instructions to conduct a thorough search of its records for data responsive to ADC's FOIA request for religion, race, and ethnicity data.

Dated:  April 16, 2007

Respectfully submitted,


s/ Michael D. Shumsky

Tefft W. Smith (D.C. Bar No. 458441)
Michael D. Shumsky (D.C. Bar No. 495078)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
Ph:     (202) 879-5000
Fax:    (202) 879-5200

*Counsel for Plaintiff*
*American-Arab Anti-Discrimination Committee*

# Immigration Enforcement Actions: 2004

Mary Dougherty, Denise Wilson, and Amy Wu
November 2005

Each year, the Department of Homeland Security (DHS) undertakes immigration enforcement actions involving hundreds of thousands of foreign nationals (for definitions of immigration enforcement action terms, see Box 1). These actions include the arrest, detention, and removal from the United States of foreign nationals who are in violation of the Immigration and Nationality Act (INA). These violations include: attempting illegal entry into the United States, entering the United States legally but subsequently losing legal status, and engaging in terrorist activity, violent crime, document fraud, and drug smuggling. Responsibility for the enforcement of immigration law within DHS rests with the Bureau of Customs and Border Protection (CBP) and the Bureau of Immigration and Customs Enforcement (ICE). CBP handles the inspections of foreign nationals at ports of entry and the deterrence or apprehension of illegal immigrants at the borders. ICE is responsible for enforcing immigration laws within the interior of the United States. Prior to the establishment of DHS in 2003, immigration enforcement was the responsibility of the Immigration and Naturalization Service (INS).

This Office of Immigration Statistics *Annual Report* presents information on apprehensions, investigations, detention and removal of foreign nationals during 2004.[1] Data were obtained from workload and case tracking systems of DHS. In 2004, in summary:

- DHS apprehended an estimated 1,241,089 foreign nationals. Ninety-two percent were natives of Mexico.
- There were 58,727 investigations initiated and 46,656 closed for immigration related activities including visa, compliance enforcement, work site enforcement, identity and benefit fraud, alien smuggling, and counter terrorism.
- ICE detained approximately 235,247 foreign nationals for a minimum of 24 hours.
- There were 202,842 foreign nationals formally removed from the United States. The leading countries of origin of formal removals were Mexico (73 percent), Guatemala (4.1 percent) and Honduras (4.0 percent).  More than 1,035,000 other foreign nationals accepted an offer of voluntary departure.

[1] In this report, years are fiscal years (October 1 to September 30).

- Expedited removals accounted for 41,752 or 21 percent of all formal removals.
- DHS removed 88,897 criminal aliens from the United States. The majority of criminal aliens (68,771 or 77 percent) were from Mexico.

## ENFORCEMENT PROGRAM ACTIVITIES

### Inspections

Customs and Border Protection inspectors determine the admissibility of aliens who have arrived at a designated port of entry. There are approximately 300 such ports in the United States. Inspectors may permit inadmissible aliens the opportunity to withdraw their application for admission or, in some cases, inspectors will refer an alien to an immigration judge for removal proceedings. Since April 1997, inspectors have had the authority to order certain aliens removed under expedited removal proceedings without further hearings or review by an immigration judge. The expedited removal order carries the same penalties as a removal order issued by an immigration judge.

### Border Patrol

The primary mission of the Border Patrol is to secure the 8,000 miles of land and water boundaries of the United States between ports of entry. Its major objectives are to prevent illegal entry into the United States of illegal aliens and foreign nationals suspected of terrorism and other criminal activity, interdict drug smugglers and other criminals, and compel those persons seeking admission to present themselves legally at ports of entry for inspection. Border Patrol operations are divided into geographic regions referred to as sectors.

### Investigations

Immigration investigations activity focuses on the enforcement of immigration laws within the interior of the United States. Special agents plan and conduct investigations of persons and events subject to the administrative and criminal provisions of the INA. Agents investigate violations of immigration law and aliens involved in criminal activities. They often work as team members in multi-agency task forces against terrorism, violent crime, document fraud, narcotic trafficking, and various forms of organized crime. They also seek to



**Homeland Security**

**Office of Immigration Statistics**
**Management Directorate**

Annual Report

Box 1.
**Definitions of Immigration Enforcement Terms**

**Detention**: The seizure and incarceration of a person in order to hold them for judicial or legal proceedings, or while awaiting return transportation to their country of citizenship.

