UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE<br>　　　　Plaintiff,<br><br>　　　　v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY<br><br>and<br><br>IMMIGRATION AND CUSTOMS ENFORCEMENT<br>　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action: 06-01770-JR |

## OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

In this action, plaintiff American-Arab Anti-Discrimination Committee seeks to compel

defendant United States Department of Homeland Security ("DHS") and its component

Immigration and Customs Enforcement ("ICE") to produce certain statistics regarding the 237

persons arrested by ICE in October 2004 for immigration status violations. Specifically, plaintiff

seeks data on the nationality, religion, race, ethnicity and gender of those arrested. Defendants

moved for summary judgment on the grounds that (1) they do not maintain such data on the

religion and ethnicity of the persons arrested, (2) they had data on the race of only 15 individuals,

which they provided, and (3) they properly withheld data on the nationality and gender of the 237

individuals under Exemptions 7(A), 7(D), 7(E) and 7(F).  In support of their motion, defendants

filed a detailed declaration by John P. Clark, Deputy Assistant Secretary of Operations for ICE.

Plaintiff responded by filing an opposition and cross-motion for partial summary

judgment arguing that defendants have failed to carry their burden of showing that the data fits

within the exemptions claimed.  To support this claim, plaintiff attached a declaration of Vincent

Cannistraro, a former employee of the Central Intelligence Agency ("CIA"), asserting that the

disclosure of the data would not pose any risks.  Plaintiff also alleged that defendants have failed

to conduct an adequate search for data relating to the race, religion and ethnicity of the 237

individuals.  None of these arguments has any merit.

First, contrary to plaintiff's claim, the declaration of Mr. Clark provides a detailed

justification for each of the exemptions claimed and should be accorded deference.  Plaintiff's

counter-declaration, on the other hand, is entitled to no weight.  Mr. Cannistraro has no first

knowledge of the data withheld or the investigations at issue.  Nor does he have any experience

in immigration enforcement or criminal investigations.  Moreover, while Mr. Cannistraro worked

for CIA at one time on national security matters, he has not worked for the government on

national security matters since 1998.  Accordingly, his speculations regarding the risks of

disclosing the data should be disregarded.

Second, defendants properly withheld data on the nationality and gender of the 237

individuals.  Contrary to plaintiff's assertions, the explanation provided by Mr. Clark regarding

each of the exemptions is not implausible but entirely reasonable.  See infra at 3-22.  Moreover,

none of the arguments raised by plaintiff in its brief undercut the application of these exemptions.

Finally, plaintiff's claim that ICE has not conducted an adequate search for data on the

race, ethnicity and religion of the 237 individuals has no merit. In its brief, plaintiff does not contend that defendants maintain data regarding race, religion or ethnicity in a database. Nor does it suggest that defendants have in fact performed a statistical analysis of the race, religion and ethnicity of these individuals. Instead, plaintiff claims that defendants may be able to create a document showing the requested statistical analysis by reviewing the files related to the removal proceedings for each of the individuals. However, it is well-established that FOIA does not require an agency to create a document.

Accordingly, this Court should grant defendants' motion for summary judgment and deny plaintiff's cross-motion for partial summary judgment.

## ARGUMENT

**I.    THE DECLARATION SUBMITTED BY DEFENDANTS IS ENTITLED TO DEFERENCE AND IS SUFFICIENT TO SUPPORT SUMMARY JUDGMENT FOR DEFENDANTS**

In this case, defendants submitted a detailed declaration by John P. Clark, the Deputy Assistant Secretary for Operations for ICE, to support their motion for summary judgment. Courts have held that such a declaration should be accorded deference. Gardels v. CIA, 689 F.2d 110, 1104-05 (D.C. Cir. 1982); Berman v. CIA, 378 F. Supp. 2d 1209, 1212-14 (E.D. Cal. 2005); Billington v. Dep't of Justice, 69 F. Supp. 2d 128, 134 (D.D.C. 1999). This is particularly true where, as here, the information relates to law enforcement investigations "which implicate national security." Center for Nat'l Sec. Studies v. U.S. Dep't of Justice, 331 F.3d 918, 927 (D.C. Cir. 2003), cert. denied, 540 U.S. 11-4 (2004); Halpern v. CIA, 629 F.2d 144, 149 (D.C. Cir. 1980). As courts have recognized, the determination of whether the withheld information falls within certain exemptions, such as Exemption 7(A), "explicitly requires a predictive judgment of

the harm that will result from disclosure of information." <u>Center for Nat'l Sec. Studies v. U.S.</u>

<u>Dep't of Justice</u>, 331 F.3d at 928. The test is, therefore, "not whether the court personally agrees

in full with the [Agency's] evaluation of the danger – rather, the issue is whether on the whole

record the Agency's judgment objectively survives the test of reasonableness, good faith,

specificity, and plausibility in this field . . . in which the [Agency] is expert . . . . " <u>Gardels v.</u>

<u>CIA</u>, 689 F.2d at 1105 (D.C. Cir. 1982).

In its brief, plaintiff seeks to avoid this deference to the agency's evaluation of the risk of

disclosure (1) by describing the declaration by Mr. Clark as "conclusory," and (2) submitting its

own counter-declaration. Neither tactic, however, has merit. Contrary to plaintiff's claim, the

declaration of Mr. Clark is not conclusory, and plaintiff's counter-declaration is entitled to no

weight.

