## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN-ARAB ANTI-<br>DISCRIMINATION COMMITTEE<br>1732 Wisconsin Avenue, NW<br>Washington, D.C.   20007<br><br>        Plaintiff,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF<br>HOMELAND SECURITY<br>Washington, D.C.   20528<br><br>IMMIGRATION AND CUSTOMS<br>ENFORCEMENT<br>425 I Street, NW<br>Washington, D.C.   20536<br><br>        Defendants. | Civil Action No.: 06-1770-JR |

### REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR
### PARTIAL SUMMARY JUDGMENT

Through its FOIA requests, Plaintiff American-Arab Anti-Discrimination Committee ("ADC") responsibly and reasonably sought limited, undifferentiated, and non-individualized data that would either validate (as Defendants Department of Homeland Security ("DHS") and Immigration and Customs Enforcement ("ICE") publicly asserted) that the October Plan was executed without bias, or (as ADC and the American-Arab community feared) that the October Plan was infected with the impermissible "profiling" of Americans of Arab descent, Arab immigrants, and Muslims.

Defendants' reply/response brief only confirms the increasingly obvious fact that the data ADC requested will confirm that the Defendants misused information obtained through the National Security Entry/Exit Registration System ("NSEERS") to selectively enforce the

immigration laws against individuals of Arab and/or Muslim origin, in direct contravention of NSEERS's stated purpose and despite Defendants' public representations that such data would not be used for law enforcement purposes.

Two aspects of Defendants' reply/response brief are particularly notable in that respect. *First,* Defendants do not even attempt to rebut the analysis presented in the Cannistraro Declaration, which showed that the limited, undifferentiated, and non-individualized data ADC requested could not possibly interfere with any law enforcement initiatives. Rather, Defendants would have this Court "disregard" that analysis because (they say) Mr. Cannistraro—a 27-year veteran of the CIA and former Director of the CIA's CounterTerrorism Center, who to this day continues to serve as a consultant to the federal government on classified national security matters—is not qualified to opine on the national security and counterterror implications of ADC's FOIA requests in a "post 9/11" world. That assertion is frivolous on its face, and cannot possibly suffice to discharge Defendants' burden of rebutting Mr. Cannistraro's reasoned explanation as to why the limited disclosures sought by ADC do not threaten Defendants' counter-terrorism efforts—efforts that ADC has long supported and in no way wishes to jeopardize.

*Second,* and most telling, Defendants' reply/response brief nowhere addresses ADC's offer to accept the requested data in an even more generalized format than originally requested: as a breakdown of NSEERS-origined and non-NSEERS origined October Plan detainees, instead of as a country-by-country breakdown of the October Plan detainees' particular nationalities. Whatever the merits of Defendants' assertion that a country-by-country breakdown of the October Plan detainees would enable the terrorists to thwart ongoing law enforcement efforts, Defendants' utter failure to account for ADC's willingness to accept the data at that higher level

of generality, and ADC's unrebutted record evidence that such data could not possibly jeopardize the government's legitimate law enforcement objectives, entitle ADC to summary judgment.

## ARGUMENT

### I.   DEFENDANTS HAVE NOT SUSTAINED THEIR BURDEN OF PROVING THAT THE REQUESTED DATA FALLS WITHIN FOIA'S LAW ENFORCEMENT EXEMPTION.

#### A.   Exemption 7(A) Does Not Immunize The Requested Data From Disclosure.

Defendants' reply/response brief offers two arguments in support of their claim that disclosure of the requested data could interfere with pending or prospective law enforcement proceedings. *First,* they argue that this Court should "disregard" the Cannistraro Declaration's carefully reasoned analysis, because Mr. Cannistraro allegedly lacks experience or expertise in law enforcement matters and last served in government before 9/11. Reply/Resp. Br. at 16; *see also id.* at 2, 6, 8. *Second,* they baldly assert that revealing the nationality and gender of the October Plan detainees would somehow allow a "terrorists group [*sic*]" to "deduce the particular focus of the investigation and thereby identify the threat being investigated." *Id.* at 17. Both arguments are baseless.

