```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
```

AMERICAN-ARAB ANTI-         :
DISCRIMINATION COMMITTEE,   :
                            :
        Plaintiff,          :
                            :
    v.                      :  Civil Action No. 06-1770 (JR)
                            :
U.S. DEPARTMENT OF HOMELAND :
SECURITY, *et al.*,         :
                            :
        Defendants.         :

## MEMORANDUM

Plaintiff American-Arab Anti-Discrimination Committee (ADC) seeks declaratory and injunctive relief against the U.S. Department of Homeland Security (DHS) and Immigration and Customs Enforcement (ICE) under the Freedom of Information Act (FOIA), 5 U.S.C. § 552. Plaintiff asserts that the defendants have failed to show that they conducted an adequate search for a portion of the data requested, and that they are improperly withholding the remainder of the requested data. Before the Court are plaintiff's motion for partial summary judgment as to the information withheld and defendants' motion for summary judgment as to the both the adequacy of the search and the exemptions asserted.

## Background

ICE, the largest investigative branch of the Department of Homeland Security, is tasked with enforcing U.S. immigration and customs laws. Created after the terrorist attacks on

September 11, 2001, ICE "prioritizes its immigration enforcement actions by targeting the greatest national security and public safety threats."  [Dkt. # 14, Ex. A].  On September 30, 2004, shortly before the 2004 Presidential election, ICE issued a press release entitled "Terrorist Threat and Disruption Efforts by ICE."  [Dkt. # 1, Ex. 1].  The release announced that ICE "ha[d] been working for the past several months at a heightened level in direct support of the government-wide Interagency Security Plan that w[ould] remain in effect through the 2005 Presidential Inauguration."  Id.  ICE's role in this coordinated plan entailed "stepped-up enforcement actions involv[ing] the re-prioritization of existing leads on suspected immigration status violators according to national security criteria."  Id.

While the press release did not spell out what "national security criteria" were used in targeting immigration status violators for this particular series of enforcement actions, the release identified a number of databases that ICE "routinely" uses to generate immigration status violation leads. Among the databases identified is one maintained as part of the National Security Entry/Exit Registration System (NSEERS).  See Registration and Monitoring of Certain Nonimmigrants, 67 Fed. Reg. 52, 584 (Aug. 12, 2002).  One aspect of NSEERS called "special registration" imposes a number of requirements on foreign nationals from countries specified by the Attorney

General – that they be fingerprinted and photographed upon entry, that they register with immigration authorities periodically, etc.  See id.  Upon learning that NSEERS was being used to generate leads for ICE's announced enforcement campaign, ADC immediately registered its concern with both DHS and ICE.  [Dkt. #1, Ex. 3].  Because the populations of 24 of the 25 countries included in NSEERS special registration are majority Muslim,[1] ADC was concerned that use of NSEERS-generated leads might cause "the ICE initiative [to] be selectively carried out against Arabs and Muslims."  [Dkt #1, Ex. 3].

On November 4, 2004, ICE issued another press release entitled "ICE Threat Disruption Effort Results in More than 230 Arrests."  [Dkt. # 1, Ex. 4].  This public statement announced that "in a one-month period beginning October 1, 2004, ICE [] arrested 237 immigration status violators nationwide as part of the government-wide Interagency Security Plan that will remain in effect through the 2005 Presidential Inauguration."  Id.

---

[1] The single country covered by special registration that is not majority Muslim is North Korea.  See Registration of Certain Nonimmigrant Aliens from Designated Counties, 67 Fed Reg. 67,766 (Nov. 6, 2002) (Iran, Iraq, Libya, Sudan, and Syria); Registration of Certain Nonimmigrant Aliens from Designated Countries, 67 Fed. Reg. 70,526 (Nov. 22, 2002) (Afghanistan, Algeria, Bahrain, Eritea, Lebanon, Morocco, North Korea, Oman, Qatar, Somalia, Tunisia, United Arab Emirates, and Yemen); Registration of Certain Nonimmigrant Aliens from Designated Countries, 67 Fed. Reg. 77,642 (Dec. 12, 2002) (Pakistan and Saudi Arabia); Registration of Certain Nonimmigrant Aliens from Designated Countries, 68 Fed. Reg. 2362 (Jan. 16, 2003) (Bangladesh, Egypt, Indonesia, Jordan, Kuwait).