**Inadmissible**: An alien seeking admission at a port of entry who does not meet the criteria of the Immigration and Nationality Act (INA) for admission. The alien may be placed in removal proceedings or, under certain circumstances, allowed to withdraw his or her application for admission.

**Removal**: The expulsion of an alien from the United States.  This expulsion may be based on ground of inadmissibility or deportability.

**Expedited Removal**: The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 authorized the DHS to quickly remove certain inadmissible aliens from the United States. The authority covers aliens who are inadmissible because they have no entry documents, or because they have used counterfeit, altered, or otherwise fraudulent or improper documents, or because they commit fraud or willful misrepresentation. The authority covers aliens who arrive in, attempt to enter, or have entered the United States without having been admitted or paroled by an immigration officer at a port-of-entry. The DHS has the authority to order the removal, and the alien is not referred to an immigration judge except under certain circumstances after an alien makes a claim to lawful status in the United States or demonstrates a credible fear of persecution if returned to his or her home country.

**Voluntary Departure**:  The departure of an alien from the United States without an order of removal. The departure may or may not have been preceded by a hearing before an immigration judge. An alien allowed to voluntarily depart concedes removability but does not have a bar to seeking admission at a port-of-entry at any time. Failure to depart within the time granted results in a fine and a ten-year bar to several forms of relief from deportation.

**Withdrawal:** An arriving alien's voluntary retraction of an application for admission to the United States in lieu of a removal hearing before an immigration judge or an expedited removal.

---

identify aliens who are incarcerated and deportable as a result of their criminal convictions. In addition, agents monitor and inspect work sites to apprehend unauthorized alien workers and to impose sanctions against employers who knowingly employ them. Apprehensions at places of employment may result in removal from the workplace and from the United States.

**Detention and Removal**

Officers and staff of the Detention and Removal Program are responsible for monitoring the cases of aliens in removal proceedings. In addition, the program provides detention funding and positions in most Border Patrol sectors. Officers assume custodial responsibility for alien detainees providing for their needs including food, shelter, medical care, access to counsel, and recreation. The officers determine appropriate release conditions and facilitate release of detained aliens on parole, bond, and recognizance or pursuant to orders of supervision where appropriate. Officers enforce the departure from the United States of deportable and inadmissible aliens under final removal orders. This activity requires securing travel documents and related liaison with foreign governments, making travel arrangements, and providing escorts as required.

*The Removal Process.* Removal proceedings encompass the actions that lead to the formal removal of an alien from the United States when the presence of that alien is deemed inconsistent with the public welfare. DHS has several options in removing an alien from the United States. Traditionally, these options included deportation, voluntary departure, and exclusion; however, the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) of 1996 made major revisions to these procedures, effective April 1, 1997. Deportation and exclusion proceedings were consolidated as removal proceedings (with voluntary departure continuing as an option at government convenience). The most significant change was the new authority for expedited removals.

Most removal proceedings are conducted before an immigration judge. Possible outcomes of an immigration hearing include removal, adjustment to a legal status, or a termination of proceedings. Some aliens abscond before or after the hearing. Decisions of the immigration judge can be appealed to the Board of Immigration Appeals.

Under expedited removal an immigration officer may determine that an arriving alien is inadmissible because the alien engaged in fraud or misrepresentation or lacks proper documents. The officer can order the alien removed without further hearing or review unless the alien states a fear of persecution or an intention to apply for asylum. Officers refer aliens who make such pleas to an asylum officer and the case may eventually be argued before an immigration judge.

The penalties associated with formal removal include not only the removal but possible fines, imprisonment for up to 10 years for aliens who do not appear at hearings or who fail to depart, and a bar to future legal entry (the bar is permanent for aggravated felons and up to 20 years for other aliens). The imposition and extent of these penalties depend upon the circumstances of the case.

*Voluntary Departure.* In some cases, an apprehended alien may be offered a

voluntary departure. This procedure is common with non-criminal aliens who are apprehended by the Border Patrol during an attempted illegal entry. Aliens agree that their entry was illegal, waive their right to a hearing, remain in custody, and are removed under supervision. Some aliens apprehended within the United States agree to voluntarily depart and pay the expense of departing. These departures may be granted by an immigration judge or, in some circumstances, by a DHS Field Office Director. Aliens who have agreed to a voluntary departure can be legally admitted in the future without penalty. Although such departures are called "voluntary departures," they are required and verified.