### A.    Defendants' Declaration is Sufficiently Detailed

Mr. Clark explains that the arrests at issue here were made in connection with a law

enforcement investigation conducted by ICE as a result of national security threat information

relating to the 2004 Presidential election and Presidential inauguration. Declaration of John

Clark ("Clark Decl."), ¶ 18. He also explains that the information on the nationality and gender

of the individuals suspected of being connected with the threat was provided by confidential

sources in the course of a criminal investigation with national security implication and that cases

relating to other persons identified and/or investigated as part of the overarching investigation

remain open. <u>Id.</u> at ¶ 19. He further explains with reasonably specific detail why the withheld

information falls within each of the exemptions claimed. Id. at ¶¶ 17-27. <u>See</u> Memorandum in

Support of Defendants' Motion for Summary Judgment ("Def. Mem.") at 10-24; <u>infra</u> at 9-22.

The declaration here is, thus, not comparable to declarations in the cases cited by plaintiff. In Washington Post Co. v. U.S. Dep't of Justice, 863 F.2d 96, 101-102 (D.C. Cir. 1988), the court found that the agency's justification of exemption 7(B) was conclusory because the agency had failed to provide sufficient details to establish the necessary elements of that exemption: (1) that trial or adjudication is pending, and (2) that disclosure of the material would seriously interfere with a fair trial. As the court stressed, the standard under Exemption 7(B) "is higher" than most of the other law enforcement exemptions. Unlike Exemption 7(A) which only requires an agency to establish that disclosure "could reasonably be expected to harm" an investigation, Exemption 7(B) requires the agency to establish that the release "would" interfere with a fair trial.

This case is also not similar to the declaration at issue in Campbell v. U.S. Dep't of Justice, 164 F.3d 20 (D.C. Cir. 1998). In that case, plaintiff sought the disclosure of FBI records pertaining to civil rights activist James Baldwin. The court found that the declaration was insufficient with regard to certain exemptions because it did not "contain any specific reference to Baldwin or any other language suggesting that the FBI tailored its response to a specific set of documents." Id. at 20-31. As explained infra, the Clark declaration discusses the exemptions in terms of the particular information sought and provides sufficient details to justify the exemptions.[1]

---

[1] In its brief, plaintiff argues that if the court finds that the Clark declaration is insufficient, it should not allow defendants to submit a more detailed declaration in camera. Pl. Mem. at 31 n.6. This claim has no merit. Courts have recognized that agencies may rely on such in camera and ex parte declarations where, as here, a more detailed explanation of the basis for the exemptions on the public records would jeopardize the information that the government seeks to protect or other privileged information. U.S. Dep't of Justice v. Landano, 508 U.S. 165, 179 (1993); Doyle v. FBI, 722 F.2d 554, 556 (9th Cir. 1983); Hayden v. Nat'l Sec. Agency, 608 F.2d

### B.    Plaintiff's Counter-Declaration Is Entitled To No Weight

Plaintiff's attempt to rebut the judgment of defendant by submitting a declaration of

Vincent Cannistraro ("Cannistraro Decl."), a former employee of the CIA, is also misguided.

While Mr. Cannistraro worked for the government at one time on national security matters, he

does not have any first hand knowledge of the investigations at issue or the data withheld.  In

fact, Mr. Cannistraro has had no experience in enforcing or investigating violations of

immigration law.  Nor does he have any experience in criminal investigations.  Moreover, he has

not been a government employee since 1998, three years before 9/11.  The role played by

immigration enforcement in national security investigations has changed significantly.  As

explained by John Clark in his declaration,"[p]rior to 9/11, immigration authorities were not

widely recognized or used as an effective counter-terrorism tool in the United States."  Clark

Decl. ¶ 3.  After 9/11, immigration enforcement was recognized as a important tool against

_____

1381, 1385 (D.C. Cir. 1979), cert. denied, 446 U.S. 937 (1980).

The cases cited by plaintiff do not hold otherwise.  In Center for Auto Safety v. EPA, 731 F.2d 16, 20 (D.C. Cir. 1984), appellants argued that the district court should have required the agency to submit the documents for in camera review.  The Court of Appeals rejected this claim, finding that in camera review was not required because public declaration was sufficient. Lykins v. U.S. Dep't of Justice, 725 F.2d 1455 (D.C. Cir. 1984), is also not on point.  In that case, the court found that the government's explanation for its withholding of a psychological report was inadequate because it did not relate specific portions of the report to any particular FOIA exemption in its public declaration.  Id. at 1464.  The court, however, did not order that the agency to produce the withheld information, as the plaintiff suggests that the court should do here.  Instead, the court remanded the case to the district court with instructions to require the agency to review the document for any reasonably segregable portions and to prepare a more detailed public index relating the withheld portions to specific exemptions.  Id. at 1466. Moreover, contrary to plaintiff's claim, the court in that case did not hold that in camera declarations were not appropriate; it simply "expressed reservation about such use [of in camera declarations] in cases which do not involve national security."  Id. at 1465.  That "reservation" has no application here because the investigation at issue has national security implications.  Clark Decl., ¶¶ 18-19.

terrorism, and ICE prioritizes its enforcement based on national security concerns. Id. See also

Exhibit B to Def. Mem. (excerpts from 9/11 Commission discussing the importance of

immigration enforcement).

Courts have consistently found that declarations submitted by persons lacking first hand

knowledge and experience have no weight. Spannaus v. U.S. Dep't of Justice, 813 F.2d 1285,

1289 (4th Cir. 1987); Curran v. Dep't of Justice, 813 F.2d 473, 477 (1st Cir. 1987); Gardels v.

CIA, 689 F.2d at 1106 n.5; Windels, Marx, Davies & Ives v. Dep't of Commerce, 576 F. Supp.

405, 410 (D.D.C. 1983); Struth v. FBI, 673 F. Supp. 949, 954 (E.D. Wisc. 1987). For example,

in Windels, Marx, Davies & Ives, plaintiff sought disclosure of a computer program used by the

Department of Commerce to perform calculations necessary to determine if a foreign steel

producer had violated antidumping laws by selling the steel at less than fair market value. 576 F.