#### 1.   Mr. Cannistraro Is Eminently Qualified To Opine On The Matters Addressed In His Declaration.

Vincent Cannistraro is a 27-year veteran of the CIA, including three years in which he served as Chief of Operations and Analysis at the CIA's CounterTerrorism Center, and continues to serve as a consultant—to the federal government itself—on classified national security and counter-terrorism matters to this day. Cannistraro Decl. ¶¶ 1, 2, 9, 15. His lifetime of experience has included first-hand participation in clandestine counter-terror operations and management, including "considerable experience in running confidential informants, both abroad and domestically." *Id.* ¶ 16. Given the duration and extent of his personal experience and his

impeccable professional credentials, it is beyond serious dispute that Mr. Cannistraro is qualified to opine on national security and counterterrorism matters.

Nonetheless, Defendants assert that Mr. Cannistraro's analysis should be ignored because "he has not been a government employee since … before 9/11," and because he "has had no experience in enforcing or investigating violations of immigration law. Nor does he have any experience in criminal investigations." Reply/Resp. Br. at 6; *see also id*. at 8 ("[H]e has no experience in law enforcement."). Those assertions are dead wrong. Mr. Cannistraro **does** have experience in law enforcement and criminal investigations; that is essentially what he spent 27 years doing at the CIA, and that is why he continues to serve—to this day—as a consultant to the federal government on national security and counterterrorism matters.

To the extent Defendants are attempting to draw some sort of distinction between the CIA's counterterrorist operations and garden-variety domestic law enforcement, that attempt reflects exactly the sort of pre-9/11 mentality condemned by *The 9/11 Commission Report*. *See generally The 9/11 Commission Report* 71-107 (describing the pre-9/11 dichotomy between domestic law enforcement and foreign intelligence/counter-terrorism activities); *id*. 399-428 (recommending "cross-fertilization between the criminal justice and national security disciplines," because "counterterrorism investigations … quickly become matters that involve violations of criminal law and possible law enforcement action"). Indeed, and in light of that history, Mr. Cannistraro is particularly well-suited to comment on the counterterror and national security implications of ADC's FOIA requests, because his nearly three decades of agency experience involved counterterrorism and national security matters—instead of routine

immigration, border patrol, or customs issues (which appear to be what the government's declarant, Mr. Clark, focused on prior to 9/11).[1]

In any event, the relevant question here is not whether Mr. Cannistraro's personal experience and expertise can be shoehorned into one categorical box ("counterterrorism") or another ("immigration law" or "criminal investigations")—to the extent those categories even could be separated in a post-9/11 world—but whether he knows enough about how terrorists operate to opine on whether disclosure of the kind of non-specific, wholly generalized data at issue here could (as the government baldly asserts) enable terrorist groups to disrupt ongoing law enforcement activities, 5 U.S.C. § 552(b)(7)(a); reveal confidential sources or information that would prevent confidential sources from coming forward, 5 U.S.C. § 552(b)(7)(D); or endanger someone's life or physical safety.  5 U.S.C. § 552(b)(7)(F).  With all due respect to Defendants, their assertion that Mr. Cannistraro's 27 years of personal experience in clandestine counterterrorist operations and management (including three years as the Chief of Operations and Analysis at the CIA's CounterTerrorism Center) do not qualify him to opine on these matters is incredible.

### 2.    Disclosure Of The Requested Information Would Not Compromise Ongoing Law Enforcement Efforts.

Defendants next argue that disclosing the requested data could somehow interfere with pending or prospective law enforcement actions—not because it would enable terrorist groups to

---

[1]    Neither *Windels, Marx, Davies, and Ives v. Dep't of Commerce*, 576 F. Supp. 405 (D.D.C. 1983),  nor *Gardels v. CIA*, 689 F.2d 1100 (D.C. Cir. 1982), suggests that the Cannistraro Declaration can or should be disregarded.  In *Windels*, the court merely declined to credit a FOIA plaintiff's own "self-executed, self-serving and highly speculative" declaration setting forth the "absurd" conclusion that releasing computer source code for federal auditing software could not possibly help companies evade detection during audits carried out using that computer software.  And in *Gardels*, the court merely refused to consider "[a] former agent's own position as to what a general CIA policy should be," *id.* at 1106 n.5, holding only that such policy pronouncements were "hardly enough (at least in this instance) to call for a trial or more extensive judicial investigation."  *Id.*

identify any particular individual detained in connection with the October Plan (as they previously argued), but because it would allow them to "identify the particular threat being investigated" and "take steps to thwart the investigation." Rep./Resp. Br. at 17. There are at least three fatal defects in that assertion.