According to the release, the arrests were the result of "leads [that had] been sent to ICE field offices for immediate investigation and potential arrest – without regard to race, ethnicity, or religion." Id.  While a complete picture of the arrests was not given, the release did disclose the nationalities of 8 of the 237 persons arrested.  They included nationals of Saudi Arabia, Jordan, Lebanon, Pakistan, Jamaica, Thailand, and the Philippines.

In light of its concerns that the use of information from NSEERS to generate enforcement leads might have had "a disproportionate impact on individuals from Arab or Muslim countries," on December 14, 2004, ADC filed a FOIA request for "data on [the] nationality of those 230 individuals detained as a result of the recent enforcement initiative by [ICE]." [Dkt. #1, Ex. 5].  ICE responded by letter dated February 14, 2005, stating "that a search of our database was able to determine the specific information you have requested.  However, this data is being withheld in its entirety pursuant to exemption b(7)(A) of the FOIA." [Dkt. # 14, Ex. A].  In a letter dated March 3, 2005, Plaintiff appealed ICE's denial to the Privacy Office of the Department of Homeland Security. [Dkt. # 1, Ex. 6].  On September 5, 2005, DHS affirmed.  [Dkt. # 1, Ex. 7].

On February 8, 2006, ADC filed a second FOIA request, asking for the release of "data on the race, ethnicity, religion,

and gender of the 237 individuals detained as a result of an immigration enforcement operation in late 2004, identified in an ICE press release of November 4, 2004." [Dkt. # 1, Ex. 8]. ICE did not immediately respond to this second request.

ADC filed this action on October 17, 2006, seeking to compel the release of the data requested in its December 14, 2004, and February 8, 2006, FOIA requests. Defendants filed a motion for summary judgment on January 18, 2007. On the same date, ICE finally responded to the plaintiff's second FOIA request, asserting that 1) it did not maintain statistics relating to ethnicity or religion; 2) only limited information on the race of arrestees had been gathered; and 3) the gender of those arrested is exempt from disclosure under FOIA Exemptions 7(A), (D), (E), and (F). [Dkt. 14, Ex. A].

## **Analysis**

FOIA requires disclosure of government records except in cases where the agency can establish that the requested information is properly withheld under one of nine statutory exemptions, see 5 U.S.C. § 552(b). These exemptions are to be narrowly construed, FBI v. Abramson, 456 U.S. 615, 630 (1982), with the burden placed on the government to prove that withheld information falls under the exemption asserted. 5 U.S.C. § 552(a)(4)(B).

A government agency can meet its burden and demonstrate that documents have been properly withheld by submitting "affidavits describing the material withheld and the manner in which it falls within the exemption claimed." King v. Dep't of Justice, 830 F.2d 210, 217 (D.C. Cir. 1987).  When an agency provides sufficiently detailed affidavits that demonstrate "a logical connection between the information [withheld] and the claimed exemption," this court will "accord those affidavits substantial weight" and will "consider[] the agency's unique insights into what adverse [e]ffects might occur as a result of public disclosure." Goldberg v. U.S. Dep't of State, 818 F.2d 71, 78 (D.C. Cir. 1987) (internal quotation marks and citation omitted).  An agency will thus be entitled to summary judgment when (1) its "affidavits describe the documents withheld and the justifications for nondisclosure in enough detail and with sufficient specificity to demonstrate that material withheld is logically within the domain of the exemption claimed, and (2) the affidavits are neither controverted by contrary record evidence nor impugned by bad faith on the part of the agency." King, 830 F.2d at 217.

The defendants have moved for summary judgment on the grounds that: 1) they do not maintain data on the religion and ethnicity of those arrested; 2) they only collected data on the race of 15 of the 237 arrested individuals and they have provided

this information; and 3) they properly withheld data on the nationality and gender of the 237 arrestees under Exemptions 7(A), 7(D), 7(E), and 7(F).  In support of all of these contentions the defendants submitted the sworn declaration of John P. Clark, Assistant Secretary for Operations at ICE. [Dkt. #14, Ex. A].  Plaintiff has filed a cross-motion for partial summary judgment asking that this Court order defendants to disclose the requested gender and nationality information. Plaintiff further asserts that the defendants have not shown that they undertook an adequate search to locate data on the arrestees' race, ethnicity, and religion.