## DATA

### Apprehension and Voluntary Departure

Apprehension data are collected on Form I-213, Record of Deportable/Inadmissible Alien. Much of the data collected establishes the identity of the individual and the circumstances of the apprehension. Some demographic data are available, including country of birth, country of citizenship, gender, date of birth, and marital status. Statistics on the number of voluntary departures also are based on data captured on Form I-213. The data on most voluntary departures are aggregated and reported in the Performance Analysis System (PAS).

### Individuals Detained or Removed

Data on individuals detained or removed with a formal order of removal or given a voluntary departure under docket control (in judicial proceedings) are more extensive. These data are collected through the ICE automated Deportable Alien Control System (DACS). The data captured include immigration status, type of entry into the United States, reasons for removal, history of criminal activity, limited employment information, and basic demographic information such as date of birth, gender, marital status, country of birth, country of citizenship, and country to which deported. In general, these data are entered in DACS over a period of time that begins with the placing of an apprehended alien in docket control. In some offices most of the data entry is done at the time of case closure (e.g. removal or adjustment of status).

### Other Data

Beginning in 2004, data on ICE immigration-related Investigations were obtained from the Treasury Enforcement Communications System (TECS) and Seized Asset and Case Tracking System (SEACATS) and refer to criminal cases only. Data for 2003 and earlier years were obtained from PAS and included both criminal and administrative cases. In 2004, apprehensions data from ICE Investigations were obtained from the Enforcement Case Tracking System (ENFORCE). Data on drug seizures, prosecutions, fines and imprisonment were obtained from PAS. These data refer to CBP Inspections and Border Patrol only; 2004 ICE Investigations drug and prosecution data were not included.

### Limitations of Data

*Case Tracking.* The current data systems of DHS do not link an apprehension to its final disposition (e.g. removal or adjustment of status). Therefore, caution should be exercised when comparing apprehension and removal data. Apprehended aliens who choose to use the available appeals procedures will spend several months and perhaps several years in the process before final disposition of their cases. In addition, DHS statistics on apprehensions and removals relate to events, not individuals. For example, if an alien has been apprehended three times during the year, that individual will appear three times in the apprehension statistics.

*Time Lags in Data Entry.* The data on removals under docket control (formal removals) reported in the *Yearbook of Immigration Statistics* should be used cautiously. One problem is the time lag in reporting removals. The data in the *Yearbook* are adjusted to reflect the actual year of removal. The data for each year require updating, and cannot be considered complete for at least three years.

*Changes in Definitions and Reporting Requirements.* Another area of caution involves changes in definitions across years. For example, information about the crimes of aliens removed in recent years was expanded to improve the accuracy of removal counts. Also, changes in data systems and reporting requirements related to the establishment of DHS had a

significant impact on the reporting of data on ICE investigations, drug seizures, prosecutions, fines, and imprisonment beginning in 2004.

## RESULTS

### Apprehensions

Aliens are apprehended primarily by CBP Border Patrol and ICE Investigations. In 2004, DHS apprehended a total of 1,241,089 aliens. The Border Patrol made 1,160,395 or 93 percent of all apprehensions. Ninety-eight percent of Border Patrol apprehensions were along the southwest border. ICE investigations reported 80,694 apprehensions or 7 percent of all apprehensions in 2004.

*Southwest Border Apprehensions.* Apprehensions along the southwest border increased 26 percent to 1,139,282 in 2004 from 905,065 in 2003 (see Figure 1). This was the first annual increase following the record level of 1,643,679 set in 2000 and subsequent decline (to 1,235,718 in 2001, 929,809 in 2002, and 905,065 in 2003). In 2004, southwest border apprehensions accounted for 98 percent of all Border Patrol apprehensions.

In 2004, as in every year since 1997, the Tucson, AZ sector had the largest number of apprehensions. Tucson accounted for 491,771 or 43 percent of all southwest border apprehensions in 2004. The next leading sectors were San Diego, CA (138,608), El Paso, TX (104,399), Yuma, AZ (98,060), and McAllen, TX (92,947). These five sectors accounted for 81 percent of all southwest border apprehensions.

*Nationality of Apprehended Aliens.* Nationals of 182 countries were apprehended in 2004—aliens from Mexico predominated, accounting for 92 percent of the total 1,241,089 apprehended. The next largest source countries were Honduras, El Salvador, Guatemala, the Dominican Republic, Canada, Cuba, the People's Republic of China, Ecuador, Nicaragua, Jamaica and Pakistan.