Supp. at 408. The Department of Commerce submitted a declaration explaining that basis for

withholding the computer program under Exemptions 2 and 7(E). Id. Plaintiff, as here, tried to

rebut the agency's declaration with its own counter-declaration. Plaintiff submitted a declaration

by an attorney asserting that release of the computer program would not create a significant risk

that antidumping laws could be circumvented because it would be too difficult for foreign

countries to make the numerous bookkeeping and transactional changes necessary to conceal

dumping even if they knew what transactions would be targeted. Id. The court found that the

speculative assertions made in plaintiff's counter-declaration were "simply too incredible to raise

a genuine issue of fact so as to preclude summary judgment." Id. at 410. The court explained:

> Without having seen the program at issue, plaintiff has no way of
> knowing the significance of the auditing procedures disclosure
> would reveal, or the effect such disclosure would have on law

> enforcement. In contrast, DOC, which knows exactly what agency auditing techniques and procedures would be revealed by disclosure of the program and which possesses considerable expertise in the complex task of antidumping law enforcement, is in a position to know what risks to enforcement would be created by disclosure and has alleged that they would be quite significant. DOC's affidavits must be accorded "substantial weight."

Id.

The Court of Appeals for the District of Columbia reached a similar conclusion in

Gardels v. CIA, 689 F.2d at 1106 n.5. In that case, as here, plaintiff submitted an affidavit of a

former CIA employee. The court found that the affidavit of a former employee, "giving his own

views as to the lack of harm which would follow the disclosure requested by plaintiff, is

insufficient to undermine the Agency's presentation." Id. Accord Berman v. CIA, 378 F. Supp.

2d at 1218.

The same is true here. Indeed, in this case, Mr. Cannistraro is not even a former

employee of defendant agency. While Mr. Cannastraro may have had at one time certain

expertise in some national security matters, he has no first hand knowledge of the investigation at

issue or any experience in law enforcement. Thus, his speculations regarding the risk of harm

that might result from such disclosure is entitled to no weight and should be disregarded.[2]

---

[2] In his declaration, Mr. Cannistraro also makes various allegations related to racial and ethnic profiling of "Americans of Arab descent and Arab and Muslim immigrants." Cannistraro Decl. ¶¶ 3-8. He also makes the bald allegation that "[ICE's] success in anti-terrrorist efforts has been minimal" because it has not established friendly and collaborative relations with community leaders. Id. at ¶ 12. He does not explain the bases for this conclusion. Moreover, since he has not worked in law enforcement and left the government in 1998, five years before ICE was even created, his conclusions are clearly not based on any first hand knowledge of or expertise in ICE's internal operations or policies. In any case, these allegations have absolutely no bearing on the issue here – whether defendants properly withheld the information at issue under FOIA.

8

## II.    DEFENDANTS PROPERLY WITHHELD DATA ON THE NATIONALITY AND GENDER OF INDIVIDUALS UNDER EXEMPTION 7

### A.    The Withheld Data is Protected from Disclosure by Exemption 7(D) Because Disclosure of the Data Could Reveal Confidential Sources and Information Provided by Confidential Sources

Defendants properly withheld the data regarding the nationality and gender of the 237 individuals arrested in October 2004 under Exemption 7(D). Unlike some of the other law enforcement exemptions, this exemption does not require a balancing or public or private interests. Parker v. Dep't of Justice, 934 F.2d 375, 380 (D.C. Cir. 1991). Exemption 7(D) permits the withholding or redacting of law enforcement records the release of which "could reasonably be expected to *disclose the identity of a confidential source, . . . or* in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, *information furnished by a confidential source.*" 5 U.S.C. § 552(b)(7)(D). The data at issue here fits within both clauses of Exemption 7(D).

### 1.    Release of the Data Could Reasonably Be Expected to Reveal Information Provided by a Confidential Source

The second clause of Exemption 7(D) is very broad. Parker v. Dep't of Justice, 934 F.2d at 380. As plaintiff concedes, under the second clause, it is irrelevant whether the disclosure of the requested information could reveal the identity of a particular confidential source. Pl. Mem. at 23. Rather, the sole issue is whether disclosure of the information "could reasonably be expected to disclose . . . information furnished by a confidential source" in the course of a criminal investigation or national security intelligence investigation. 5 U.S.C. § 552(B)(7)(D). In this case, plaintiff does not dispute that ICE had received threat information related to the

2004 Presidential election and inauguration from confidential source as part of a criminal investigation. Instead plaintiff argues that the exemption does not apply because (1) only some of the data was provided by a confidential source, (2) defendants waived the exemption by disclosing annualized statistics on the nationality of individuals deported, and (3) disclosure of generalized group data would not dissuade anyone from providing leads about persons planning to carry out unlawful activities. Pl. Mem. at 25. None of these arguments has any merit.

Plaintiff's claim that the exemption only applies to some data is based on a misreading of the Clark Declaration and a misunderstanding of the nature of the information provided. While only some of the information relating to the threat was provided by the confidential source, the information which was provided by the confidential source "includ[ed] information relating to the gender and nationality of potential targets of the investigation." Clark Decl. ¶ 19. Accordingly, the specific information that plaintiff seeks in its FOIA request was information provided by a confidential source in a criminal investigation. ICE used this confidential information regarding the nationality and gender to prioritize its enforcement actions for immigration status violations in October 2004. Id. Disclosing data regarding the nationality and gender of the 237 individuals arrested during this time period could, therefore, be reasonably expected to reveal ICE's priorities and revealing the priorities could in turn reveal one of the very pieces of information provided by the confidential source – the nationality and gender of the suspected targets of the criminal investigation. Id.