*First,* the cited provision of the Clark Declaration does not even support that assertion—much less provide an analytical justification for it. Instead, the cited provision of the Clark Declaration states only (and without any explanation) that "[d]isclosure of the information requested by plaintiff in conjunction with other information publicly available or information known to potential terrorists could assist potential terrorists in identifying sources and methods of the ICE investigations and the focus of the ICE investigations." Clark Decl. ¶ 18.

That statement is no support for the Department of Justice's **new** assertion that disclosing the requested information could enable terrorist groups to "identify the **particular threat** being investigated." Rep./Resp. Br. at 17 (emphasis added). Yet it is well-settled that courts may not credit an agency lawyer's "*post hoc* rationale developed as part of a litigation strategy," *City of Kansas City, Mo. v. HUD*, 923 F.2d 188, 192 (D.C. 1991)—least of all when that *post hoc* rationale is spelled out for the first time in a reply brief. *See, e.g.*, *Power Co. of America, L.P. v. FERC*, 245 F.3d 839, 845 (D.C. Cir. 2001).

*Second,* neither the Clark Declaration nor the Department of Justice's *post hoc* litigation rationale provides any explanation of **how** it would be possible for a terrorist or terrorist group to determine the "particular threat being investigated" from the non-specific, wholly generalized data ADC requested about the gender and nationalities of the October Plan detainees. But an agency cannot sustain its burden of justifying non-disclosure "by mere conclusory statements; the agency must show **how** release of the particular material would have the adverse consequence that the Act seeks to guard against." *Washington Post v. Dep't of Justice*, 863 F.2d

96, 101 (D.C. Cir. 1988) (citing *Campbell v. HHS*, 682 F.2d 256, 259 (D.C. Cir. 1982))

(emphasis added); *see also Wiener v. FBI*, 943 F.2d 972, 977 (9th Cir. 1991) (requiring the

government to provide "a particularized explanation of **how** disclosure of the particular

[information requested] would damage the interest protected by the claimed exemption")

(emphasis added). [2]

Finally, Defendants' *post hoc* litigation rationale is frivolous.  Defendants have already

disclosed that the October Plan was directed at threats targeting the *2004* Presidential election.

To the extent any such plans were disrupted, the terrorists have known *for nearly three years*

that their plans were foiled.  As the Cannistraro Declaration explains, by generally disclosing the

"operational targets of the October Plan, the government has already led potential terrorists to all

of the information it now claims that the disclosure of the requested data would reveal," because

"the terrorists responsible for those [plots] know not only what those operations were, but which

individuals were responsible for carrying them out, and which other individuals could have been

potential sources of the identifying information that enabled the government to foil those plots."

Cannistraro Decl. ¶ 11.

The converse also is true: To the extent any such plans were carried out (and, of course,

there is no indication any were), the terrorists can rest assured that their plans evaded detection.

---

[2]  That rule is especially important here, since the Cannistraro Declaration carefully explains
(and Defendants do not provide any counteranalysis) that it would be impossible for the
terrorists to identify any particular detainee's identity from the requested data.  *See*
Cannistraro Decl. ¶¶ 12-14.  To be sure, Defendants baldly assert that Mr. Cannistraro
"misunderstand[s] the data at issue" and provides "no logical or factual basis for this
conclusion."  Rep./Resp. at 16 & n.5.  But that simply is not so, and Defendants' selective
quotation of the Cannistraro Declaration is no substitute for a reasoned rebuttal.  Again, as
the unrebutted Cannistraro Declaration illustrates, "if the terrorists have planted a single
operative from the Middle East in the United States, and the data released in response to
ADC's request indicates that 1 Saudi national was detained during the October Plan, the
terrorists have no way of knowing whether the detained Saudi national was (a) their operative
or (b) one of the many other Saudis detained by the government in 2004."  Cannistraro Decl.
¶ 13.

After all, Defendants are not in the business of allowing known terror plots to be consummated. *See, e.g.*, Michael Powell and William K. Rashbaum, *Papers Portray Plot As More Talk Than Action*, N.Y. TIMES, June 4, 2007 (noting that "the public was never at risk" from the recently foiled plot to detonate fuel storage tanks at J.F.K. International Airport because "law enforcement had stopped this plot long before it ever had a chance to be carried out," and explaining that since 9/11, "the whole goal now is to get these plots at a very nascent stage") (quotations omitted); *see also* White House Office Of The Press Secretary, *Fact Sheet: Plots, Casings, and Infiltrations Referenced in President Bush's Remarks on the War on Terror*, *available at* http://www.whitehouse.gov/news/releases/2005/10/20051006-7.html (last visited June 10, 2007) (identifying 15 disrupted terrorist plots or "casings").