Adequacy of the Search.

"In order to obtain summary judgment the agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested."  Oglesby v. United States Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990).  To demonstrate the adequacy of their search, the defendants were required to submit "[a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched[.]"  Id.  When, as in this case, the adequacy of an agency's search is challenged, the agency "must demonstrate 'beyond material doubt' that the search was

reasonable."  Truitt v. Department of State, 897 F.2d 540, 542 (D.C. Cir. 1990) (quoting Weisberg v. U.S. DOJ, 705 F.2d 1344, 1351 (D.C. Cir. 1983)).

It is well-established that a conclusory affidavit that gives "no detail as to the scope of the examination . . . is insufficient as a matter of law" in demonstrating the adequacy of the search.  Weisberg v. U.S. DOJ, 627 F.2d 365, 370 (D.C. Cir. 1980).  ADC asserts that defendants are not entitled to summary judgment with respect to the requests for data on the race, religion, and ethnicity of the 237 arrestees because the Clark declaration is not sufficiently detailed.  According to ADC this is so because, rather than detail the procedures for responding to its FOIA requests, the Clark declaration only states, in a conclusory fashion, that "ICE does not maintain information relating to[] ethnicity[] and religion."  [Dkt. 14, Ex. A]. Similarly, the Clark declaration states that ICE does not "uniformly collect" information on the race of those arrested and, in this case, had collected information on only 15 of the 237 persons arrested.[2]  Id.

The sufficiency of the Clark declaration is a close call.  Viewed in isolation, the statement that "ICE does not maintain information relating to[] ethnicity[] and religion" is

---

[2] In a letter dated January 18, 2007, ICE disclosed to the ADC the race information that had been collected as to this subset of 15 arrestees.

akin to simple ipse dixit.  Neither this statement nor the discussion of the race data requests provides much insight as to what the defendants' document location protocols are nor how they were followed in this case.  See Weisberg, 627 F.2d at 371.

The adequacy of the affidavit must be judged, however, in light of the entirety of its contents.  Clark declares that his statements are based on information with which he is personally familiar as well as his conversations with "ICE Counsel and . . . with several ICE Supervisory and Senior Special Agents."  [Dkt. 14, Ex. A].  In his role as the Deputy Assistant Secretary for Operations, Clark will be presumed able to familiarize himself with what statistics ICE does and does not maintain.  His explanation that ICE neither maintains data on arrestees' ethnicity or religion nor uniformly collects such information on race is sufficient – if not exactly to show the adequacy of the search, then to explain why a search would be futile and is unnecessary.

Withholding of Gender and Nationality Data.

While ICE did locate records responsive to ADC's request for data as to the gender and nationality of the arrestees, the defendants have withheld these records under FOIA's Exemption 7, which permits withholding "records or information compiled for law enforcement purposes" when certain enumerated risks are posed by disclosure.  5 U.S.C. § 552(b)(7).

ADC does not dispute that the records were compiled for law enforcement purposes. Instead, it argues that none of the exemptions invoked applies.

Exemption 7(A)

Exemption 7(A) authorizes the withholding of "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).  To properly invoke this exemption, a "defendant must demonstrate that . . . release of the information could reasonably be expected to cause some articulable harm to the proceeding." Voiniche v. FBI, 46 F. Supp. 2d 26, 31 (D.D.C. 1999).

The Clark declaration states that release of the requested information could assist potential terrorists by revealing both where investigative resources have been focused and where they have not been.  Specifically, the Clark declaration asserts:

> If the information requested by plaintiffs were disclosed, it could reveal the methods used by ICE to prioritize violator leads by identifying the specific targets developed as a result of the prioritization process during this specific and condensed time period. This would provide a means for terrorist organizations to introduce persons into the United States that would fall outside of the targeted priority.  Disclosure of these methods would not only limit the effectiveness of future ICE and other federal law enforcement operations but would also create a vulnerability to our national security.