Table 1.
**Selected Immigration Related Activities of U.S. Immigration and Customs Enforcement (ICE) Investigations: 2004**

| Activity | Cases initiated | Cases closed | Criminal arrests | Criminal convictions | Number seizures | Dollar value seizures |
|---|---|---|---|---|---|---|
| Total, all immigration related categories ........................ | 58,727 | 46,656 | 9,455 | 4,007 | 1,782 | 10,105,566 |
| Human trafficking investigations .......................................... | 3,017 | 2,860 | 250 | 70 | 102 | 312,259 |
| Criminal alien investigations ............................................... | 10,908 | 6,262 | 4,851 | 2,308 | 188 | 2,277,995 |
| Employers of unauthorized alien investigations ................. | 3,258 | 3,064 | 159 | 46 | 54 | 486,313 |
| Identity and benefit fraud (IBF) investigations..................... | 5,351 | 3,872 | 1,310 | 533 | 660 | 1,497,285 |
| Alien smuggling organizations investigations...................... | 3,984 | 3,141 | 1,121 | 408 | 498 | 4,123,440 |
| Alien smuggling individuals/groups investigations .............. | 3,958 | 3,281 | 1,295 | 491 | 234 | 1,053,737 |
| Alien absconder investigations............................................ | 2,911 | 2,866 | 19 | D | D | 103 |
| Compliance enforcement investigations ............................. | 9,622 | 6,458 | 40 | D | D | -- |
| Alien PWA/ EWI status violation investigations................... | 3,521 | 3,332 | 260 | 102 | 11 | 139,154 |
| Joint Terrorism Task Force (JTTF) ...................................... | 3,711 | 3,070 | 130 | 36 | 25 | 117,079 |

D Disclosure standards not met.   -- Figure is zero.  Source: Department of Homeland Security, Treasury Enforcement Communications System (TECS) and Seized Asset and Case Tracking System (SEACATS)



Figure 1.
**Apprehensions: 1965 to 2004**

Millions

Source: U.S. Department of Homeland Security

## Investigations

Immigration investigations include the following major activities/categories—human trafficking, criminal investigations, work site enforcement, identity and benefit fraud, alien smuggling, compliance enforcement investigations, immigration status violations, and the Joint Terrorism Task Force.  In 2004, criminal alien investigations remained the largest category of immigration related cases both opened and closed (see Table 1).

*Human Trafficking.* Human trafficking investigations identify, disrupt and dismantle criminal smuggling and trafficking organizations that smuggle humans into the United States. These investigations are prioritized according to the degree of risk posed to national security and public safety. Field office investigations are coordinated and the goal is to eliminate the ability of the targeted organization to function. In 2004, there were 3,017 immigration related human trafficking cases opened, representing 5 percent of the total cases opened. The cases closed represented 6 percent of the total cases closed.

*Criminal Investigations.* Compared to other types of investigations, criminal cases have historically represented the largest proportion of the total investigations immigration related workload. In 2004 they account for 19 percent of the cases initiated, 51 percent of arrests, and 58 percent of criminal convictions. The targets of these investigations include large-scale organizations engaged in on-going criminal activity in violation of Title 8 or Title 18, U.S.C. or similar laws, including those pertaining to narcotics and terrorism. Criminal cases also include individual aliens convicted of a crime or crimes rendering them subject to DHS action, aliens arrested for the commission of an aggravated felony, aliens involved in activities considered contrary to the security of the United States, and aliens involved in certain immoral activities. Criminal alien investigations resulted in 188 seizures with a value of 2.3 million dollars.

*Work Site Enforcement.* Immigration law prohibits the unlawful employment of aliens and provides for penalties and fines against employers who hire, recruit, or refer aliens for employment for a fee. Employer cases may involve criminal or administrative investigations as well as general inspections. Employer cases may also originate as referrals from the Department of Labor. In 2004, there were 3,064 cases closed involving employers of unauthorized aliens. These cases accounted for 7 percent of all immigration related investigations cases closed by ICE. Employer arrests represented 2 percent of the total immigration related criminal arrests by ICE Investigations.