Contrary to plaintiff's suggestion (Pl. Mem. at 21-22), this is not a case in which the defendants can prevent disclosure of the confidential information provided simply by deleting certain information. The specific information that plaintiff is seeking is the information provided

10

by the confidential informant during the course of the criminal investigation. The confidential

information regarding the nationality and gender of the potential targets is intertwined in the data

sought by plaintiff. If defendants deleted the country or countries identified by the confidential

source from the group data, the redacted data could be compared with annual statistics and other

available information to identify the nationality of the targets of the investigation. Information

regarding the gender of the suspect is even more transparent. Deleting information on one sex

would indicate that the suspected targets were of that sex.

Plaintiff's argument that defendants have waived the exemption also lacks merit. Courts

have consistently held that in order for a waiver to occur the prior public disclosure must

precisely "match" the withheld information. Assassination Archives & Research Ctr. v. CIA, 334

F.3d 55, 60 (D.C. Cir. 2003) (holding that previous generalized disclosures did not result in

waiver, because they "did not track precisely the records sought to be released"); Afshar v. Dep't

of State, 702 F.2d 1125, 1130 (D.C. Cir. 1983) (plaintiff must "point[] to specific information in

the public domain that appears to duplicate that being withheld"); Coastal Delivery Corp. v. U.S.

Customs Serv., 272 F. Supp. 2d 958, 966 (C.D. Cal. 2003) (rejecting the requester's waiver

argument because the withheld information was "merely the same category of information, not

the exact information, that has been disclosed").[3]

---

[3] The cases cited by plaintiff do not hold otherwise. In Cottone v. Reno, 193 F.3d 550,
555 (D.C. Cir. 1999), plaintiff proved that the specific tapes he sought were played in open court
and entered into evidence. In Davis v. U.S. Dep't of Justice, 968 F.2d 1276, 1288 (D.C. Cir.
1992), the court found that agency was not required to disclose the entire tape simply because
some portion of the tape had been played in open court. Likewise in Afshar v. Dep't of State, 702
F.2d at 1130, the court found that plaintiff had failed to establish that the precise information
sought had been revealed to the public. As the court explained, the context in which the
information appears is important in determining whether the information is identical.

Here, plaintiff bases its waiver argument on the fact that DHS's Office of Immigration Statistics releases "annualized data on the nationality of every deportable alien." Pl. Mem. at 24. But comparing annualized data on the nationalities of deportable aliens with the nationality of 237 individuals arrested for immigration status violations in October 2004 pursuant to a specific enforcement initiative is comparing apples with oranges. Individuals are subject to removal for a number of reasons other than immigration status violations. 8 U.S.C. § 1227(a). Individuals can be removed for twenty-seven different reasons. Id. These reasons include inadmissibility at the time of entry, violations of conditions of entry, marriage fraud, criminal offenses, and falsification of documents. Id. Moreover, the data cited by plaintiff on deportable aliens is annualized data, not monthly data, and it is not specific to any particular investigation, initiative, or operation. The data published by DHS is, thus, significantly broader both in terms of the categories of individuals involved and the time period at issue than the data at issue here. Because the published annual data is broader, the nationality statistics of 1,241,089 deportable aliens cannot be readily dissected to identify the information relating to this specific ICE investigation provided by the confidential source in this case. As previously explained, however, the statistical data on the nationalities of the 237 individuals arrested pursuant to a particular enforcement initiative in October 2004 could reasonably reveal the information provided by a confidential source because that information was used to determine the enforcement priorities at that particular point in time. See supra at 10.

Plaintiff's complaint that defendants failed to explain how disclosing such group data would dissuade anyone from providing leads about persons planning to carry out unlawful activities is also misguided. Pl. Mem. at 23-24. Nothing in either the FOIA or case law requires

an agency to make such a showing. As courts have stressed, Exemption 7(D) is a "broad exemption." Parker v. Dep't of Justice, 934 F.2d at 380. Unlike the first clause of Exemption 7(D), the second clause does not turn of whether disclosure of the information would reveal the identity of the confidential source. Id. at 375.[4] Moreover, unlike some other exemptions, applicability of the second clause of Exemption 7(D) "depends not on the specific factual contents of a particular document." Lesar v. U.S. Dep't of Justice, 636 F.2d 472, 492 (D.C. Cir. 1980). Accord Providence Journal Co. v. U.S. Dep't of Army, 981 F.2d 552, 563 (1st Cir. 1992). "[I]nstead, the pertinent question is whether the information at issue was furnished by a 'confidential source' during the course of a legitimate criminal law investigation." Id. Plaintiff cannot defeat the applicability of the exemption by allegations that a confidential source was "unafraid." Billington v. Dep't of Justice, 69 F. Supp. 2d at 139. Nor can the need for "agency assurances of confidentiality be subjected to *post hoc* judicial evaluation." Providence Journal Co. v. U.S. Dep't of Army, 981 F.2d at 564. As one court explained, "mere awareness by potential sources that agency's assurances of 'content' confidentiality would be subject to second-guessing by the courts (advice with which fairness would seem to require that an agency provide its potential sources in advance) frequently would mean that only the unwary would be inclined to provide information . . . " Id. at 565. Thus, the issue of whether a confidential source would have been dissuaded from providing the information is simply irrelevant. Accordingly,

---

[4] In any case, contrary to plaintiff's assumption, the disclosure of the group data could also be expected to reveal the identity of the confidential source because the arrests relate to a specific enforcement initiative during a specific month. See Def. Mem. at 18-20; infra at 14-15. Accordingly, the example cited by plaintiff of a confidential source providing information on one Canadian out of 1400 Canadians arrested annually in unrelated investigations is not analogous to the facts here. See infra at 16-17.

defendants properly withheld that data because it would reveal information provided by a confidential source.