But even if a terrorist organization could use data on the gender and particular nationalities of the October Plan detainees to determine the particular threats being investigated and thereafter disrupt pending or prospective law enforcement proceedings,, Defendants nowhere respond to ADC's offer to accept the requested nationality data in an even more generalized format than originally requested—as a breakdown of NSEERS-origined and non-NSEERS origined October Plan detainees, instead of as a country-by-country breakdown of the October Plan detainees' nationalities. As the Cannistraro Declaration makes clear:

> Though the requested information already is far too generalized to permit the terrorists to identify targets or sources, this added measure of generality would decisively mask the individual identities of the detained individuals and, thus, the sources relied upon to identify those individuals. Again, based on my 27 years of experience as a CIA officer, including three years as Chief of Operations and Analysis at the CIA's CounterTerrorism Center, I can say without any hesitation that it would be impossible for the terrorists to identify any individual detainee from data indicating (for instance) that 200 of the October Plan detainees came from the 25 NSEERS-designated countries and 37 did not come from those countries, and that 220 of the detainees were male and 17 were not.

Cannistraro Decl. ¶ 15.

Defendants' failure even to respond to this simple and straightforward solution to their asserted concerns is dispositive. *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998) (agency obligated to "account for contrary record evidence"); *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981) (agency entitled to judgment only if its affidavits "are not controverted by … contrary evidence in the record"). The bottom line here is that the only reasoned evidence in the record demonstrates that disclosing the requested information—whether at the high level of generality with which it initially was sought, or at the even higher level of generality with which ADC has offered to accept it—could not possibly be expected to interfere with ongoing or prospective law enforcement proceedings. ADC is entitled to summary judgment.

### B.   Exemption 7(D) Does Not Immunize The Requested Data From Disclosure.

Defendants' next argue that the requested data is immune from disclosure under Exemption 7(D) because Defendants received "some" of the demographic information about particular detainees from confidential sources, and because releasing generalized demographic data compiled during the October Plan could reveal the identity of one or more of those confidential sources. But Defendants do not—and cannot—counter the arguments and evidence presented in ADC's cross-motion, which demonstrate that Defendants' invocation of this Exemption is inconsistent with both their own prior conduct and the law.

### 1.   Defendants' Interpretation Of The Confidential Information Exemption Misconstrues The Statute And Is Inconsistent With Their Own Past Practice.

Defendants continue to insist that the confidential information Exemption bars the release of data on the gender and nationalities of the October Plan detainees because "some" of that information was provided by confidential sources during the course of the government's investigation. Reply/Resp. Br. at 10-14. But the cardinal rule of FOIA is that where an agency

withholds requested information pursuant to a FOIA Exemption, it bears the burden of demonstrating precisely "*how* release of the particular material would have the adverse consequence that the Act seeks to guard against." *Washington Post*, 863 F.2d at 101 (emphasis added) (citing *Campbell*, 682 F.2d at 259); *see also Wiener*, 943 F.2d at 977.

In this case, Defendants do not dispute that "[t]he purpose of the confidential information exemption is to prevent the FOIA from causing the 'drying up' of sources of information in criminal investigations." *Shaw v. FBI*, 749 F.2d 58, 61 (D.C. Cir. 1984); *see also Providence Journal Co. v. U.S. Dep't of Army*, 981 F.2d 552, 564 (1st Cir. 1992) (cited by Defendants) (rejecting FOIA plaintiff's interpretation of Exemption 7(D) because it "likely would risk 'drying-up' the flow of information from many wary witnesses with valuable information, especially sources who might reasonably expect that an agency would extend an offer of confidentiality if it were an available option").

The obvious problem here is that there is no basis for thinking that disclosing the non-specific, wholly generalized demographic data requested by ADC would dissuade confidential sources from providing information to the government in the future—that is, that disclosing the information ADC seeks would cause the government's well of potential informants to "dry up." Indeed, the only record evidence on this point conclusively establishes that releasing the sort of non-specific, wholly generalized information at issue in ADC's FOIA requests would *not* have that effect. *See* Cannistraro Decl. ¶ 16.[3]

---

[3] ADC agrees with Defendants that "the issue of whether a confidential source *would have been dissuaded* from providing the information is simply irrelevant." Reply/Resp. Br. at 13 (emphasis added). What does matter for purposes of this Exemption is whether the release of this sort of entirely innocuous data would dissuade potential sources from coming forward in the future, *see Shaw*, 749 F.2d at 61, and Defendants have not offered any evidence to suggest it would.