- 10 -

[Dkt. 14, Ex. A, Para 25].  The nub of this dispute is that the plaintiff is unconvinced by the defendants' invocation of potential harm.  Indeed, in an effort to rebut the assertions contained in the Clark declaration, the plaintiff has introduced a sworn statement of its own, by Vincent Cannistraro, a former CIA officer with counterintelligence experience.  [Dkt. # 18, Ex. 2].  On brief, and through the Cannistraro statement, the plaintiff points to a variety of information that would not be directly revealed by its FOIA requests.  Revealing the gender and nationality of those detained would not disclose: the identities of government agents that participated in the investigation, the locations of the arrests, the names of those arrested, the particular charges pressed, the disposition of any administrative or criminal proceedings, or the duration of confinement.  Of course what would be revealed is exactly what the plaintiff's FOIA inquiry requests: the ratio of males to females arrested and a list of countries whose nationals were targeted during the course of the October 2004 investigation.  The Clark declaration makes clear that the defendants believe that the disclosure of this information would cause harm both to ongoing immigration investigations and to national security itself.

"[I]n the FOIA context courts have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching

judicial review." Center for National Security Studies v. U.S. DOJ, 331 F.3d 918, 927 (D.C. Cir. 2003).  At issue in Center for National Security Studies was the question of whether the Department of Justice could properly keep secret the names of hundreds of persons detained in connection with the investigation of the September 11, 2001, terrorist attacks.  In that case, as in this one, the government asserted that withholding was justified under Exemption 7(A).  The DOJ affiant asserted that releasing the detainees' names "'*may* reveal details about the focus and scope of the investigation and thereby allow terrorists to counteract it.'"  Id. at 942 (Tatel, J., dissenting)(quoting DOJ affidavit).  The affidavit did not distinguish between the harm that might result from disclosing the names of those actually found to have a connection to terrorism and disclosing the names of those found to be innocent.  As Judge Tatel pointed out in a vigorous dissent, it did not even attempt to explain "how a list of names of persons unknown to terrorist organizations would tell the terrorists anything at all about the investigation, much less allow them to 'map its progress.'"  Id. at 943.

      Notwithstanding the vagueness of and gaps in the affidavit, however, the majority concluded that when the matter was "viewed in light of the appropriate deference to the executive on issues of national security," the government had

satisfied its burden of demonstrating "a reasonable likelihood of interference with the terrorism investigation." Id. at 926.

Center for National Security Studies may have ratcheted up the degree of deference that must be accorded the executive, but it was clear long before that decision that the courts are not simply to use their own best judgment in a national security context.  The test has never been whether the plaintiff, the plaintiff's declarant or the court "personally agree[] in full with the [defendants'] evaluation of the danger[.]" Gardels v. Central Intelligence Agency, 689 F.2d 1100, 1105 (D.C. Cir. 1982).  The issue instead is whether the defendants' judgment "objectively survives the test of reasonableness, good faith, specificity and plausibility" in this field of national security in which ICE has been given a special role by Congress. Id.  The Clark declaration satisfies this test with respect to plaintiff's requests for nationality and gender data.  It does so by explaining in sufficient detail that some of the methods used by ICE to prioritize leads and target immigration status violators would be revealed by disclosing data on the gender and nationality of those arrested during the course of its October 2004 enforcement campaign.  I have been given no reason to question the good faith underlying the defendants' predictive judgment about the harm that could be caused to ongoing and prospective investigations if the requested information – which

the defendants admit would reveal much about the substantive focus and scope of the October 2004 investigation – were to be disclosed.  Accordingly, defendants' motion for summary judgment [14] will be granted and plaintiff's motion for partial summary judgement [18] will be denied.[3]

An appropriate order accompanies this memorandum.


                                        JAMES ROBERTSON
                                   United States District Judge

---

[3] Because I have found that the gender and nationality data was properly withheld under Exeption 7(A), I need not consider whether this information could also have been withheld under Exemptions 7(D), (E), and (F) as defendants also assert.