*Fraud Investigations.* Fraud investigations seek to penetrate fraud schemes of all sizes and complexity that are used to violate immigration and related laws, or used to shield the true status of illegal aliens in order to obtain entitlement benefits from federal, state, or local agencies. The Identify and Benefits Fraud Unit of the Office of Investigations, ICE provides oversight of programs that seek "to identify

and disrupt through criminal prosecutions, organizations and individuals involved in the illegal manufacture, facilitation and sale of fraudulent identifying documents, and the acquisition of immigration benefits through fraudulent means." There were 5,351 identity and benefit fraud criminal cases initiated in 2004. These cases represented 9 percent of all criminal cases initiated and 8 percent of all cases closed. Also, in 2004, there were 660 seizures related to identity and benefit fraud with a dollar value of 1.5 million dollars.

*Smuggling Investigations.* ICE smuggling investigations include the detection, apprehension, and prosecution of alien smuggling operations. The targets of these investigations are persons or entities including criminal smuggling organizations that bring, transport, harbor, or smuggle illegal aliens into or within the United States. The targets include violators with a substantial volume of smuggled aliens or revenues from the smuggling activity, e.g., organized conspiracies consisting of four or more persons, individuals such as free-lance operators who smuggle infrequently or independently, and non-professional violators who smuggle relatives, household employees, or employees of small businesses. In 2004, there were 6,422 smuggling investigation criminal cases closed by ICE. Fifty-one percent of these cases were individual or group investigations. In 2004, there were 732 criminal alien smuggling investigation cases that resulted in seizures with a dollar value of 5.2 million dollars. A single case may involve multiple individuals or organizations.

*Compliance Enforcement Investigations.* In 2004, compliance enforcement investigations was the second largest category of immigration related activities and accomplishments of the ICE Office of Investigations. These investigations are initiated by examining various government databases to identify foreign students, exchange visitors, and other non-immigrant visitors who may have violated their immigration status. Compliance enforcement investigations represented 16 percent of all cases initiated and 14 percent of cases closed.

*Aliens Present Without Authorization (PWA) or Entry Without Inspection (EWI) Status Violation Investigations.* This category includes status violators and stowaways, landed crewmen who were ordered detained on board, and aliens who entered without inspection. Status violators include aliens apprehended for violating the terms of their admission such as staying longer in the United States than permitted. Often, such aliens are not themselves investigative targets, but are located during other investigations. During 2004, there were over 3,500 criminal investigation cases initiated that pertained to PWA/ EWI status violations. These status violation investigation cases represented 6 percent of all immigration related criminal cases opened and 7 percent of cases closed.

*Joint Terrorism Task Force (JTTF).* The National Security and Threat Protection Branch under the National Security Investigations Division, Office of Investigations, provides oversight of enforcement operations related to the investigation, detection, interdiction, prosecution and removal of alien terrorists, their supporters along with foreign intelligence agents in the United States considered hostile to this country. In addition, this branch has responsibility for the operational oversight of Immigration Customs Enforcement (ICE) Special Agents who are assigned to approximately 66 FBI Joint Terrorism Task Forces (JTTF).

Ongoing support is given to all counter-terrorism investigations and ICE Investigations field offices supporting these counter-terrorism efforts. Special Agents provide counter-terrorism lead information in order to prevent or breakup domestic and international terrorist cells. In 2004 ICE Special Agents working for FBI Joint Terrorism Task Forces initiated 3,711 counter terrorism investigations and closed 3,070 cases.

### Detentions

An estimated 235,247 aliens were detained by ICE during 2004. Approximately 120,049 (51 percent) of these aliens had criminal records. The average daily detention population was 21,919. Although 52 percent of all detainees were aliens from Mexico, their relatively short stays in detention meant that they accounted for only 22 percent of detention bed days. The other leading countries were: Cuba (8 percent of bed days); Honduras, El Salvador and Guatemala (7 percent each); People's Republic of China (4 percent); Jamaica, the Dominican Republic, Brazil, and Haiti (3 percent each).

### Removals

The most complete picture of adverse actions involving individual aliens includes aliens who withdraw their application for admission when presented with evidence of their inadmissibility, aliens who are allowed to voluntarily depart, and aliens who are formally removed with consequent penalties. In 2004, 378,130 aliens withdrew their applications for admission, while 1,035,477 accepted the offer of voluntary departure, and 202,842 were formally removed (with penalties).

*Withdrawal of Application for Admission and Other Actions at Ports of Entry.* An immigration inspector makes the decision to permit a withdrawal of an application for admission at a port of entry. The inspector also has the authority to place an arriving alien in expedited removal proceedings (discussed below). DHS has very little data on the characteristics of the 378,130 foreign nationals who were permitted to withdraw. In addition to withdrawals and expedited removal actions, inspectors referred an additional 9,693 aliens to hearings before an immigration judge during 2004.