### 2. Release of the Requested Data Could Reasonably Be Expected to Reveal the Identity of the Confidential Source

The data regarding the nationality and gender of the persons arrested also fits within the first prong because it could reasonably be expected to reveal the identity of the confidential source. Clark Decl. ¶ 19-22. In its brief, plaintiff attempts to refute this point by arguing that disclosing generalized group data could not reveal "the identification of any individual October detainee and thus to the specific source or sources who provided information about any individual October Plan detainee." Pl. Mem. at 23. See also Canistraro Decl. ¶ 14 ("Because it is therefore impossible to identify the particular individual detained by the government in connection with the October plan, it is impossible to identify the particular sources – confidential or not – that led the government to the October Plan detainees").

This argument, however, misses the point. It assumes that the identity of a confidential informant could only be revealed by identifying a particular detainee. While that may be true in some instances, here the identity of the confidential source could reasonably be revealed by disclosing the generalized group data. Def. Mem. at 18-19. As explained, ICE used the information provided by the confidential source regarding the nationality and gender of those suspected to be involved in the threat to prioritize its investigations during this period. Clark Decl. ¶¶ 18-19. While ICE has stated that the criminal investigation is related to threat information received related to the 2004 Presidential election and Presidential inauguration (Clark Decl, ¶¶ 18-19), it has not identified any specific details regarding the particular threat.

14

Thus, any terrorist group involved in a threat to 2004 Presidential election does not know whether the investigation relates to its particular plans or actions. Nor does a group know if the investigation relates only to a particular aspect of its plans or actions. By examining the nationality and gender of the persons arrested during this period, a compartmentalized terrorist group could deduce the particular focus of the investigation and, thus, pinpoint the perceived threats being investigated. This information could assist persons with terrorist ties to identify which individuals or groups of individuals had access to such information at that time period thereby narrowing the scope of potential sources. Id. Accordingly, the withheld data could be reasonably expected to reveal the confidential source. The data is therefore protected from disclosure by exemption 7(D).

**B.     The Withheld Data Is Protected From Disclosure By Exemption 7(A) Because Release of the Data Could Reasonably Be Expected to Harm Pending and Prospective Enforcement Proceedings**

The requested data is also protected by Exemption 7(A), which allows an agency to withhold any records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). While the data on its face may seem innocuous, as explained above, supra at 10-11, releasing the data on the nationality and gender of the individuals arrested pursuant to a particular enforcement initiative could when pieced together with other information which either is public or known to the terrorist groups reveal the focus of the investigation. Def. Mem. at 11-17. Revealing the focus of the investigation could harm prospective and ongoing enforcement proceedings by allowing terrorists to thwart the investigations. Id.

In this case, plaintiff does not dispute that the information was compiled in connection with law enforcement proceedings. Nor does it dispute that those proceedings are related to ongoing investigations. Instead, plaintiff only disputes whether disclosure of the data would interfere with enforcement proceedings. In its brief, plaintiff attempts to refute this conclusion by relying on the declaration of Vincent Cannistraro. Pl. Mem. at 19-20.

The statements made by Mr. Cannistraro, however, do not refute the harm demonstrated by defendants in the declaration of Mr. Clark. First, as previously noted, Mr. Cannistraro has no personal experience or particular expertise in immigration enforcement, much less knowledge of the particular investigations at issue here. Thus, his opinion regarding the risks created by disclosure cannot preclude summary judgment for the agency, when the agency possessing the relevant experience has provided detailed declaration explaining the risk. See supra at 6-8.

Second, the conclusions reached by Mr. Cannistraro appear to be based on a misunderstanding of the data at issue. His conclusion that release of the data would not harm the investigation appears to be based on the fact that ICE "arrest[s] more than 1 million people every year, and there is no way to determine from the data ADC has requested whether a given individual was detained as part of the October plan or some other law enforcement operation." Cannistraro Decl. ¶ 13.[5] This conclusion, however, ignores the fact that plaintiff is not seeking statistics regarding the "more than 1 million people" arrested by ICE each year on various violations. It is seeking statistics on 237 individuals arrested in October 2004 for immigration

---

[5] He subsequently tries to tie this conclusion to specific data sought by stating that "because the October detainees represent a small fraction of all similarly categorized persons detained by the government in 2004, it is impossible to determine from the release of this data which individuals were detained." Cannistraro Decl., ¶ 13. There is, however, no logical or factual basis for this conclusion.

status violations based on particular national security priorities established by ICE.

Third, Mr. Cannistraro's conclusion is based on the assumption that harm to ongoing and related investigations can only result from the identifying the particular persons arrested in October 2004. However, as explained by Mr. Clark in his declaration, disclosure of the data can harm the investigations by revealing more details on the exact focus of the investigations. Clark Decl. ¶ 18. As Mr. Clark explained, ICE used the information provided by a confidential source (including the nationality and gender of potential suspects) to prioritize its immigration status violations investigations during this period. Id. While ICE has stated that the criminal investigation related to threat information received related to the 2004 Presidential Inauguration, it has not identified any specific details regarding the threat. See supra at 14-15. By examining the nationality and gender of the persons arrested during this period, a terrorists group could deduce the particular focus of the investigation and thereby identify the particular threat being investigated. Moreover, knowledge of the precise focus could allow a compartmentalized terrorists group to identify the confidential source by narrowing the scope of potential sources. See supra at 14-15.