Defendants do not even attempt to argue otherwise, and as ADC explained in its earlier brief, the interpretation advanced by Defendants in this litigation is flatly at odds with their practice of releasing the very kind of data at issue here, in annual statistical reports on deportable aliens (which remain publicly available to this day).  *See* DHS, *2005 Yearbook of Immigration Statistics*, *available at* http://www.dhs.gov/xlibrary/assets/statistics/yearbook/2005/table35.xls (last visited June 8, 2007); see also DHS, *2004 Yearbook of Immigration Statistics*, *available at* http://www.dhs.gov/xlibrary/assets/statistics/yearbook/2004/Table36.xls (last visited June 8, 2007).

Contrary to Defendants' assertions, the key point here is not merely that Defendants have waived their right to invoke the confidential information Exemption with respect to the particular data requested by ADC.  *Cf*. Reply/Resp. Br. at 11.  It is that the interpretation of the statute advanced by Defendants in connection with this litigation cannot possibly be reconciled with the interpretation of the statute manifested in their longstanding practice of routinely releasing information on the nationalities of deportable aliens—despite the fact that some of that information doubtlessly was furnished to Defendants by confidential sources.

In our system of government, administrative agencies cannot eat their cake and have it too; where an agency decision conflicts with its longstanding practice, the decision is arbitrary and capricious, and must be set aside—regardless of how much deference the agency otherwise might be due.  *See, e.g.*, *Crosthwait v. FCC*, 584 F.2d 550, 556 (D.C. Cir. 1978); *Garrett v. FCC*, 513 F.2d 1056, 1060 & n.26 (D.C. Cir. 1975) (collecting cases).  Here, Defendants' routine release of demographic data regarding deportable aliens manifests their longstanding judgment that the release of such innocuous demographic information—even if received from a confidential source in connection with a law enforcement proceeding—is not likely to "dry up" the government's well of future sources, and thus is not the kind of information whose release is

prohibited by the confidential information Exemption.  Defendants cannot now turn around and attempt to shield such information on the basis that that it is in fact covered by that Exemption (or that it would have such an effect).

> **2.     Disclosure Of The Requested Data Would Not Reveal Confidential Sources.**

Perhaps recognizing the inconsistency between their invocation of the confidential information Exemption and their practice of routinely releasing the very kind of data they now seek to withhold, Defendants retreat to the claim that disclosing the requested data would reveal "the identity of a confidential source."  Reply/Resp. Br. at 13 n.4.  That is so, according to Defendants' attorneys (but not according to the Clark Declaration, and thus not according to Defendants themselves), because the government has never disclosed the particular "threats being investigated," and because releasing non-specific, wholly generalized data on the nationalities and gender of the persons arrested during this period could somehow enable a terrorist group to "pinpoint the perceived threats being investigated" and thereafter "narrow[] the scope of potential sources" by "deduc[ing] … which individuals or groups of individuals had access to such information."  Reply/Resp. Br. at 15 (citing Clark Decl. ¶¶ 18-19).

But this is simply a variant of the flawed argument Defendants make in connection with their invocation of Exemption 7(A), and once again, it suffers from the same three fatal defects discussed earlier.  *First,* the Clark Declaration does not support the proposition that the requested information could be used to identify the particular threats investigated in connection with the October Plan.  *Second,* neither the Clark Declaration nor the Department of Justice's *post hoc* litigation rationale explains **how** it would be possible to do so from the requested data—much less that it would be possible to do so if Defendants were to release that data in the even more generalized format that ADC has offered to accept.  *Finally*, because the terrorists already know whether their plans were disrupted or not, releasing the requested data could not reasonably be

expected to lead to the identification of a previously unknown confidential source by permitting terrorist groups to determine the precise focus of the October Plan investigations.

In short, there is no basis for withholding the requested data under either prong of Exemption 7(D), and ADC is entitled to summary judgment.