*Voluntary Departure.* More than 99 percent of the 1,035,477 voluntary departures in 2004 involved aliens who were apprehended by the Border Patrol and removed quickly. This statistic includes recidivists and thus is a measure of events rather than unique individuals.

*Formal and Expedited Removal.* The number of formal removals increased 7 percent to 202,842 in 2004 from 189,368 in 2003 (see Table 2). Although the number of expedited removals decreased by 5 percent from 2003 to 2004, the number of non-expedited removals increased 11 percent.

Table 2.
**Trends in Total and Expedited Removals: 1994 to 2004**

| Year | Total removals | Expedited removals |
|------|------|------|
| 2004 | 202,842 | 41,752 |
| 2003 | 189,368 | 43,758 |
| 2002 | 150,542 | 34,536 |
| 2001 | 178,026 | 69,841 |
| 2000 | 186,222 | 85,926 |
| 1999 | 181,072 | 89,170 |
| 1998 | 173,146 | 76,078 |
| 1997 | 114,432 | 23,242 |
| 1996 | 69,680 | X |
| 1995 | 50,924 | X |
| 1994 | 45,674 | X |

X  Not applicable.  Source: U.S. Department of Homeland Security, Deportable Alien Control System (DACS).

Table 3.
**Leading Country of Nationality of Alien Removals: 2004**

| Country | Number removed | Number of criminals |
|------|------|------|
| Total ..................... | 202,842 | 88,897 |
| Mexico .................... | 148,551 | 68,771 |
| Guatemala................ | 8,235 | 1,868 |
| Honduras................. | 8,125 | 2,366 |
| El Salvador.............. | 6,342 | 2,698 |
| Brazil ...................... | 5,859 | 748 |
| Dominican Republic . | 3,506 | 2,514 |
| Jamaica .................. | 2,243 | 1,635 |
| Colombia ................. | 2,197 | 1,465 |
| Other ...................... | 17,784 | 6,832 |

Source: U.S. Department of Homeland Security, Deportable Alien Control System (DACS).

Table 4.
**Removals of Criminal Aliens by Leading Crime Category: 2004**

| Crime category | Number removed | Percent of total |
|------|------|------|
| Total ........................... | 88,897 | 100.0 |
| Dangerous drugs............ | 33,367 | 37.5 |
| Immigration .................... | 14,929 | 16.8 |
| Assault .......................... | 9,259 | 10.4 |
| Burglary......................... | 3,355 | 3.8 |
| Robbery.......................... | 2,855 | 3.2 |
| Larceny.......................... | 2,718 | 3.1 |
| Sexual assault................ | 2,716 | 3.1 |
| Family offenses ............. | 2,442 | 2.7 |
| Sex offenses.................. | 1,959 | 2.2 |
| Stolen vehicles .............. | 1,773 | 2.0 |
| Other ............................. | 13,524 | 15.2 |

Source: U.S. Department of Homeland Security, Deportable Alien Control System (DACS).

Expedited removals represented 21 percent of all formal removals in 2004. Expedited removal procedures allow DHS to quickly remove certain inadmissible aliens from the United States. In 2004, DHS used these procedures with aliens arriving at ports of entry who illegally attempted to gain admission by fraud or misrepresentation, or with no entry documents, or by using counterfeit, altered, or otherwise fraudulent or improper documents. Aliens placed in the expedited removal process have the opportunity to claim a fear of persecution, or an intention to apply for asylum, or they may claim to have certain legal status in the United States. All cases are reviewed by a supervisor and aliens who have made certain claims may be referred to an asylum officer and ultimately to an immigration judge.

The number of expedited removals decreased significantly in 2002 after the September 11 attacks.  In part, tightened border security may have been a deterrent to those seeking admission at a port of entry without proper documents or with fraudulent documents.

Approximately 184,000 foreign national were determined to be inadmissible in 2004 for reasons that made them subject to expedited removal. However, 129,000 of those aliens were allowed to withdraw their application for admission. The remaining 55,000 were placed in expedited removal.  Only about 7,900 of these aliens expressed a fear of being returned to their country of origin if denied admission; they were referred to an asylum officer. About 94 percent of those 7,900 aliens were found to have a credible fear of persecution, and were taken out of the expedited removal process, and scheduled for hearings before an immigration judge.