Records revealing the focus and scope of an investigation are "precisely the sort of information exemption 7(A) allows an agency to keep secret." Swan v. SEC, 96 F.3d 498, 500 (D.C. Cir. 1996). Accord Kay v. FCC, 976 F. Supp. 23, 38 (D.D.C. 1997) (agency "may establish interference by showing that release of the records would reveal the scope, direction and nature of its investigation"). As in any investigation, knowing the particular focus of an investigation allows suspects to take steps to thwart the investigation. Solar Source, Inc. v. United States, 142 F.3d 1033, 1039 (7th Cir. 1998) (possibility of destruction of evidence and intimidation of

witnesses). Hence, contrary to plaintiff's claim, the harm cited by defendants is not implausible. Just like the information withheld in <u>Center for Nat'l Sec. Studies</u> regarding persons arrested or detained in the investigation immediately after 9/11, data on the nationality and sex of the 237 persons arrested here could be used be pieced to together with other information either publicly available or known to the terrorist groups to reveal the focus of the investigation and thus allow such groups to thwart ongoing and prospective enforcement proceedings.

Plaintiff attempted to distinguish <u>Center for Nat'l Sec. Studies</u> by stressing that, unlike the data sought in that case, the requested data here "does not include the names or any other personally identifiable information about the detainees." Pl. Mem. at 18. This argument, however, assumes that the investigation could only be harmed if the identities of the persons arrested is revealed. But, the decision by the Court of Appeals in <u>Center for Nat'l Sec. Studies</u> does not support that conclusion. In that case, the Court of Appeals upheld withholding not only the names of the detainees but also other types data, including the identity of the locations at which the detainees were arrested. The court explained that identifying the location of such arrests could provide the terrorists with a "geographical picture of the government investigation" and, thereby, allow the terrorist to deduce "which cells had been compromised, and which individuals had been cooperative with the United States." 331 F.3d at 933.

As previously explained, the same danger is present here. Although the information may seem unimportant to the uninformed, the withheld information provides an additional and important piece of the puzzle which could reasonably be expected to reveal sufficient details on the focus of the investigation to allow terrorists to interfere with pending and prospective enforcement proceedings. The withheld data is, therefore, protected by Exemption 7(A).

18

C.    **The Withheld Data is Protected from Disclosure by Exemption 7(E) Because Release of the Data Would Reveal the Methods Used by ICE to Prioritize Its Enforcement Efforts and Law Enforcement Techniques**

Data regarding nationality and gender of the 237 individuals arrested in October 2004 for immigration status violations was also properly withheld by defendants under Exemption 7(E), which protects information which "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

As previously explained in our initial brief, Def. Mem. at 20-22, the first clause of this exemption seeks to protect information related to law enforcement techniques, including methods used by a law enforcement agency to prioritize its investigations or identify possible violations. Gordon v. FBI, 388 F. Supp. 2d 1028, 1035-36 (N.D. Cal. 2005) (documents relating to "watch list" and watch list selection criteria); Pully v. Internal Revenue Services, 939 F. Supp. 429, 438 (E.D. Va. 1996) (statistical techniques used to determine which taxpayers to audit); Jimenez v. FBI, 938 F. Supp. 21, 30 (D.D.C. 1996) (criteria used by FBI to determine whether a particular individual can be classified as a gang member); Hames v. U.S. Customs Serv., No. 94 Civ. 4868, 1994 WL 693717 at *1 (S.D.N.Y. Dec. 9, 1994) (protecting criteria used by Custom Services to determine which passengers to stop and examine).

In its brief, plaintiff seeks to distinguish these cases by asserting that defendants "have already publicized the fact that they rely on the National Security Entry/Exit Registration System (NSEERS) data to develop and prioritize their enforcement activities." Pl. Mem. at 29-30. This argument is, however, based on a misunderstanding of the statements made by ICE in the cited

19

press release.  See Exhibit 4 to Complaint.  Plaintiff confuses the information used by ICE to develop "leads" (i.e., the process of identifying individuals suspected of being immigration status violators) and the criteria used by ICE to prioritize its investigation of those leads.  As explained in the cited press release, ICE's Compliance Enforcement Unit uses information from a variety of sources, including data from Student and Exchange Visitor Information System (SEVIS), the United States Visitor and Immigration Status Indicator Technology program (US-VISIT) and NSEERS to develop leads on possible immigration status violators.  See Exhibit 3 to Complaint.[6] ICE then used the threat information, separate and apart from these other sources, to prioritize its investigations of its "leads" regarding persons who may have violated their immigration status. Id. See also Clark Decl., ¶ 18, 24-25.  The disclosure of the information sought by plaintiff would disclose the specific (and previously undisclosed) criteria used by ICE to prioritize its investigation. Clark Decl. ¶ 25.

In addition, disclosure of the nationality and gender of the persons arrested during a specific time period when pieced together with other available information could also reveal the law enforcement techniques used to gather information regarding the threats to the 2004 Presidential elections and the identity of persons suspected of being involved in that threat.  Clark Decl. ¶ 26.

In its brief, plaintiff tries to rebut this danger by asserting the defendants have not provided sufficient details about the methods used here and that many of the methods used by ICE are already well-known.  These arguments have no merit.  First, courts have recognized that an

---

[6] For example, because the information in those systems identifies the date on which the person entered the United States and the expected length of the visit, those systems can be used to identify persons who may have overstayed their visits.

agency should not be forced "to resort to just the sort of precise description which would itself compromise the exemption." Curran, 813 F.2d at 476. Accord Maynard v. CIA, 986 F.2d 547, 557 (1st Cir. 1993) (although public declaration "lacked specifics, a more detailed affidavit could have revealed the very intelligence sources or methods that the CIA wished to keep secret"); Berman v. CIA, 378 F. Supp. 2d at 1215-16 (recognizing that because the CIA's declaration is part of the public record, "it must necessarily claim the Exemption in terms that are general").