### 3.    Defendants Have Not Justified Their Failure To Segregate Disclosable Data.

Separate and apart from the foregoing analysis, it remains the case that Defendants are obligated to segregate and release any non-exempt data sought by ADC.  *See* 5 U.S.C. § 522(b); *see also Ctr. for Auto Safety v. EPA*, 731 F.2d 16, 21 (D.C. Cir. 1984) ("The 'segregability' requirement applies to all documents and all exemptions in the FOIA."); *Arieff v. U.S. Dep't of Justice*, 712 F.2d 1462, 1466 (D.C. Cir. 1983) ("[T]he exemptions of the FOIA do not apply wholesale.  An item of exempt information does not insulate from disclosure the entire file in which it is contained, or even the entire page on which it appears.").  Here, that means that where Defendants did not obtain gender and nationality information about a particular October Plan detainee from a confidential source, it must disclose data about that detainee to ADC.

Defendants do not contest that the statute's segregability requirement requires such a disclosure.  Instead, they appear to assert that the segregability requirement is not applicable here because confidential sources provided gender and nationality information about **every** single October Plan detainee.  Reply/Resp. Br. at 10.  The problem with that assertion (once again) is that it is not what the Clark Declaration says.  According to the Clark Declaration: "***Some*** of the threat data used in the enforcement initiative in question, including information relating to the gender and nationality of potential targets of the investigation, was received from confidential sources pursuant to a strict understanding of confidentiality."  Clark Decl. at ¶ 19 (emphasis added).

That statement simply does not say that gender and nationality data concerning *every* eventual October Plan detainee was received from a confidential source; at the very least, it is ambiguous about whether *some* information relating to the gender and nationality of potential targets came from confidential sources, or whether information relating to the gender and nationality of *each* potential target came from confidential sources. Thus, in the event the Court reaches this question—and for the reasons set forth above, ADC respectfully suggests that it need not do so—the proper remedy is to remand this matter to Defendants for an unambiguous explanation of whether "some" or "all" of the gender and nationality data came from confidential sources. *See Schiller v. NLRB*, 964 F.2d 1205, 1209 (D.C. Cir. 1992).[4]

### C.    Exemption 7(E) Does Not Immunize The Requested Data From Disclosure.

Defendants next assert that disclosing the requested data would reveal unknown law enforcement techniques and methods. That is so, according to Defendants, because releasing data on the nationalities and gender of the October Plan detainees would reveal how Defendants "prioritize [their] investigations," and because it would "reveal the law enforcement techniques used to gather information regarding the threats to the 2004 Presidential elections and the identity of the persons suspected of being involved in that threat." Reply/Resp. Br. at 20. Again, those arguments are unavailing.

As a threshold matter, it is worth noting that this issue is essentially one of Defendants' own making. Had they simply released the requested data without claiming that doing so would

---

[4]    Defendants' further assertion that "[i]f defendants deleted the country or countries identified by the confidential source from the group data, the redacted data could be compared with annual statistics and other available information to identify the nationality of the targets of the investigation," Reply/Resp. Br. at 11, not only lacks any evidentiary basis in the record but is absurd on its face. If Defendants obtained nationality information about 100 of the 240 October Plan detainees from confidential sources, and thereafter provided nationality data on the 140 detainees for whom such information was not obtained from confidential sources, it would be impossible for someone to determine the nationalities of the remaining 100 October Plan detainees: Those individuals could have come from anywhere.

disclose that they selectively enforce the immigration laws—that is, that they apparently "prioritize [their] investigations" based on the nationality and gender of identified immigration status violators, and thus in fact are engaged in precisely the sort of profiling they otherwise deny—it never would have occurred to anyone that a country-by-country breakdown of the roughly 240 October Plan detainees' nationalities and genders would reveal anything "specific (and previously undisclosed)," Reply/Resp. Br. at 20, about Defendants' broader enforcement priorities for investigating and prosecuting immigration status violators (except, of course, that out of the millions of immigration status violators in this country, Defendants sensibly prioritize their enforcement actions against those individuals suspected of being involved in terrorist plots, as opposed to those who otherwise have innocuously overstayed their visas).

But by effectively conceding that Defendants are indeed engaged in widespread national-origin profiling—such that a country-by-country breakdown of nationality data concerning just 240 of the more than 1 million status violators detained in 2004 would actually reveal the specific criteria used to effectuate the Defendants' broader scheme of national origin profiling—Defendants have fabricated a FOIA issue where none previously existed.

To remedy this manufactured dilemma, ADC has offered to accept even more generalized data than it initially requested—i.e., as a breakdown of NSEERS-origined and non-NSEERS origined October Plan detainees, instead of a country-by-country delineation of each October Plan detainee's particular country of origin.  Doing so unquestionably would mask the specific profiling guidelines Defendants apparently rely upon to selectively enforce the immigration laws against status violators.