Aliens from Mexico accounted for over 81 percent of expedited removals in 2004. The next largest source countries were Brazil, the Dominican Republic, Guatemala, Jamaica, and Peru (all with 3 percent or fewer of total expedited removals). Approximately 70 percent of all expedited removals occurred at ports of entry in one of three southwest Districts: San Diego, CA (48 percent); Phoenix, AZ (11 percent); and El Paso, TX (11 percent).

***Country of Nationality of Alien Removals.*** Aliens with a formal removal came from 181 countries in 2004; 49 countries had more than 100 aliens removed from the United States. However, just eight countries accounted for almost 91 percent of all formal removals. Seven of these eight countries have been the top countries for several years with approximately 88 percent each year since 1993. Mexico was the leading country of nationality of aliens removed in 2004 (148,551 or 73 percent of the total) (see Table 3).

***Criminal Activity.*** The passage of the Immigration Reform and Control Act in 1986 helped INS focus on the removal of those aliens determined to be the greatest threat to society. In 1986 INS removed 1,978 aliens for criminal violations (about 3 percent of all removals). The removal of criminal aliens has increased greatly since then. The 2004 removal of 88,897 criminals represents an increase of 10 percent compared to 2003 (81,108). The countries that account for most of the removals also account for 93 percent of criminals that DHS removed from the United States in 2004. They have been the leading countries in this category for several years, with 91 percent or more of all criminals removed each year since 1993. DHS continues to increase cooperation with other law enforcement agencies by using the Institutional Removal Program to insure that incarcerated criminal aliens are placed in removal proceedings. The program seeks to eliminate or minimize the time an alien must be detained by DHS after release from prison and before removal. In 2004, DHS removed 25,633 criminal aliens using this program.

The most common categories of crime committed by aliens removed in 2004 included dangerous drugs, immigration, and assault (see Table 4). These three categories accounted for 65 percent of all alien removals in 2004.

***Administrative Reason for Removal.*** The administrative reason for removal is the primary charge cited by an immigration judge in the order to remove an alien. There are more than 100 charges that might form the basis for a removal in 2004, but most fall into one of three main catego-

**DHS Office of Immigration Statistics**

ries. Aliens who were present in the United States after making an illegal entry accounted for 42 percent of all aliens formally removed. Those who attempted entry without proper documents, or through fraud or misrepresentation, accounted for 25 percent. Aliens with criminal charges accounted for 21 percent. A criminal alien, as defined in the previous section, may not have a criminal charge as the reason for removal if, for example, the immigration judge did not have appropriate documents from the relevant criminal justice system. This distribution is very different compared to the years before 1998 because of the large number of expedited removal cases; those cases are classified as attempting entry.

***Immigration Status at Entry to the United States.*** In 2004, at least 67 percent of all aliens with a formal removal attempted (and perhaps completed) an illegal entry between designated ports of entry. Approximately 21 percent attempted to enter at a port of entry without proper documents or through fraud or misrepresentation. The remainder made legal entries but then failed to maintain status; parolees, tourists, and legal permanent residents are the largest groups in this category.

***Aliens Removed From the Interior.*** In 2004, about 104,000 formal removals were of aliens who had been in the United States at least 3 days before their apprehension—about 52 percent of all formal removals. At least 51,000 aliens with formal removals had been in the United States for longer than a year.

♦  ♦  ♦

**FOR MORE INFORMATION**

Visit the Office of Immigration Statistics Web page at *uscis.gov/graphics/shared /statistics.*

*Office of Investigations*

U.S. Department of Homeland Security
1800 F Street, NW
Washington, DC 20536



**U.S. Immigration
and Customs
Enforcement**

DIS 2-01 OI:MS:ID
07-LITI-49486 MHF

**JAN 18 2007**

John O'Quinn, Esq.
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, DC 20005

Dear Mr. O'Quinn:

This is in response to your letter dated February 8, 2006, wherein you requested, pursuant to the Freedom of Information Act (FOIA), the release of data on the race, ethnicity, religion, and gender of the 237 individuals detained as a result of an immigration enforcement operation identified in an Immigration and Customs Enforcement (ICE) press release of November 4, 2004.

Please be advised that we reviewed your request and have determined that ICE did not maintain statistics relating to ethnicity or religion.