Second, Exemption 7(E) applies even when a law enforcement technique itself has been disclosed if the public is not generally aware of the particular manner and circumstances in which the technique is employed by an agency. See, e.g., Blanton v. U.S. Dep't of Justice, 63 F. Supp. 2d 35, 49-50 (D.D.C. 1999); Edmonds v. FBI, 272 F. Supp. 2d 35, 55-56 (D.D.C. 2003); Coleman v. FBI, 13 F. Supp. 2d 75, 83-84 (D.D.C. 1998); See also Def. Mem. at 21. As Mr. Clark explained, to the extent that a terrorist organization is able to identify sources of information used to identify the threat being investigated, it will then be able to scrutinize circumstances and events surrounding the sources at the time the information was disclosed by the sources and thereby identify the particular techniques employed to obtain the information. Clark Decl., ¶ 26. It does not require a stretch of the imagination to understand how identifying the particular method used to obtain the information could limit its future effectiveness with respect to that particular terrorist group. Defendants, therefore, properly withheld data on the nationality and gender under Exemption 7(E).

### D. The Withheld Data Is Protected By Exemption 7(F) Because Release of the Withheld Information Could Reasonably Be Expected to Endanger the Life or Physical Safety of Individuals

The withheld information is also protected from disclosure by Exemption 7(F), which

protects "records or information compiled for law enforcement purposes" when "the production of such law enforcement records or information . . . could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). In this case, ICE has identified a reasonable risk that disclosure of data could reveal the identities of confidential sources, and has concluded that were the identities of the informants to become known to terrorists, their lives could well be in danger. Clark Decl. ¶ 27. Moreover, to the extent that ICE agents or other government agents continue to associate with these sources and rely on them for information, such agents could also be placed in danger if the source being contacted has unknowingly been compromised and terrorist groups used the source to gain access to the agents. Id.

Plaintiff's refutation of this claim is based solely on its assumption that release of the data could not be used to identify the confidential source at issue here. But as explained, plaintiff's argument rests on the erroneous assumption that the identity of the source could only be revealed if the identity of the particular individuals arrested were identified. See supra at 14-15. Accordingly, plaintiff's attempt to refute the applicability of Exemption 7(F) fails for the same reason.

## III.    DEFENDANTS HAVE CONDUCTED AN ADEQUATE SEARCH FOR RESPONSIVE DOCUMENTS AND ARE NOT REQUIRED TO CREATE A DOCUMENT

Plaintiff's claim that defendants did not conduct an adequate search for statistical data on the race, ethnicity or religion of the 237 individuals arrested for immigration status violations in October 2004 also has no merit. As defendants explained, ICE does not maintain data on ethnicity or religion of those arrested. Clark Decl. ¶ 14. To the extent ICE maintains data on the race of persons arrested, it is collected at the time of the arrest. Id. Information regarding race,

22

however, is not required to be recorded. Instead, it may be recorded at the discretion of the arresting officer. Id. A search of its records revealed that ICE only had information on the race of 15 of the 237 individuals.

Plaintiff has cited no evidence to suggest that ICE maintains such information in any computer databases.[7] Indeed, nowhere in its brief does plaintiff even suggests that defendants maintain such data in a database. Instead, plaintiff asserts that information regarding an individual's race, religion and ethnicity may be contained in files relating to his/her removal proceeding if he/she claimed asylum because such factors are common grounds for asylum claims. Pl. Mem. at 33-34. Plaintiff suggests that defendants should, therefore, be required to manually review the files relating to removal proceedings, if any, for each of the 237 individuals arrested in October 2004.

Plaintiff's demand for such a search has no merit. Plaintiff's FOIA request did not ask for documents relating to each of the 237 individuals arrested. Instead, it requested statistical data. Specifically, in its second FOIA request plaintiff sought "data on the race, ethnicity, religion and gender of the 237 individuals detained as a result of an immigration enforcement operation" in October 2004. See Exhibit 8 to Complaint (plaintiff's FOIA request dated February 8, 2006). Indeed, in its brief, plaintiff repeatedly stressed that it sought "undifferentiated, non-individualized data on the race, national origin, ethnicity, religion, and gender as a group." Pl. Mem. at 2. See also Id. at 17 ("ADC sought non-specific, wholly generalized demographic data concerning a group of 237 individuals"); id. at 18 (description of plaintiff's expected statistical response).

---

[7] In fact, the Annual Report on Immigration Statistics attached by plaintiff to its brief is consistent with defendants' position in this case. While the Annual Report provides statistics on nationality, it does not provide any statistics on race, religion or ethnicity.

FOIA, however, does not require an agency to review its files to create a document showing such a statistical analysis. Borom v. Crawford, 651 F.2d 500, 501 (7th Cir. 1981); Anderson v. U.S. Dep't of Justice, Civil Action No. 05-2294, 2007 WL 915221, at * 7 (D.D.C. Mar. 26, 2007); Frank v. U.S. Dep't of Justice, 941 F. Supp. 4, 5 (D.D.C. 1996).   "It is well settled that an agency is not required by FOIA to create a document that does not exist in order to satisfy a request." Yeager v. DEA, 678 F.2d 315, 321 (D.C. Cir. 1982). Accord Krohn v. Dep't of Justice, 628 F. Supp. 195, 197-98 (D.C. Cir. 1980); Hudgins v. IRS, 620 F. Supp. 19, 21 (D.D.C. 1985).