That, as ADC explained in its earlier brief, is why it matters that Defendants have both widely publicized and repeatedly conceded that they rely on NSEERS to develop immigration leads.  *See* Complaint Exs. 3, 4; Clark Decl. ¶ 24, Reply/Resp. Br. at 20.  In light of those

disclosures, data indicating that a disproportionate number of the October Plan detainees came from NSEERS countries could not possibly reveal any unknown facet of Defendants' prioritization process (much less a country-by-country schematic of how Defendants rely on national-origin profiling to selectively enforce the immigration laws against status violators from particular countries). Indeed, as ADC previously noted, the people least likely to be surprised by such a disclosure are the terrorists themselves, who (by virtue of Defendants' prior disclosures about their use of NSEERS) already have been alerted to the fact that they ought not recruit operatives who are subject (and submit) to NSEERS Special Registration and thereafter subjected to (what ICE itself describes as) "routine" monitoring designed to produce "further contact" with those individuals. Complaint Ex. 2 (quoting 9/11 Commission Report).

Once again, however, Defendants fail even to respond to ADC's offer to accept data at this even greater level of generality—much less argue that the disclosure of data in that even more generalized form would disclose the criteria Defendants use to selectively enforce the immigration laws. Given their complete failure to respond to this point, ADC is entitled to summary judgment.

Defendants' efforts to demonstrate that disclosure of the requested data would reveal law enforcement techniques fare no better. To begin with, their assertion that disclosing the requested data would reveal law enforcement techniques is hyperspeculative; that assertion hinges on the possibility that the requested data could reveal the particular sources of information about the threat being investigated (which, as set forth above, it could not); that the terrorists could then piece together all of the "circumstances and events surrounding the sources at the time the information was disclosed" (some three years ago); and that the terrorists then could figure out "the particular techniques employed to obtain the information." Reply/Resp. Br. at 21.

As the Cannistraro Declaration makes clear, however, Defendants have not offered any plausible explanation of how the terrorists could discern the identity of any given source from the information requested (much less how they could do so if Defendants disclose the data in the even more generalized format ADC has offered to accept), and there is no such explanation. *See* Cannistraro Decl. at ¶¶ 13-15.

But even if releasing the requested data would tip all of those dominoes, it is well-settled that Exemption 7(E) does not shield information that, if released, would reveal the government's reliance on the kind of widely known techniques that Defendants ***already have disclosed*** were used in the investigation at issue here: "surveillance, intelligence, [and] employment of undercover personnel and informants," Clark Decl. ¶ 26. *See, e.g.*, *Albuquerque Publishing Co. v. U.S. Dep't of Justice*, 726 F. Supp. 851, 858 (D.D.C. 1989) (holding that exemption 7(E) does not apply to "techniques that are commonly described or depicted in movies, popular novels, stories or magazines, or on television [including] techniques such as eavesdropping, wiretapping, and surreptitious tape recording and photographing"); *see also Smith v. Bureau of Alcohol, Tobacco and Firearms*, 977 F. Supp. 496, 501 (D.D.C. 1997); *Blanton v. U.S. Dep't of Justice*, 63 F. Supp. 2d 35, 49 (D.D.C. 1999) (quoting *Malloy v. U.S. Dep't of Justice*, 457 F. Supp. 543, 545 (D.D.C. 1978)).

In an effort to evade that line of cases, Defendants once again attempt to shoehorn themselves into the exception for cases where disclosure would reveal an unknown aspect of an otherwise well-known law enforcement technique. Rep./Resp. at 21. But as ADC explained in its opening brief, ADC Br. at 28-29 & n.4, each of the cases upon which Defendants continue to rely is distinguishable—not only because the plaintiff in those cases actually did seek information that would have revealed an unknown aspect of a law enforcement technique (*i.e.*, specific details about the structure, pattern, sequencing, and intensity of FBI polygraph

examinations), but because the agencies in those cases actually explained how and exactly what the disclosure of the requested information could reveal. *Edmonds v. FBI*, 272 F. Supp. 2d 35 (D.D.C. 2003); *Blanton v. FBI*, 63 F. Supp. 2d 35 (D.D.C. 1999); *Coleman v. FBI*, 13 F. Supp. 2d 75 (D.D.C. 1998).