With respect to race data, to the extent ICE obtained such data, it was collected at the time of arrest, and was not generally known to ICE at the time ICE initiated its investigation. ICE did not mandate the collection of information relating to an individual's race and such information was only collected at the discretion of the arresting officer. Moreover, to the extent that such information was collected, there is no means by which to verify the accuracy of information relating to an individual's race since such information was recorded based on the arresting officer's personal perception of the subject's race, or based on the subject's self reporting of his or her race. With respect to the 237 individuals arrested, race data was captured for 16 individuals: fourteen (14) were annotated as "White – Non – Hispanic," one (1) was annotated as "Asian – Pacific Islander," one (1) was annotated as "Unknown."

With respect to gender, ICE has determined that this information is exempt from disclosure pursuant to exemptions (b)(7)(A), (b)(7)(D), (b)(7)(E) and (b)(7)(F) of the FOIA.

Although we are aware that your request is the subject of ongoing litigation and that appeals are not ordinarily acted on in such situations, we are required by statute and regulation to inform you of your right to file an administrative appeal. You may appeal this decision, in writing, within 60 days after the date of this notification to the Privacy Office, Attn: FOIA Appeals, Department of Homeland Security, 245 Murray Lane, SW, Building 410, Washington, DC 20528. Please reference case number 07-LITI-49486.

John O'Quinn, Esq.
Page 2

Enclosed is an information sheet pertaining to exemptions from disclosure under the FOIA, your right to administrative appeal and judicial review.

Sincerely,

Gloria L. Marshall
Chief, Information Disclosure Unit
Mission Support Division

Enclosures

Definitions of the Exemptions Under the Freedom of Information Act – 5 U.S.C. 552

## EXEMPTIONS

Pursuant to 5 U.S.C. 552 (b), the Freedom of Information Act does not apply to matters that are –

- (1)(A) specifically authorized under rules established by an Executive Order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified under such order;

- (2) related solely to the internal personnel rules and practices of an agency

- (3) specifically exempt from disclosure by statute, provided that such statute

  (A) requires that the matters be withheld from the public so as to leave no discretion on the issue or,

  (B)  established particular criteria for withholding or refers to particular kinds of matters to be withheld;

- (4) trade secrets and commercial or financial information obtained from a person and privileged or confidential;

- (5) inter-agency or intra-agency memoranda or letters which would not be available by law to a party other that an agency in litigation with the agency;

- (6) personnel and medical files and similar files the disclosure of which constitutes a clearly unwarranted invasion of personal privacy;

- (7) records or information compiled for a law enforcement purpose, but only to the extent that the production of such records or information

  (A) could reasonable be expected to interfere with enforcement proceedings,

  (B) would deprive a person of a right to a fair trial or impartial adjudication,

  (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy,

  (D) could reasonably be expected to disclose the identity of a confidential source, including state, local or foreign agency or authority, or any private institution which furnished information on a confidential basis, and for a record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source,

  (E) would disclose techniques and procedures for law enforcement investigations or prosecutions or procedures or would disclose guidelines for law enforcement investigations or prosecutions if such disclosures could reasonably be expected to risk circumvention of the law or,

  (F)  could reasonable be expected to endanger the life or physical safety of any individual;

- (8) contained in or related to examination, operating or condition reports prepared by or for any agency responsible for the regulation or supervision of financial institutions; or

- (9) geological and geophysical information about wells, including maps.

# ADMINISTRATIVE APPEAL

You may file an appeal with the Privacy Office, Department of Homeland Security within 35 days after (1) the date of a determination to withhold records, or (2) if some records are released at a later date, the date that the records were released.  The appeal must be in writing, signed by you, and contain the following information:

- Your name and address;
- Date of your initial request;
- Date of the letter denying your request;
- Description of withheld records or information, and reason you believe why such records or information should be disclosed

Please mail your appeal to:    Privacy Office
Department of Homeland Security
FOIA Appeals
245 Murray Lane SW, Building 410
Washington, D.C. 20528

# JUDICIAL REVIEW

In the event that the Privacy Office, Department of Homeland Security should (1) fail to issue a determination of your appeal within 20 days of its receipt (plus 10 additional working days if you are notified in writing that an extension of time is required and applicable, or (2) deny your appeal, you may obtain judicial review pursuant to 5 U.S.C. 552(a)(4)(B) in the United States District Court in the district in which you (your client) reside(s) or have (has) a principal place of business, or in which the agency records are situated, or in the United States District Court for the District of Columbia.