For example, in Borom, plaintiff sought statistical information on the parole and early release of black and white federal prisoners.  651 F.2d at 501 n.1.  The Parole Commission responded that its data systems do not contain information on race as it does not enter into the parole decision making process.  Id.  It also explained that it did not collect any data on early release or compile statistics in the other categories requested.  Id.  Plaintiff nevertheless contended that the Commission should be required to compile the requested statistics in response to his FOIA request.  Id.  The court rejected this claim because FOIA did not require defendants "to create records they did not maintain."  Id. at 502.

This court reached the same conclusion in Frank v. U.S. Dep't of Justice, 941 F. Supp. at 5.  In that case, plaintiff sought statistical information on the number of special assistant United States Attorneys who were state and local prosecutors during the first three months of 1988.  As here, the agency explained that it did not maintain such statistics.  The court granted summary judgment for the agency, finding that an agency "is not required, by FOIA or by any other statute, to dig out all the information that might exist, in whatever form or place it might be found, to

24

*create* a document that answers plaintiff's question." Id.

Accordingly, plaintiff's challenge to the adequacy of defendants' search should be rejected. Defendants are not required to review the removal files to generate a statistical analysis of the race, ethnicity and religion of the 237 individuals at issue.

## CONCLUSION

For the foregoing reasons, the Court should grant defendants' Motion for Summary Judgment and deny plaintiff's Motion for Partial Summary Judgment.

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
Assistant Branch Director

s/Marcia K. Sowles
MARCIA K. SOWLES, DC Bar No. 369455
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 7114
Washington, D.C.  20530
Tel.: (202) 514- 4960
Fax: (202) 616- 8470
E-mail:  marcia.sowles@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE<br>Plaintiff, | ) ) ) ) ) | |
| v. | ) ) | Civil Action: 06-01770-JR |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY | ) ) ) | |
| and | ) ) | |
| IMMIGRATION AND CUSTOMS ENFORCEMENT<br>Defendants. | ) ) ) ) ) ) | |

**DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANTS'
STATEMENT OF MATERIAL FACTS AS TO WHICH
THERE IS NO GENUINE ISSUE**

Pursuant to Fed. R. Civ. P. 56 and Local Civil Rule 7(h), defendants United States

Department of Homeland Security ("DHS") and the Immigration and Custom Enforcement

("ICE") filed a Statement of Material Facts as to Which There Is No Genuine Issue ("Defendants'

Statement") with their motion for summary judgment. Plaintiff responded to the nine paragraphs

set forth in Defendants' Statement and then added four additional paragraphs. Defendants

respond to the paragraphs added by plaintiff as follows:

10.     The allegation in this paragraph regarding the disclosure of data on the race,

ethnicity and religion of the 237 individuals is immaterial because (1) defendants

have provided plaintiff with statistical information on race to the extent it exists

and (2) defendants do not maintain statistical information of the religion and ethnicity of the individuals. The remaining allegation in this paragraph is a conclusion of law regarding whether the gender and nationality data was properly withheld under 5 U.S.C. § 552(b)(7)(A), not an assertion of fact. Therefore, no response is required.

11.    The allegation in this paragraph regarding the disclosure of data on the race, ethnicity and religion of the 237 individuals is immaterial because (1) defendants have provided plaintiff with statistical information on race to the extent it exists and (2) defendants do not maintain statistical information of the religion and ethnicity of the individuals. The assertion in this paragraph that disclosing of the data on the nationality and gender of the 237 individuals arrested by ICE in October 2004 on immigration status violations would not dissuade current or prospective sources from assisting law enforcement is also not material because application of 5 U.S.C. § 552(b)(7)(D) turns on whether a promise of confidentiality was made, not whether a confidential source would have provided the information if he/she had not been promised confidentiality. The remaining allegation is this paragraph is a conclusion of law regarding whether nationality and gender data was properly withheld under the first clause of 5 U.S.C. § 552(b)(7)(D), not an assertion of fact. Therefore no response is required.

12.    The allegation in this paragraph regarding the disclosure of data on the race, ethnicity and religion of the 237 individuals is immaterial because (1) defendants have provided plaintiff with statistical information on race to the extent it exists and (2) defendants do not maintain statistical information of the religion and

ethnicity of the individuals.  The remaining assertion in this paragraph is a

conclusion of law regarding whether the nationality and gender data was properly

withheld under 5 U.S.C. § 552(b)(7)(E), not an assertion of fact. Therefore, no

response is required.

13.    The allegation in this paragraph regarding the disclosure of data on the race,

ethnicity and religion of the 237 individuals is immaterial because (1) defendants

have provided plaintiff with statistical information on race to the extent it exisis

and (2) defendants do not maintain statistical information of the religion and

ethnicity of the individuals.  The remaining assertion in this paragraph is a

conclusion of law regarding whether the nationality and gender data was properly

withheld under 5 U.S.C. § 552(b)(7)(F), not an assertion of fact.  Therefore, no

response is required.

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

ELIZABETH J. SHAPIRO
Assistant Branch Director

s/Marcia K. Sowles
MARCIA K. SOWLES, DC Bar No. 369455
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.  Room 7114
Washington, D.C.  20530
Tel.: (202) 514- 4960
Fax: (202) 616- 8470
E-mail:  marcia.sowles@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE<br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY<br><br>and<br><br>IMMIGRATION AND CUSTOMS ENFORCEMENT<br>Defendants. | Civil Action: 06-01770-JR |

## ORDER

Upon consideration of defendants' motion for summary judgment, plaintiff's cross motion for partial summary judgment, and defendants' and plaintiff's oppositions to the other's motion, it is hereby

**ORDERED** that defendants' motion for summary judgment is **granted**.

**ORDERED** that plaintiff's cross-motion for partial summary judgment is **denied.**

_____
Date

_____
UNITED STATES DISTRICT JUDGE