Here, by contrast, Defendants assert only that "[i]t does not require a stretch of the imagination to understand how identifying the particular method used to obtain the information could limit its future effectiveness with respect to that particular terrorist group." Reply/Resp. Br. at 21. But that naked assertion not only fails to demonstrate that a release of the requested data would reveal anything ***unknown*** about particular law enforcement method or technique, but is irrelevant given Mr. Cannistraro's ***uncontroverted*** explanation that "within targeted communities there [already] tends to be general knowledge that their phones, their places of worship, their homes and meeting places are subject to government monitoring" and that such groups are well aware of the fact "that individuals in the community … may be providing information to the government." Cannistraro Decl. at ¶ 12.

In short, there is no legal or factual basis for Defendants' invocation of this exemption, and ADC is entitled to summary judgment.

### D.      Exemption 7(F) Does Not Immunize The Requested Data From Disclosure.

Finally, Defendants argue that disclosure of the requested information would jeopardize the life or physical safety of one or more individuals. As Defendants acknowledge, however, their invocation of this Exemption is derivative of their claims concerning the confidential source Exemption. Rep./Resp. Br. at 22. Because there is no basis for shielding the requested data under that Exemption, there is no basis for shielding the requested data under this Exemption.

II.    **DEFENDANTS HAVE NOT JUSTIFIED THEIR REFUSAL TO PRODUCE RELEVANT DOCUMENTS RELATING TO THE RACE, ETHNICITY, AND RELIGION OF THE OCTOBER PLAN DETAINEES.**

Defendants do not dispute there is a strong likelihood that a search of their files relating to the October Plan detainees' removal proceedings would produce data responsive to ADC's request for information relating to the race, ethnicity, and/or religion of the October Plan detainees. Instead, they argue only that Defendants are not obligated to "manually" review those records in order to generate responsive data, because ADC "did not ask for documents relating to each of the 237 individuals arrested." Rep./Resp. Br. at 23.

Whatever the merits of Defendants' exceedingly narrow construction of ADC's FOIA request, ADC is prepared to save Defendants the effort compiling any statistical data relating to the October Plan detainees: ADC will itself review the non-classified portions of detainees' removal files and compile the statistical data itself. Defendants make no effort to argue that the files themselves are protected by any FOIA exemption, or that the data those files would reveal fall within any FOIA exemption. As a result, there is no basis for denying ADC access to properly redacted removal files, and this Court should order Defendants to disclose the underlying removal files to ADC.

**CONCLUSION**

For the foregoing reasons, this Court should grant ADC's cross-motion for summary judgment.

-19-

Dated:  June 11, 2007                     Respectfully submitted,


                                          s/ Michael D. Shumsky
                                          _____

                                          Tefft W. Smith (D.C. Bar No. 458441)
                                          Michael D. Shumsky (D.C. Bar No. 495078)
                                          KIRKLAND & ELLIS LLP
                                          655 Fifteenth Street, N.W.
                                          Washington, D.C.  20005
                                          Ph:     (202) 879-5000
                                          Fax:    (202) 879-5200

                                          *Counsel for Plaintiff*
                                          *American-Arab Anti-Discrimination Committee*

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN-ARAB ANTI-DISCRIMINATION COMMITTEE 1732 Wisconsin Avenue, NW Washington, DC   20007 <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY Washington, D.C. 20528 <br><br> IMMIGRATION AND CUSTOMS ENFORCEMENT 425 I Street, NW Washington, D.C. 20536 <br><br> Defendants. | Civil Action No.: 06-1770-JR |

**ORDER**

Upon consideration of Defendants' Motion for Summary Judgment, Plaintiff's opposition thereto, and Defendants' Reply in support thereof, and Plaintiff's Cross-Motion for Partial Summary Judgment, Defendants' opposition thereto, and Plaintiff's Reply in support thereof, it is hereby ordered that:

(1) Defendants' Motion for Summary Judgment is **DENIED** and Plaintiff's Cross-Motion for Partial Summary Judgment is **GRANTED**.

(2) Within thirty (30) days of this Order, Defendants must disclose to Plaintiff all requested data regarding the national origin and gender of the October Plan detainees.

(3) Within thirty (30) days of this Order, Defendants must disclose to Plaintiff any non-classified records (or portions thereof) containing information regarding the race, ethnicity, and religion of the October Plan detainees.

Dated: _____

_____
UNITED STATES DISTRICT JUDGE